## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,<br>P.O. Box 6767<br>Towson, Maryland 21285<br><br>                                   Plaintiff,<br><br>                    v.<br><br>ELIZABETH (BETSY) DEVOS, *in her official capacity as Secretary of Education*,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>JOHNNY W. COLLET, *in his official capacity as Assistant Secretary for Special Education and Rehabilitative Services*,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>U.S. DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue, SW<br>Washington, D.C. 20202<br><br>                                   Defendants. | Civil Action No. |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.      For more than 40 years, States have been required by the Individuals with Disabilities Education Act (the IDEA) to identify all children with disabilities residing within their jurisdiction and to place those children in the least restrictive educational setting appropriate to their needs.  In that time, States have also been required to examine potential discipline of those children to avoid punishing them for having a disability.

2.      These federal requirements, tied to the annual receipt of billions of dollars in federal IDEA funds, have led to vast improvements in the provision of special education and related services for many children with disabilities.  But problems in implementing the IDEA with fidelity remain widespread.

3.      One consistent problem in implementation of the IDEA has been the treatment of students of color.  In 2004, Congress responded by revising the IDEA to require States to determine whether "significant disproportionality based on race and ethnicity is occurring in the State and the local educational agencies of the State" with respect to the identification, placement, and discipline of children with disabilities.  20 U.S.C. § 1418(d).  Section 618(d) also required States to "provide for the collection and examination of data" to determine whether significant disproportionality is occurring, without specifying the methodology to be used.  Regulations adopted in 2006 essentially tracked the statutory language.  34 C.F.R. § 300.646 (2007).

4.      When a State identifies significant racial disproportionality in a school district's identification, placement, or discipline of students with disabilities, the State must provide for a review of the school district's policies, practices, and procedures to ensure they comply with the IDEA; engage in an analysis that identifies the factors contributing to the significant disproportionality, *i.e.*, a root-cause analysis; and spend a percentage of their IDEA funds on comprehensive coordinated intervening services for students.  There is no requirement that a school district eliminate any significant disproportionality; the statute and regulations anticipate situations where the disproportionality is not a result of violations of the IDEA but instead reflects differences among different student populations in that community.

5. After collecting extensive information from a Government Accountability Office report in 2013, and through a Request for Information in 2014 and a Notice of Proposed Rulemaking (NPRM) in March 2016, the Department of Education ("the Department") determined that the approaches many States had adopted to comply with Section 618(d) were wanting. It promulgated final regulations in December 2016 ("2016 Final Regulations") to meaningfully implement Section 618(d). These Final Regulations, codified at 34 C.F.R. §§ 300.646 and 300.647, established a standard methodology to use to determine whether disproportionality is occurring and provided flexibility for States in determining when that disproportionality is significant.

6. The 2016 Final Regulations took effect on January 18, 2017. In order to give States and school districts time to implement the new regulations, the compliance date for the regulations was set for almost 18 months after the effective date, that is July 1, 2018.

7. On July 3, 2018 – two days after the States were required to be in compliance – the Department issued a final regulation in the Federal Register delaying the requirement to comply with the regulations for two years (the "Delay Regulation").

8. The Department claims in the Delay Regulation that it delayed the 2016 Final Regulations because it is "concerned" they "may create an incentive" for school districts to use racial quotas in identification, placement, and discipline of students with disabilities. The Department acknowledged that it had "addressed the issue of quotas in the 2016 significant disproportionality regulations," but it did not point to any new facts or arguments to explain its new-found concerns. Instead, it claimed the right to reverse course "even in the absence of changed facts and circumstances" because it now believed that the Department did not previously "give sufficient weight" to the risk.

9.      In the Delay Regulation, the Department gave short shrift to seven safeguards it built into the 2016 Final Regulations to address the risk of quotas.  It summarily declared that the express prohibition on racial quotas included in the preamble to the 2016 Final Regulations was "insufficient." The Department likewise dismissed out of hand a number of other measures included in the 2016 Final Regulations to mitigate any such risk, because it would "require[] careful review" to "[k]now[] if these measures would be effective."  And the Department failed to discuss at all some measures it relied on in the 2016 Final Regulations.  The Department nonetheless delayed the 2016 Final Regulations for two years to allow it to "evaluate whether the numerical thresholds in the 2016 significant disproportionality regulations may incentivize quotas."

10.     As explained below, the Delay Regulation violates the Administrative Procedure Act (APA).  The Delay Regulation is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedures required by law because, separately or combined, the Department:

a)  relied only on arguments and facts that were before the Department in 2016 but failed to provide a reasoned explanation for reaching a different result;

b)  failed to consider and address plausible available alternatives to delay in light of the acknowledged failure of many States to comply meaningfully with Section 618(d);

c)  failed to consider significant aspects of the problem, including the costs to society, parents, and their children of delay the regulation, and the resources invested by States over the past 18 months in reliance on the 2016 Final Regulations;

d)  had a closed mind, bordering on pre-determination, about the outcome even before it initiated the notice-and-comment process leading to the Delay Regulation;

e) improperly limited the comments it said it would consider; and

11. The Delay Regulation should be set aside under the APA, and the original compliance date of July 1, 2018, reinstated for these critical regulations.

## PARTIES

12. Plaintiff Council of Parent Attorneys and Advocates, Inc. (COPAA) is a national not-for-profit organization of parents of children with disabilities, their attorneys, and their advocates. COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families.

13. COPAA has more than 2,100 members located across the United States. Membership is open to all persons who are interested in furthering COPAA's purposes, and each member pays annual dues. Persons who work for, or contract with, state, regional, or local education agencies (*e.g.*, state Departments of Education or school districts), however, are presumptively not permitted to join COPAA, but a super–majority of the Board of Directors may permit such persons to join as members after an interview and other varied requirements. The Board of Directors is composed exclusively of COPAA members.

14. In its daily operations, COPAA accomplishes its mission by, among other things: providing resources, training, and information to parents, advocates, and attorneys to assist them in obtaining the equal educational opportunity to which children with disabilities are entitled under the federal civil rights laws, including the IDEA; educating members of the public and policy makers, including federal agencies, about the educational experiences of children with disabilities and their families (including the intersection of race and disability); and educating COPAA members about developments in the federal civil rights laws and policies affecting education of children with disabilities.

15.    COPAA maintains a resource library available to members only.  It also creates and makes available webinars for its members and others.

16.    COPAA periodically submits comments on federal agencies' proposed rules and regulations to inform agencies about the impact of such proposals on the lives and rights of children with disabilities and their families.

17.    In conducting these activities to fulfill its mission, COPAA relies on information and research it collects about what school districts are doing with regard to disability and race, including how States identify school districts as significantly disproportionate and how school districts respond (with or without their states' assistance) to determinations of significant disproportionality.

18.    COPAA regularly issues reports and policy papers on issues that are important to its members.  COPAA, under agreement from The National Council on Disability, an independent federal agency, conducted research for a five-report series examining the implementation of the IDEA. To assure input from key stakeholders, COPAA held local and national fora in multiple cities across the country and online. The findings in these reports serve to provide policymakers – including the White House, Congress, and state and local education agencies – with insight needed to make policy decisions designed to improve outcomes for all students with disabilities.

19.    Defendants are the U.S. Department of Education ("the Department"), current U.S. Secretary of Education Elizabeth (Betsy) DeVos, and Johnny W. Collet, Assistant Secretary for Special Education and Rehabilitative Services.  Ms. DeVos and Mr. Collet are sued in their official capacities.

20.     As the U.S. Secretary of Education, Ms. DeVos is responsible for the administration of the Department in accordance with law, including adoption of rules and regulations pursuant to the rule-making procedures set out in the APA.

21.     Defendant Johnny W. Collet is the Assistant Secretary for Special Education and Rehabilitative Services.  He serves as the principal adviser to the Secretary on Departmental matters related to special education and rehabilitative services.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law, namely the Individuals with Disabilities Education Act (IDEA) and the Administrative Procedure Act (APA).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1346(a)(2) because a department of the United States is a defendant.  Declaratory and injunctive relief are available pursuant to 28 U.S.C. §§ 2201-2202.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.

## FACTUAL AND REGULATORY BACKGROUND

24.     Section 618(d) of the IDEA, 20 U.S.C. § 1418(d), is one of several provisions added to the IDEA in 2004 that reflects congressional concern that a student's race improperly influences – at both individual and systemic levels – a school district's determination about whether that student is identified as a student with a disability, what type of disability the student is identified as having, where that student is placed to receive special education, and whether and how often that student is disciplined.

25.     In response to that concern, Congress adopted a tailored, important provision: IDEA Section 618(d).  It did not declare racially significant disproportionality unlawful.  Instead,

Section 618(d) required states to implement certain measures that could address problems related to racial disproportionality, regardless of reason for that disproportionality.  First, there are measures aimed at figuring out and disclosing to the public why the disproportionality was occurring.  In addition, the school district is required to use IDEA funds for comprehensive coordinated early intervening services.  The statutory expectation is that these services would be provided particularly (but not exclusively) to children in groups that are significantly overidentified to meet their needs – even before they are identified as children with disabilities.

26.    After a dozen years' experience, during which time most States found ways to evade this provision, in 2016 the Department adopted regulatory guiderails – a standard methodology – for measuring disproportionality, while still providing flexibility to States in determining what would constitute significant disproportionality.  The Department adopted the standard methodology after an extensive collaborative process involving recommendations from the GAO, a formal Request for Information, and an NPRM.

27.    The Department's current effort to delay these regulations allows States to effectively eliminate any obligations they have under the statutory provision. Thus, it should be rejected.

***Disproportionality & Misidentification***

28.    Section 618(d) is focused on over-representation of students of color in special education, in more restrictive placements, and in discipline. Section 618(d)'s trigger is not the appropriateness of *any* disproportionality detected, but instead the existence of "significant" disproportionality determined by the "examination of data." A State's definition of significant disproportionality thus needs to be based on an analysis of numerical information.

29.    Congress anticipated that when States identified school districts with significant disproportionality, they would identify school districts where students were not over-identified

and the disproportionality was due to only extrinsic differences.  Nonetheless, there are strong

reasons to think that some (but obviously not all) of the amount of the over-representation is the

result of misidentification of students of color.

30.     Students of color have long been identified as students with disabilities when they did

not have any disabilities.  This misidentification leads to students of color disproportionately

being over-represented in the population of students with disabilities compared to their presence

in the student population. At the national level, for example, African American students have

been found to be consistently over-represented as students with disabilities compared to their

percentage of the student population.

31.     The Department itself has explained during in its 2016 NPRM leading to the 2016 Final

Regulation that "[w]hen children of color are identified as children with disabilities at

substantially higher rates than their peers, there is a strong concern that some of these children

may have been improperly identified as children with disabilities, to their detriment.

Misidentification interferes with a school's ability to provide children with appropriate

educational services. The overidentification of children of color in special education, in

particular, raises concerns of potential inequities in both educational opportunities and

outcomes."

32.     This misidentification can be attributed to pre-existing implicit or explicit bias that

people of color were inferior, and thus any educational difficulties were the result of something

being "wrong" with the child.

33.     Additionally, this misidentification can be attributed to institutional pressures resisting

racial desegregation in classrooms.  By identifying students of color (particularly males) as

having a disability, a school district has a seemingly neutral justification to place them in a separate "special education" classroom away from their white peers.

34.     Indeed, as discussed below, Congress itself suggested the possible influences on such identifications when it included in the 2004 amendments to IDEA a finding that "[s]tudies have found that schools with predominately White students and teachers have placed disproportionately high numbers of minority students into special education." Pub. L. No. 108-446, § 601(c)(12), 118 Stat. 2651 (2004).

35.     The Department itself acknowledged, in proposing the Delay Regulation, that "the status quo for school districts across the country properly identifying children with disabilities is troubling."  In the preamble to the final Delay Regulation, the Department continued to acknowledge "problems in the status quo."

36.     In a similar vein, school districts may correctly identify a student of color as a student with a disability, but incorrectly identify the type of disability.  This misidentification can affect the services provided to the student, the location where the students receive such services (*i.e.*, in a general education classroom or otherwise), and a proper understanding of whether discipline for misbehavior is appropriate.

37.     The Department itself reported, in proposing the Delay Regulation, that:

> In 2012, American Indian and Alaska Native students were 60 percent more likely to be identified for an intellectual disability than children in other racial or ethnic groups, while black children were more than twice as likely as other groups to be so identified. Similarly, American Indian or Alaska Native students were 90 percent more likely, black students were 50 percent more likely, and Hispanic students were 40 percent more likely to be identified as having a learning disability. In addition, black children were more than twice as likely to be identified with an emotional disturbance.

38.    Disproportionality is greater for students of color in the subjective or "soft" disability categories of Intellectual Disability, Emotional Disturbance, or Learning Disability, than in the more objective or "hard" categories, such as hearing impairment or visual impairment.

39.    This greater disproportionality in the more subjective categories suggests that the over-representation of students of color as students with certain disabilities may be the result of untoward factors that are more able to influence subjective judgments.

40.    The Department itself recognized in the NPRM for the 2016 Final Regulations that "[o]ver-identification may differentially diminish the opportunities of children of color to interact with teachers and others within the larger school context, especially when education is provided in separate settings."

***Disproportionality in Placement***

41.    Disproportionality on the basis of race also occurs in the placement of students with disabilities, that is the setting in which they learn (a general education classroom, a classroom solely for special education in a regular school, a separate school, etc.).

42.    Available data demonstrates that students of color, especially African Americans, are over-represented in more restrictive educational environments and underrepresented in less restrictive settings compared to their white peers with the same disabilities.

43.    Again, as the Department itself reported in the NPRM preceding the 2016 Final Regulations:

> Research has found that African American, Hispanic/Latino, and American Indian/ Alaska Native children and English language learners have a greater chance of receiving placements in separate educational settings than do their peers. Nationally, Black/African–American, Asian, and Native Hawaiian and Other Pacific Islander children with disabilities (ages 6 through 21) were less likely than their White peers to be inside the regular classroom 80 percent or more of the day (56 percent, 57

percent, 54 percent, and 65 percent, respectively) during the 2012–2013 school year (SY).

44.    In February 2018, The National Council on Disability, an independent federal agency, issued a report entitled The Segregation of Students with Disabilities, which found that "White students and Native American students continue to be included in general education classrooms more often than African American students, Asian students, and those from the Pacific Islands, including Hawaii."  The Council found this racial disproportionality "[m]ost troubling, because variables other than child–related factors (such as IQ or communication skills) appear to be at play in placement decisions."

45.    That same report also credited a 2016 analysis of placements for students with autism that "suggested that African American students with autism are disproportionately placed in more restrictive educational settings" than students of other races with autism.

***Disproportionality in Discipline***

46.    Disproportionality on the basis of race also occurs in the disciplining of children with disabilities.

47.    The Department's Office for Civil Rights reported in March 2018 that during the 2015–16 school year, students with disabilities were consistently disciplined at disproportionate rates. Students with disabilities represented 12 percent of the overall student enrollment yet school-level reported data show they are:

- 28 percent of students referred to law enforcement or arrested;

- 26 percent of students who received an out-of-school suspension; and

- 24 percent of those students who were expelled.

48.    Students of color with disabilities experience even higher rates of discipline.

49.   In March 2018, the Government Accountability Office (GAO), a non–partisan arm of Congress, reported that "Black students with disabilities" were "disproportionately disciplined" in public schools.  For example, "Black students with disabilities represented about 19 percent of all K–12 students with disabilities, and accounted for nearly 36 percent of students with disabilities suspended from school (about 17 percentage points above their representation among students with disabilities)."

50.   The GAO found that "[t]his pattern of disproportionate discipline persisted regardless of the type of disciplinary action, level of school poverty, or type of public school these students attended."

***Statutory Response to Disproportionality***

51.   Although the issue has been studied since the 1970s, Congress first expressly identified racial over-representation in special education as a problem in its 1997 amendments to the IDEA, Pub. L. No. 105-17, 111 Stat. 37 (1997).  It added statutory findings to the IDEA that stated that "[m]ore minority children continue to be served in special education than would be expected from the percentage of minority students in the general school population."  Specifically, "[a]lthough African–Americans represent 16 percent of elementary and secondary enrollments, they constitute 21 percent of total enrollments in special education."  Congress also found that for certain disabilities, the disproportionality based on race was even larger, even when controlling for poverty: "[p]oor African-American children are 2.3 times more likely to be identified by their teacher as having mental retardation than their white counterpart."  After identifying these examples of over-representation, Congress thus concluded that "[g]reater efforts are needed to prevent the intensification of problems connected with mislabeling … among minority children with disabilities." *Id.* § 601(c)(8), 111 Stat. at 40-41.

52.     In response to these findings, Congress adopted its first provision that referenced significant disproportionality.  That provision required States to "collect[] and examin[e] data to determine if significant disproportionality based on race is occurring in the State with respect to" identification and placement of children with disabilities.  A finding of significant disproportionality triggered a requirement for the State to "review and, if appropriate, revis[e], the policies, procedures, and practices used in such identification or placement to ensure that such policies, procedures, and practices comply with the requirements of this Act." *Id.* § 618(c), 111 Stat. at 102. The regulation promulgated by the Department in 1999 simply mirrored the statutory language.

53.     Twelve years later, Congress addressed the topic again when it reauthorized and amended the IDEA. Pub. L. No. 108–446, 118 Stat. 2647 (2004).  Congress specifically amended the statutory findings to include its determinations that "African-American children are identified as having [intellectual disabilities] or emotional disturbance at rates greater than their White counterparts;" that "[i]n the 1998–1999 school year, African-American children represented just 14.8 percent of the population aged 6 through 21, but comprised 20.2 percent of all children with disabilities;" and that "[s]tudies have found that schools with predominately White students and teachers have placed disproportionately high numbers of minority students into special education." *Id.* § 601(c)(12), 118 Stat. at 2651.

54.     Apparently dissatisfied with the results yielded by the 1997 significant disproportionality provision, Congress enhanced the provision's scope.  It expanded the States' significant disproportionality obligation to cover the incidence, duration, and type of disciplinary actions, including suspensions and expulsions, in addition to identification and placement. *Id.* § 618(d)(1)(A)-(C), 118 Stat. at 2739.

55.    At the same time, Congress included two solutions – one substantive and one procedural – for school districts that were determined to be significantly disproportionate. First, any school districts identified as having significant disproportionality are required to spend 15% of their federal IDEA money to provide comprehensive coordinated early intervening services to children in the school district, particularly (but not exclusively) to children in groups that are significantly overidentified.  Second, school districts are required to publicly report on any revision of its policies, procedures, and practices used in identification, placement, and disciplinary actions it creates in response to a disproportionality designation.  *Id.* § 618(d)(2)(A)-(C), 118 Stat. at 2739-2740.

56.    The scope of Section 618(d)'s significantly-disproportionate requirement is informed by two other provisions enacted at the same time.  Section 612(a)(24) requires States to have in effect "policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity."  118 Stat. at 2691.  Section 616(a)(3) requires States to monitor school districts using quantifiable and qualitative indicators to adequately measure "[d]isproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification."  118 Stat. at 2731.  These provisions show that when Congress was concerned only about the reasons for racial disproportionality, it expressly discussed "inappropriate" disproportionality.

***Response to Section 618(d) by the Department and States***

57.    When initially regulating to implement Section 618(d), the Department took a hands-off approach.  It decided that "[w]ith respect to the definition of significant disproportionality,

each State has the discretion to define the term for the LEAs [local education agencies] and for the State in general" (71 Fed. Reg. 46,540, 46,738).

58.     That decision proved to be an error.  Many States knowingly adopted metrics for determining disproportionality, and what constituted significant disproportionality, that resulted in no school districts in those States being identified as significantly disproportionate.  Thus, districts in those States have not been required to review their policies, procedures, and practices and to spend IDEA funds on comprehensive coordinated early intervening services.

59.     The GAO issued a report in February 2013 that found "the discretion that States have in defining significant disproportionality has resulted in a wide range of definitions that provides no assurance that the problem is being appropriately identified across the nation."  Further, the GAO found that "the way some States defined overrepresentation made it unlikely that any districts would be identified."  According to the GAO, 21 States did not identify any school districts as significantly disproportionate on any measure.  In addition, "[a]mong the almost 15,000 school districts nationwide that received IDEA funding in school year 2010-2011, states required 356 (2.4 percent) districts to use these funds for early intervening services due to significant disproportionality."  Of the school districts identified, over half were located in only 5 States, with 73 districts located in Louisiana.

60.     "To better understand the extent of racial and ethnic overrepresentation in special education and promote consistency in how States determine the districts required to provide early intervening services," the GAO recommended that the Department "develop a standard approach for defining significant disproportionality to be used by all states.  This approach should allow flexibility to account for state differences and specify when exceptions can be made."

61.    Data that came out after the GAO issued its report did not indicate States were improving on their own.  The Department reported that in the 2012-13 school year – two school years after the period relied on by the GAO in its report – 22 States did not identify any school districts as significantly disproportionate on any measure.  Of the 491 school districts identified as significantly disproportionate, 75 percent were located in only 7 States.

***Process for Developing and Adopting 2016 Final Regulations***

62.    In response to the GAO's report, the Department issued a Request for Information in June 2014 (79 Fed. Reg. 35,154) in which it stated that it was "concerned that the definitions and procedures for identifying LEAs with significant disproportionality that many States have established may set the bar so high that even LEAs with significant racial and ethnic disparities in the identification of children for special education are not identified as having significant disproportionality."

63.    In March 2016, the Department issued an NPRM to propose changes to its regulation to provide the standard methodology that States must use to determine whether there is significant disproportionality based on race or ethnicity in the State and its LEAs (81 Fed. Reg. 10,968).

64.    In December 2016, after considering comments received, the Department issued Final Regulations (81 Fed. Reg. 92,376).  The Department determined that, "given the widespread disparities in rates of identification, placement, and disciplinary removal across racial and ethnic groups," the "relatively low number of LEAs identified as having significant disproportionality, raises concerns about whether the prior approach [by States] was being implemented to meet Congress' intent to address racial and ethnic disparities in special education and to ensure compliance with IDEA."  The Final Regulations, the Department explained, "are necessary to ensure that States meaningfully identify LEAs with significant disproportionality and that the

statutory remedies are implemented in a manner that addresses any significant disproportionality identified."

65.    The Department determined that the Final Regulations would provide substantial benefits to students, parents, and members of the public, although it acknowledged that it could not "meaningfully quantify the economic impacts of the benefits."  And it further determined that the benefits of the regulations "outweigh the estimated costs of these final regulations."

66.    The 2016 Final Regulations require all States to use a standard methodology to identify significant disproportionality.  34 C.F.R. § 300.646(b).  The standard methodology uses risk ratios to analyze disparities for seven racial or ethnic groups, comparing each to all other children within the school district in 14 different categories of analysis.  *Id*. § 300.647(b)(2)-(b)(4).

67.    A risk ratio is a numerical comparison, expressed as a ratio or decimal, between the risk of a specific outcome for a specific racial or ethnic group in a school and the risk of that same outcome for all other children in the district.  34 C.F.R. § 300.647(a)(6).  Generally, a risk ratio of 1.0 indicates that children from a given racial or ethnic group are no more or less likely than children from all other racial or ethnic groups to experience a particular outcome.  A risk ratio of 2.0 indicates that one group is twice as likely as all other children to experience that outcome.  A risk ratio of 3.0 indicates three times as likely, etc.

68.    Drawing from an example the Department used in a Questions and Answers document it issued in March 2018, if 40 out of 200 Hispanic children in a school district are identified as children with disabilities, the risk of a Hispanic child being identified as a child with a disability in that district is 40/200 or 20 percent.  If 200 out of all of the other 2,000 children in the school district are identified as children with disabilities, then the risk of all other children being

identified as children with disabilities is 200/2,000 or 10 percent.  The risk ratio for Hispanic children in the district being identified as children with disabilities is 20/10, 2:1, or 2.0.

69.   The 2016 Final Regulations also provide substantial flexibility to the States within that framework.  States determine the thresholds above which the risk ratio in each category of analysis indicates significant disproportionality.  34 C.F.R. § 300.647(b)(1)(i)(A).  Using the same example as above, if a State sets a risk ratio threshold for identification of children as children with disabilities at 2.5, then the disproportionality for Hispanic children identified as children with disabilities is not significant despite the fact they are twice as likely as all other children to be identified as children with disabilities.  States may set different risk ratio thresholds for different categories of analysis.  *Id*. § 300.647(b)(1)(ii).

70.   Risk ratio thresholds must be reasonable. 34 C.F.R. § 300.647(b)(1)(i)(A).  "Reasonable" is not defined in the regulation itself, but Department stated in the preamble to the 2016 Final Regulations that "it is reasonable" for States "to consider the racial and ethnic composition of the State and LEAs, unique enrollment demographics, as well as factors correlated with disability."  In the Department's Questions and Answers document issued in March 2018, the Department stated that "reasonable" means "a sound judgment in light of all of the facts and circumstances that bear upon the choice."

71.   States also have flexibility to identify a school district with significant disproportionality only after it exceeds a risk ratio threshold for up to three prior consecutive years, 34 C.F.R. § 300.647(d)(1); to exclude small populations from analysis (through setting minimum cell sizes and n–sizes), *id*. § 300.647(a)(3) & (4), (b)(1)(i)(B) & (C); and to exclude from determinations of significant disproportionality LEAs that have made reasonable progress in reducing their risk ratios, *id*. § 300.647(d)(2).

72.    In adopting the standard methodology and the attendant flexibilities, the Department responded in the 2016 Final Regulations preamble to multiple comments raising the concern that the standard methodology "would create an incentive to not identify children for special education and related services in order to reduce [racial] disproportionality numbers" and thus result in de facto racial quotas.  The Department established seven safeguards against such results.

73.    First, the Department made clear in the preamble that "nothing in these regulations establishes or authorizes the use of racial or ethnic quotas limiting a child's access to special education and related services."

74.    Second, the Department amended the regulation to add section 300.646(f) to make clear that these regulations do not authorize a State or an LEA to develop or implement policies, practices, or procedures that result in actions that violate any IDEA requirements, including requirements to ensure that all children with disabilities residing in the State who are in need of special education and related services are identified, located, and evaluated (the so-called child find requirement) and to ensure that a free appropriate public education is available to all eligible children with disabilities.

75.    Third, the Department declared in the regulatory preamble that such quotas would violate the IDEA:  "[I]t is a violation of IDEA for LEAs to attempt to avoid determinations of significant disproportionality by failing to identify otherwise eligible children as children with disabilities."

76.    Fourth, the Department warned in the regulatory preamble that a school district's use of racial quotas "would almost certainly result in legal liability under Federal civil rights laws, including title VI of the Civil Rights Act of 1964 and the Constitution."  Thus, not only would

quotas violate the express prohibition in the regulation, school districts faced the risk of private civil litigation for damages and attorneys' fees.

77.     Fifth, the Department acknowledged in the regulatory preamble that the incentives for quotas were most likely to occur "in cases where States select particularly low risk ratio thresholds."  It was "[f]or this reason" that the 2016 Final Regulations provided "States the flexibility to set their own reasonable risk ratio thresholds."  Working with knowledgeable stakeholders, the Department explained, States are required to "identify particular risk ratio thresholds that help States and LEAs to address large racial and ethnic disparities without undermining the appropriate implementation of [the IDEA's] child find procedures."  It is up to States, in the first instance, to accommodate "the need to identify significant disproportionality in LEAs with the need to avoid perverse incentives that would inhibit a child with a disability from being identified or placed in the most appropriate setting based on the determination of the IEP Team."  Further, the Department would "monitor States for any use of risk ratio thresholds that may be unreasonable and take steps, as needed, to ensure the States' compliance."

78.     Sixth, the Department stated in the regulatory preamble its intent "to publish guidance to help schools to prevent racial discrimination in the identification of children as children with disabilities, including over-identification, under-identification, and delayed identification of disabilities by race."  That guidance, Preventing Racial Discrimination in Special Education, was issued by the Department's Office for Civil Rights in December 2016.  It affirmed that it is unlawful for a school district not to identify a student with a disability due to the student's race.

79.     Seventh, the Department in the regulatory preamble committed to conduct an evaluation of the implementation of the 2016 Final Regulations that would "include an examination of the extent to which school and LEA personnel incorrectly interpret the risk ratio

thresholds and implement racial quotas in an attempt to avoid findings of significant

disproportionality by States, contrary to IDEA."

80.     The 2016 Final Regulations also addressed the steps required after a finding of

significant disproportionality within a school district.  First, the State must provide for the review

and, if appropriate, revision of the district's policies, practices, and procedures to ensure

compliance with the requirements of the IDEA.  34 C.F.R. § 300.646(c)(1).  If revisions are

made, the State must require the school district to publicly report on any such revisions.  *Id.*

§ 300.646(c)(2).  Second, the school district must use 15% of its IDEA funds for comprehensive

coordinated early intervening services.  *Id.* § 300.646(d).  In implementing these services, the

district must perform an analysis that identifies the factors contributing to the significant

disproportionality, *i.e.*, a root-cause analysis.  *Id.* § 300.646(d)(1)(ii).  The district must then

"address" any policy, practice, or procedure it identifies as contributing to the significant

disproportionality. *Id.* § 300.646(d)(1)(iii).  The district may address those causes through

professional development and behavior evaluations, services, and supports.  *Id.*

§ 300.646(d)(1)(i).  These services must be focused particularly, but not exclusively, on children

in those groups that were significantly overidentified.  *Id.* §  300.646(d)(1)(iii).

81.     Recognizing that significant disproportionality is not always reflective of racial

discrimination or other untoward considerations, the Department concluded that these

consequences were appropriate for all school districts.  Even where "differential exposure to risk

factors" or other non-discriminatory factors contributed to racially significant disproportionality

in special education, the Department determined requiring school districts to engage in the

comprehensive coordinated early intervening services would be beneficial because "schools may

help to mitigate the effects of these risk factors by screening children early and by providing early and appropriate intervention and supports."

82.     The Department also decided that States would not be required to comply with the regulations until July 1, 2018, for the 2018-19 school year.  The Department explained that it "recognize[d] the practical necessity of allowing States time to plan for implementing these final regulations, including to the extent necessary, time to amend the policies and procedures necessary to comply."

83.     After the 2016 Final Regulations were published in the Federal Register, the Department provided technical support to assist the States in getting ready to comply.  In February 2017, the Department hosted a symposium on significant disproportionality for States and released a webinar about the 2016 Final Regulations.

84.     In March 2017, a month after Secretary DeVos took office, the Department issued a "model timeline" for States that identified all the preparatory tasks required to meet the July 1, 2018 compliance deadline, issued a Questions and Answers document for States about the 2016 Final Regulations, and released another webinar.  The Questions and Answers document, like the 2016 Final Regulations, cautioned that States may not "explicitly, or by their choice of risk ratio thresholds, implicitly, set racial quotas for any category of analysis."

85.     As late as October 24, 2017, the Department sent a letter to a member of Congress reassuring him that the Department had "provided supplemental technical assistance to assist States as they prepare to implement the final regulations in school year 2018–2019" and "to help States implement the regulations and implement [them] with fidelity."

*The Department Reverses Course*

86.    Only two days later, however, on October 26, 2017, Politico published an article about a draft NPRM it had obtained that would propose to extend the compliance date of the 2016 Final Regulations for two years.  Politico reported that a Department official said the draft Politico had was "an early version" of the NPRM "and has been significantly revised."

87.    On November 8, 2017, the Department proposed dropping questions from its Annual State Application under Part B of the IDEA that related to significant disproportionality.  It explained to commenters that these questions were deleted as a result of "the Department continu[ing] to analyze the significant disproportionality regulations to further examine issues such as fiscal impact on SEAs [state education agencies] and LEAs and unintended consequences of the regulations, particularly on the identification of children with disabilities."

88.    On December 15, 2017, The Washington Post and The New York Times both published articles that reported that a Department official said that "ED is looking closely at this rule and has determined that, while this review takes place, it is prudent to delay implementation for two years."

89.    On February 27, 2018, the Department's NPRM for a two-year delay was published in the Federal Register.

90.    The NPRM started by inviting readers "to submit comments regarding this notice of proposed rulemaking" but then immediately stated that the Department "will consider comments on the proposed delayed compliance dates only and will not consider comments on the text or substance of the final regulations."

91.    The NPRM then started its discussion of the "Reasons" for the proposed delay with an acknowledgement that "the status quo for school districts across the country properly identifying

children with disabilities is troubling."  It restated the statistics, quoted in paragraph 37 above,

showing that students of color were more likely to be identified for various disabilities than

white students.  "And yet," the Department observed, "only 28 States and the District of

Columbia identified any LEAs with significant disproportionality, and of the 491 LEAs

identified, 75 percent were located in only seven States."

92.    The NPRM noted that, in response to the Department's general solicitation in 2017 on

regulatory reform – which had requested input on regulations that may be appropriate for repeal,

replacement or modification – it had received comments on the 2016 Final Regulations.

Subsequently, in response to a Freedom of Information Act request, the Department revealed that

it relied on only seven comments as the basis for the Delay NPRM – out of the over 16,000

comments submitted in response to the general solicitation.

https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&

dct=PS&D=ED-2017-OS-0074.

93.    The Department described those seven comments as raising five "concerns":  (1) lack

of statutory authority to mandate a standard methodology; (2) the regulations improperly look at

group outcomes through statistical measures rather than the needs of each individual child; (3)

the regulations provide incentives to school district to establish quotas; (4) inability to assess the

impact of the regulations; and (5) failure to align the regulations with other statistical measures

required by the Department.

94.    The Department stated the two-year delay was warranted because, in light of those

comments, it had concerns that the 2016 Final Regulations "may not appropriately address the

problem of significant disproportionality." The extra time would be used "to review all of the

issues raised and determine how to better serve children with disabilities."

95.    In identifying the "[a]lternatives [c]onsidered," the NPRM said the Department considered "proposing a delay of the compliance dates for different lengths of time" and elected two years because one year is "too little time as a general matter" for the Department to "develop, propose, and promulgate complex regulations" but three years was "too long" "given the amount of work on this issue the Department has already done."  The Department did not identify any non-delay alternatives.

96.    In the analysis of costs and benefits, the NPRM concluded that the delay would generate benefits (*i.e.*, cost savings to States and school districts) between $10.9 and $11.5 million over a ten-year period.  It did not identify any costs of the delay.  To the contrary it estimated that the proposed delay "will not impose any additional costs."

97.    After receiving comments, the Department published the final Delay Regulation in the Federal Register on July 3, 2018. The Delay Regulation mirrors the NPRM, with no textual changes.

98.    The Delay Regulation stated that "[a]s of June 29, 2018" – prior to its publication in the Federal Register – "the date of compliance for recipients of Federal financial assistance ... is delayed" for two years.

99.    The Delay Regulation stated that the Department "is not certain" that the standard methodology "is the best method for States to identify significant disproportionality."

100.  This purported uncertainty stemmed, first, from the Department's claim that there was "conflicting research" as to what caused significant racial disproportionality; how much of the disproportionality was the result of racial discrimination; whether over-identification of students of color was, in fact, a problem; and how prevalent was under-identification of students of color.

But the Department did not explain why these questions were legally relevant to determining

significant disproportionality, which is a numerical calculation

101.  The Department's primary concern, repeated numerous times, was that the standard

methodology "*may* create an incentive for LEAs to establish de facto quotas" to avoid being

identified as significantly disproportionate.  The Department said that it wanted time to "evaluate

*whether* the numerical thresholds in the 2016 significant disproportionality regulations may

incentivize quotas."  (Both emphases added.)

102.  The Delay Regulation acknowledged that the Department had "addressed the issue of

quotas in the 2016 significant disproportionality regulations," but it did not point to any new

facts or arguments.  Instead, the Department claimed the right to reverse course "even in the

absence of changed facts and circumstances" because it now believed that Department did not

previously "give sufficient weight" to the risk that the standard methodology "[p]otentially

creates" racial quotas.

103.  The Department did acknowledge that, confronting these same concerns, the

Department previously responded by expressly noting in the preamble to the 2016 Final

Regulations that quotas were prohibited and amending the text of the regulation to confirm that

nothing in the regulations abrogated each child's right under IDEA to special education in the

least restrictive environment.  But, in the Delay Regulation, the Department stated that these two

actions were "insufficient protection against LEAs creating de facto quotas because, regardless

of the disclaimer, the regulations themselves may, in fact, incentivize quotas."  The Department

did not offer any explanation of how it had determined that expressly prohibiting quotas and

expressly amending the regulations to say that the significant disproportionality regulations did

not absolve school districts of their other responsibilities under the IDEA were insufficient to address the concern that the regulations may incentivize quotas.

104.   The Department did not acknowledge the five other safeguards that were identified in the 2016 Final Regulations to prevent racial quotas, including the clear explanation that racial quotas would violate the IDEA; the warning that racial quotas could result in legal liability under Title VI and the Constitution; the regulatory responsibility given to each State to select (subject to Departmental review) risk ratios that were not so low as to incentivize quotas; the additional guidance issued by the Department's Office for Civil Rights about preventing racial discrimination in special education; and the promised study of the effects of the 2016 Final Regulations to determine whether and to what extent school districts were using racial quotas.

105.   The Department did acknowledge a commenter's suggestion that the Department could "close[ly] monitor[] States for compliance with IDEA."  The Department said that "monitoring may not be able to resolve applicable issues," but it gave no explanation why that was so.  It instead transitioned to a non sequitur about the efficacy of the 2016 Final Regulations themselves, asserting that it was "not certain that compliance-driven monitoring will, by itself, effectively address the factors contributing to significant disproportionality or enable the Department to best support States to improve their systems."  Such a rethinking of the 2016 Final Regulations were not at issue with the Delay NPRM and the Department expressly stated that it would not consider comments based on the merits of the disproportionality Regulations themselves.  The Department failed to address the pertinent issue – whether monitoring could address the factors that the Department was concerned may incentivize quotas.

106.   The Department summarily disposed of reasonable alternatives to delay suggested by COPAA in its comments.  COPAA urged the Department to accelerate the evaluation – to which

it committed in the 2016 Final Regulations – to examine if any school districts in States that already used risk ratios were implementing racial quotas in an attempt to avoid findings of significant disproportionality, rather than wait until the 2018-19 school year was completed. COPAA also suggested that the Department could provide more technical assistance to States. It could also initiate reviews of States and school districts under Title VI of the Civil Rights Act to ensure they are not using racial quotas and publicize these reviews to deter others from doing so. The Department responded only that "[k]nowing if these measures would be effective requires careful review, which we will do during this delay." The Department thus admitted that it was changing the status quo (compliance with the 2016 Federal Regulations on July 1, 2018) simply because it had concerns – no facts.

107. Despite the Department's expressed concerns that the standard methodology may create an incentive to establish quotas that would be in violation of IDEA, Title VI, and the Constitution, the Department made clear that States "may implement the standard methodology" during the two-year delay. Indeed, the Department acknowledged that many States intend to "implement the standard methodology in the 2016 significant disproportionality regulations."

108. In declaring that the regulations may incentivize racial quotas, the Department did not acknowledge the presumption of good faith and regularity to which state and local officials are entitled. Nor did the Department provide any examples of States or school districts that had been incentivized by the IDEA in the past to impose racial quotas, despite States having to comply with this provision for 14 years.

109. Instead, the Department offered a single example arising out of Texas, which did not involve racial disparities or discrimination. In that instance, Texas established an indicator involving the percentage of children identified as students with disabilities. Inadequate state

supervision allowed some school districts to impose unlawful barriers to the identification of children as students with disabilities in order to meet the indicator.  The Department did not explain what lessons it could draw from that single example.  It could not have concluded that numerical measurements are inappropriate to ensure compliance with the IDEA.  The IDEA itself requires each State to establish measurable quantitative targets for various indicators, and to use those targets to analyze the performance of each school district.  20 U.S.C. § 1416(a)(3), (b)(2)(C); 34 C.F.R. §§ 300.600, 602.

110.  In issuing the final Delay Regulation, the Department failed entirely to consider an important aspect of the problem when it failed to address whether the Delay Regulation provided net cost savings to society as a whole, including the parents and students, or whether there were alternatives that would provide society net cost savings without delaying the compliance date.

111.  Similarly, the Department failed entirely to consider another important aspect of the problem when it insisted that because "States are still required to comply with the statutory requirements of IDEA" around significant disproportionality, some progress might occur even with the Delay Regulation in place.  But the Department did not revisit or question its prior determinations that, left to their own statistical devices, many States would select measures so that they would not identify any districts.

112.  In the Final Delay Regulation, the Department revised its cost-benefit analysis and asserted that it "has included a copy of all calculation spreadsheets supporting this analysis in the docket folder for this notice."  No revised calculation spreadsheets have been made available as of the date of the Complaint.

*Injuries Caused by the Delay Regulation*

113.  The Department "recognize[d] the time, effort, and resources" that the States (and those they consulted with) had already expended to come into compliance with the 2016 Final Regulations.  The Department described these costs as "sunk investments" because "[r]egardless of whether the Department delayed the required compliance date, States would be unable to recover those expenses."  It further could not assure States that if they did accept the delay authorized by the Delay Regulation that they would not have to spend more money in two years, even if the 2016 Final Regulations were not changed.  The most it could state is that "those [States] that delay implementation until a later date would not necessarily be required to recreate the work already completed."

114.  States expended their time and resources in reliance on the 2016 Final Regulations and the fair assumption that the Department would not change the rules simply based on a re-weighing of potential risks.  The Department did not acknowledge those reliance interests in deciding to delay the rule.

115.  To be sure, the Department has given States a choice whether to delay or not.  But regardless of what path a State chooses, the delay interferes with reliance interests.  A State could stay the course and expend more resources to comply with the 2016 Final Regulations now.  It risks, however, being told within the next two years that its spending was for naught and it must change its system again.  Alternatively, a State could delay compliance with the 2016 Final Regulations for now to see if there are regulatory amendments.  If there are regulatory amendments, the State will learn then how much of the time and resources already expended must be written off; if there are no amendments, the State will learn how much it will need to

spend "to recreate the work already completed."  Yet the Department did not consider these important interests.

116.  While many States have stated their intention to comply with the 2016 Final Regulations despite the adoption of the Delay Regulation, some States will not do so because of the Delay Regulation.  The Department's delay in the compliance date will reduce the number of school districts that are identified as significantly disproportionate in the 2018-19 school year compared to what would occur if compliance with the 2016 Final Regulations were required for the 2018-19 school year in all States.

117.  This reduction in the number of school districts identified will have certain inevitable consequences that will injure COPAA, its members, and students.

118.  The delay in the compliance date will reduce the number of school districts that must engage in a review of their policies, practices, and procedures.  These reviews can find students that are mis-identified, misplaced, or improperly disciplined, and districts can correct such mistakes.  As the Department explained in promulgating the 2016 Final Regulations, "the State must ensure that the LEA has corrected each individual case of noncompliance, unless the child is no longer within the jurisdiction of the LEA."  Absent these mandated reviews, some such mistakes will continue unabated, to the detriment of COPAA and its members.

119.  The delay in the compliance date will necessarily reduce the amount of information available to COPAA and its members because it will reduce the number of school districts determined to be significantly disproportionate and, in turn, reduce the number of school districts subject to two information-generating provisions of the IDEA and the 2016 Final Regulations: first, a report, which will be made publicly available, of revisions, if any, of the school district's policies, practices, and procedures, 34 C.F.R. § 300.646(c)(2); and second, an analysis that

identifies the factors contributing to the significant disproportionality, *i.e.*, a root–cause analysis, *id.* § 300.646(d)(1)(ii).  These reports and analyses are an important source of information relied upon by COPAA in preparing educational materials, in adopting policy positions, and in advocating on behalf of children before federal agencies.

120.  The delay in the compliance date will drastically deprive COPAA of key information on which it relies to educate its members and the public and will prevent COPAA from receiving information it wishes to use in its routine information–dispensing activities.  The delay will deny COPAA and its members the opportunity to learn what school districts that would otherwise be determined to be significantly disproportionate under the 2016 Final Regulations are doing, resulting in a significantly restricted flow of information.  Indeed, in States that choose to delay compliance with the 2016 Final Regulations, this information about the practices occurring in the 2018-19 school year and why these practices happened will not be able to be reconstructed when compliance is required in two years.

121.  The delay in requiring all States to comply with the 2016 Final Regulations has already impaired and will continue to impair COPAA's ability to bring potential IDEA violations to the attention of the Department and to continue to educate the public about racial disproportionality and possible remedies.

122.  The Department's failure to require compliance with the 2016 Final Regulations deprives COPAA of information on which it routinely relies when reported by the small number of existing school districts currently identified as significantly disproportionate.  This lack of information directly conflicts with COPAA's mission to prevent violations of the IDEA and frustrates its public education efforts.  As a result of the Department's Delay Regulation, COPAA is required to expend resources to obtain information about significant

disproportionality, and effective remedies, through investigations, research, and state and local public records requests.

123.  But for the Department's Delay Regulation, COPAA would not need to undertake such extensive efforts.  Requiring all States to comply with the 2016 Final Regulations in the 2018-19 school year will make this information available to COPAA in the near term.  The information would enhance the capacity of COPAA to point its members and others to school districts that are responding to a determination of significant disproportionality in a positive manner and to counsel its members and school districts when unlawful discrimination may have figured into the disproportionality.  The Delay Regulation thus puts the Department at loggerheads with COPAA in obtaining and using information for its membership and the public.

**CLAIMS**

**<u>Administrative Procedure Act, 5 U.S.C. § 706(2)(A) & (2)(D)</u>**

124.  Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

***The Department failed to provide a reasoned explanation for its change.***

125.  The APA requires that an agency seeking to delay an existing regulation must "show that there are good reasons for the new" timing and provide "a reasoned explanation is needed for disregarding facts and circumstances that underlay" the timing of the existing regulation or "facts and circumstances that … were engendered by" the regulation, in order for the change not to be "arbitrary and capricious."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U. S. 502, 515-516 (2009)).  A "change that does not take account of legitimate reliance on prior interpretation" is also "arbitrary and capricious." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996).

126.  The Department did not comply with this APA requirement because it did not identify any reason for disregarding its prior factual determination that the 2016 Final Regulations, with the safeguards included, would not incentivize racial quotas.  It identified no intervening facts or circumstances.  The Department also ignored the circumstances engendered by the 2016 Final Regulations, in that States had invested time and money for 18 months in reliance on these regulations going into effect in July 2018.  And the Department's purported justification for delay – its "concern" that standard methodology may incentivize quotas – is inconsistent with Department's express endorsement of immediate implementation of the 2016 Final Regulations by many States.

**_The Department failed to consider significant aspects of the problem._**

127.  The APA requires that an agency issuing a regulation "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made" in order for the regulation not to be "arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  In doing so, the agency issuing a regulation must consider all the "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

128.  The Department did not comply with this APA requirement in at least two ways.  First, it failed to address whether the Delay Regulation provided net cost savings to society as a whole, including the parents and students.  Instead, the Department myopically focused on supposed cost savings to the regulated entities, the States and school districts.  Congress, however, was directly concerned the high costs on society that accompanies over- and under-identification, placement, and discipline of students based on race.  In 2016, the Department considered these

benefits of the 2016 Final Regulation, and in 2018 it "entirely failed to consider" these costs to
society created by its delay.

129.  Second, the Department failed to consider meaningful alternatives to delay.  The APA
requires that an agency consider "reasonably obvious alternatives" that could serve the agency's
identified goals.  *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 942
(D.C. Cir. 2017).  In its consideration of the alternatives, the agency must "give a reasoned
explanation for its rejection of such alternatives."  *Am. Radio Relay League, Inc. v. FCC*, 524
F.3d 227, 242 (D.C. Cir. 2008).  When the agency is proposing a delay, its justifications must
refer to the delay itself and not be based on the suggestion of future regulation.  *See, e.g.*,
*California v. BLM*, 286 F. Supp. 3d 1054, 1064 (N.D. Cal. 2018).

130.  The Department did not comply with this APA requirement because it did not consider
the obvious alternatives that were addressed in the 2016 Final Regulations and/or raised by
commenters during the Delay Regulation rulemaking.  The Department failed to meaningfully
consider these alternatives, ignoring some altogether, and addressing others cursorily at best.  In
addition, the Department's meager reasoning purported to address why certain alternatives would
not solve the supposed issues with the 2016 Regulations themselves instead of why they would
not be preferable to the proposed delay.

**The Department failed to provide for meaningful participation.**

131.  The APA requires that members of the public have an opportunity to "participate in the
rulemaking through submission of" comments and only "[a]fter the consideration of relevant
matter presented" may the agency adopt a regulation.  5 U.S.C. § 553(c); *Rural Cellular Ass'n v.
FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009) ("The opportunity for comment must be a

meaningful opportunity, and we have held that in order to satisfy this requirement, an agency must also remain sufficiently open-minded." (citation omitted)).

132.  The Department did not comply with this APA requirement because it informed the public that it would not consider certain comments, and it did not actually consider the comments submitted.  Instead, it began the rule-making process with a closed mind and simply adopted its preordained result.  This closed mind is reflected in, among other things, the statement of a Department official and removal of the Department's data collection questions prior to the issuance of NPRM; and by the multiple procedural and substantive errors in the 2018 NPRM and 2018 Final Regulations.

133.  The Department did not comply with this APA requirement because it did not disclose the materials it relied on in making its cost-benefit assessments, despite saying it would do so.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

A.    Declaring that Defendants' Delay Regulation is unlawful.

B.    Vacating and setting aside the Delay Regulation as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with lawl and without procedure required by law.

C.    Enjoining the Department of Education and its officers, employees, and agents from implementing the Delay Regulation;

D.    Awarding Plaintiff its reasonable costs and attorney's fees incurred in the prosecution of this action; and

E.    Awarding such other equitable and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 12th day of July, 2018.


_____/s/ Jennifer J. Clark_____

Michael Harris*
NATIONAL CENTER FOR YOUTH LAW
405 14th St., 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Facsimile: (410) 835-8099
mharris@youthlaw.org

Crystal M. Adams*
NATIONAL CENTER FOR YOUTH LAW
1313 L St. NW, Suite 130
Washington, DC 20005
Telephone: (202) 868-4785
Facsimile: (202) 868-4788
cadams@youthlaw.org

Jennifer J. Clark (Bar No. 1003483)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
jennifer.clark@sidley.com

Jean-Claude André*
Benjamin G. Barokh*
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 400
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
JCAndre@sidley.com
bbarokh@sidley.com


* Application for admission *pro hac vice* to be submitted.