# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC. <br><br> Plaintiff, <br><br> v. <br><br> ELIZABETH (BETSY) DEVOS, SECRETARY OF EDUCATION; JOHNNY W. COLLET, ASSISTANT SECRETARY FOR SPECIAL EDUCATION AND REHABILITATIVE SERVICES; U.S. DEPARTMENT OF EDUCATION, <br><br> Defendants. | Civil No. 18-CV-01636-TSC |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Council of Parent Attorneys and Advocates, Inc. respectfully moves for summary judgment on the above-captioned action. Per Local Rule 7(a), this motion is accompanied by a statement of points and authorities upon which Plaintiff relies in support of this motion, which is combined with Plaintiff's memorandum in opposition to Defendants' Motion to Dismiss. A proposed order is also attached.

Dated: October 1, 2018                           Respectfully submitted,


Michael Harris (*admitted pro hac vice*)         Jennifer J. Clark (Bar No. 1003483)
NATIONAL CENTER FOR YOUTH LAW                    SIDLEY AUSTIN LLP
405 14th St., 15th Floor                         1501 K Street, NW
Oakland, CA 94612                                Washington, DC 20005
Telephone: (510) 835-8098                        Telephone: (202) 736-8000
Facsimile: (410) 835-8099                        Facsimile: (202) 736-8711
mharris@youthlaw.org                             jennifer.clark@sidley.com


                                                 Jean-Claude André (*admitted pro hac vice*)
                                                 SIDLEY AUSTIN LLP
                                                 555 West Fifth Street, Suite 400
                                                 Los Angeles, CA 90013
                                                 Telephone: (213) 896-6000
                                                 Facsimile: (213) 896-6600
                                                 JCAndre@sidley.com

                                                 *Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC. | Civil No. 18-CV-01636-TSC |
| Plaintiff, | |
| v. | |
| ELIZABETH (BETSY) DEVOS, SECRETARY OF EDUCATION; JOHNNY W. COLLET, ASSISTANT SECRETARY FOR SPECIAL EDUCATION AND REHABILITATIVE SERVICES; U.S. DEPARTMENT OF EDUCATION, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

    I.      IDEA and the 2016 Significant Disproportionality Regulations .................................... 3

    II.    The Delay Regulations ................................................................................................. 5

    III.   COPAA ......................................................................................................................... 8

STANDARD OF REVIEW ............................................................................................ 10

ARGUMENT .................................................................................................................. 10

    I.      COPAA AND ITS MEMBERS HAVE STANDING TO BRING THIS ACTION ... 10

            A.  COPAA Has Alleged and Proven Organizational Standing ........................... 11

            B.  COPAA Has Alleged and Proven Associational Standing ............................. 19

    II.    COPAA AND ITS MEMBERS HAVE STANDING TO BRING THIS ACTION ... 10

    III.   THE DELAY REGULATION IS ARBITRARY AND CAPRICIOUS .................... 21

            A.     ED's Failure to Provide a Reasoned Explanation for Delay Renders the Delay Regulation Arbitrary and Capricious. .............................................. 22

            B.     ED's Failure to Consider the Costs of Delay Renders the Delay Regulation Arbitrary and Capricious. .................................................................. 34

            C.     ED's Failure to Consider Reasonable Alternatives to Delay Renders the Delay Regulation Arbitrary and Capricious. .............................................. 39

            D.     ED's Failure to Provide for Meaningful Participation in the Rulemaking Renders the Delay Regulation Arbitrary and Capricious. ......................... 43

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)......................................................................................30

*Air All. Hous. v. EPA,*
    No. 17-115, 2018 WL 4000490 (D.C. Cir. Aug. 17, 2018).......................16, 24, 39

*Allen v. Wright,*
    468 U.S. 737 (1984)........................................................................................21

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015)..........................................................................10

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius,*
    901 F. Supp. 2d 19 (D.D.C. 2012) (Berman Jackson, J.), *aff'd*, 746 F.3d 468
    (D.C. Cir. 2014) ............................................................................................19

*California v. Bureau of Land Mgmt.,*
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) .......................................................41, 45

*CC Distribs., Inc. v. United States,*
    883 F.2d 146 (D.C. Cir. 1989).......................................................................21

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016)...................................................................................28

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009).......................................................................................21

*Friends of Animals v. Jewell,*
    828 F.3d 989 (D.C. Cir. 2016).......................................................................18

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016) (Kavanaugh, J. dissenting) ...........................38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)....................................................................................21, 34

*Multicultural Media, Telecom & Internet Council v. FCC,*
    873 F.3d 932 (D.C. Cir. 2017).......................................................................22

*People for the Ethical Treatment of Animals v. USDA,*
    797 F.3d 1087 (D.C. Cir. 2015)........................................................11, 13, 14, 15

iii

*Rural Cellular Ass'n v. FCC*,
  588 F.3d 1095 (D.C. Cir. 2009) ...........................................................22

*S.C. Coastal Conservation League v. Pruitt*,
  2018 WL 2184395 (D.S.C. May 11, 2018) ..............................................41

*S.C. Coastal Conservation League v. Pruitt*,
  318 F. Supp. 3d 959 (D.S.C. 2018) .........................................................44

*Scenic Am., Inc. v. United States Dep't of Transportation*,
  836 F.3d 42 (D.C. Cir. 2016) ..................................................................10

*Stuttering Found. of Am. v. Springer*,
  498 F. Supp. 2d 203 (D.D.C. 2007) (Contreras, J.) ...............................10

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
  412 U.S. 669 (1973) ................................................................................18

*Waterkeeper Alliance v. EPA*,
  853 F.3d 527 (D.C. Cir. 2017) ..........................................................10, 12

**Statutes and Regulations**

34 C.F.R. § 300.646 ......................................................................................26

34 C.F.R. § 300.647 ...................................................................................6, 27

34 C.F.R. § 300.755 ........................................................................................3

5 U.S.C. § 706(2) ..........................................................................................22

20 U.S.C. § 1412 ...........................................................................................26

20 U.S.C. § 1416 ...........................................................................................30

20 U.S.C. § 1418 .....................................................................................11, 32

20 U.S.C. § 1437 .............................................................................................6

42 U.S.C. § 1983 ...........................................................................................26

42 U.S.C. § 1988 ...........................................................................................26

42 U.S.C. § 2000d .........................................................................................26

Final Regulation Regarding Assistance to States for the Education of Children
  With Disabilities; Preschool Grants for Children With Disabilities, 81 Fed.
  Reg. 92376 (Dec. 19, 2016) ..............................5, 16, 20, 25, 26, 27, 33, 36, 37, 38

Final Rule Delaying Compliance Date Regarding Assistance to States for the
  Education of Children With Disabilities; Preschool Grants for Children With
  Disabilities, 83 Fed. Reg. 31306 (July 3, 2018)8, 11, 17, 21, 23, 24, 28, 30, 31, 32, 33, 35, 36,
  37, 40, 41, 43, 44

Individuals with Disabilities Education Act Amendments of 1997, 111 Stat. 37,
  102 (1997)..................................................................................................................3

Individuals with Disabilities Education Improvement Act of 2004, 118 Stat. 2647,
  2739 (2004) (codified at 20 U.S.C. § 1418(d)(1)) ...................................................4

Notice of Proposed Rulemaking Regarding Assistance to States for the Education
  of Children With Disabilities; Preschool Grants for Children With Disabilities,
  81 Fed. Reg. 10968 (Mar. 2, 2016)...........................................................................5

**Other Authorities**

Dear Colleague Letter: Preventing Racial Discrimination in Special Education,
  *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-
  201612-racedisc-special-education.pdf ...................................................................27

Enclosure to Letter from ED's Office of Special Education Program to Texas
  Education Agency (Jan. 11, 2018),
  https://www.ed.gov/fund/data/report/idea/partbdmsrpts/dms-tx-b-2017-
  enclosure.pdf...........................................................................................................30

Statement for Paperwork Reduction Act Submission, *available at*
  https://www.reginfo.gov/public/do/DownloadDocument?objectID=15940702 ....................11

Supporting Statement for Paperwork Reduction Act Submission, *available at*
  https://www.reginfo.gov/public/do/DownloadDocument?objectID=78801301 ......................6

U.S. Dep't of Ed., Significant Disproportionality (Equity in IDEA): Essential
  Questions and Answers, *available at* https://sites.ed.gov/idea/files/significant-
  disproportionality-qa-03-08-17.pdf .......................................................................27

## INTRODUCTION[1]

To prevent states from continuing to evade the Individuals with Disabilities Education Act (IDEA) requirement to determine whether any of their school districts have significant racial disproportionality in the identification, placement, and/or discipline of students in special education, the Department of Education[2] conducted a thorough rulemaking in 2016. That process produced final regulations ("the 2016 Regulations") adopting a standard methodology for determining significant disproportionality to help states "meaningfully identify [districts] with significant disproportionality" and to ensure "that children with disabilities are properly identified for services, receive necessary services in the least restrictive environment, and are not disproportionately removed from their educational placements by disciplinary removals." 81 Fed. Reg. 92376 (Ex. A). In response to comments, ED adopted multiple safeguards to protect against districts resorting to racial quotas to avoid a finding of significant disproportionality. ED further determined that states must comply with the standard methodology by July 1, 2018, over 18 months after the rule was promulgated.

Well into states' preparations to meet this deadline, ED dramatically changed course. It issued an NPRM offering only three options—delay the compliance date for one year, delay it for two years, or delay it for three years. 83 Fed. Reg. 8396 (Ex. B). ED declared that it would not consider any comments related to the substantive aspects of the rule. Consistent with its earlier statements and conduct, on July 3, 2018, ED published its final rule in the Federal

---

[1] Defendants did not file the certified list of the contents of the administrative record as required under Local Civil Rule 7(n)(1). Consequently, plaintiffs have included the portions of the administrative record cited herein as exhibits to this memorandum of points and authorities.
[2] This Memorandum of Points and Authorities uses "ED" to refer to the Department of Education in its rulemaking capacity and/or the three administrative defendants sued here.

Register delaying the July 1, 2018 compliance date for two years ("the Delay Regulation"). 83 Fed. Reg. 31306 (Ex. C).

In promulgating the Delay Regulation, ED violated multiple requirements of the Administrative Procedure Act (APA). ED provided no reasoned explanation for the delay, asserting a desire to reconsider the 2016 Regulations but nowhere explaining why it could not carry out that reconsideration without delaying the previously adopted compliance date. ED pointed to "concerns" that the standard methodology could incentivize the use of racial quotas but provided no factual support for these concerns, contradicted these concerns elsewhere in the final rule, and failed to explain why safeguards in the 2016 Regulations were insufficient.

ED also failed to consider important aspects of the problem. It recognized that fewer additional school districts would be identified as significantly disproportionate without the standard methodology. This meant that those districts and their students would not receive the state-provided reviews and targeted support provided by statute and the 2016 Regulations to assess compliance with IDEA and the causes of racial disparities and address them appropriately. But it failed to account for the delay's imposition of these costs on children, parents, and society. It also discounted the reliance costs expended by states in preparing to implement the standard methodology. ED further failed to adequately consider—and to provide a rational explanation for rejecting—reasonable alternatives to delay. Finally, as demonstrated by its pre-rulemaking statements and conduct and its refusal to fully consider comments and alternatives, ED failed to approach the rulemaking with a sufficiently open mind. These failures render the Delay Regulation arbitrary and capricious and contrary to procedure required by law.

Perhaps recognizing these fundamental flaws in its rulemaking process, ED now relies on a baseless 12(b)(1) motion to dismiss on standing grounds. Plaintiff, Council of Parent Attorneys

and Advocates (COPAA), meets the applicable standing requirements, based both on its own injuries as an organization from the delay and on the injuries to its members in the states that will now identify fewer additional districts as significantly disproportionate in 2018 through 2020. Although the harms continue to accumulate the longer the unlawful delay stays in effect, there is still time for states, most of whom had been prepared to implement the 2016 Regulations in July 2018, to use the standard methodology for this school year and the next. Removing the delay will provide benefits to COPAA, its members, and to society.

## STATEMENT OF FACTS

I.      **IDEA and the 2016 Significant Disproportionality Regulations**

IDEA is a comprehensive federal special education statute aimed at improving educational outcomes for students with disabilities. It ties significant federal funding to faithful implementation by states. *See* 20 U.S.C. §§ 1411, 1412. A consistent problem in implementing IDEA, however, has been the over- and under-representation of minority students in various facets of the special education system. *See* 20 U.S.C. § 1400(c)(12) (Congressional findings); Compl. ¶¶ 30-50, ECF No. 1. In 1997, Congress revised IDEA to require states to collect and examine data to determine if significant disproportionality based on race and ethnicity existed in the identification and placement of students with disabilities. Individuals with Disabilities Education Act Amendments of 1997, 111 Stat. 37, 102 (1997). The state was required to provide a review of school districts (also called local education agencies or LEAs) with significant disproportionality to ensure their policies, practices, and procedures complied with IDEA. *Id.* ED's regulations mirrored the statutory language. *See* 34 C.F.R. § 300.755 (2001).

In 2004, after finding yet more evidence of racial disproportionality in special education, Congress expanded the significant disproportionality provisions. First, it expanded the data collection requirement to include discipline in addition to identification and placement.

3

Individuals with Disabilities Education Improvement Act of 2004, 118 Stat. 2647, 2739 (2004)
(codified at 20 U.S.C. § 1418(d)(1)). Second, it required 15% of an identified LEA's federal
IDEA funds be set aside for comprehensive coordinated early intervening services.
§ 1418(d)(2)(B). Finally, it required LEAs to publicly report revisions of policies, practices, and
procedures undertaken after a mandatory review provided by the state, § 1418(d)(2)(A), (C).

Regulations adopted shortly thereafter left states to define the term "significant
disproportionality." 71 Fed. Reg. 46540, 46738 (Aug. 14, 2006); 34 C.F.R. § 300.646 (2007).
Unsurprisingly, states used their discretion to avoid the burdens imposed by § 1418(d)(2). A
Government Accountability Office (GAO) report from February 2013 found that "the way some
States defined overrepresentation made it unlikely that any districts would be identified." U.S.
Gov't Accountability Off., GAO-13-137, *Individuals with Disabilities Education Act: Standards
Needed to Improve Identification of Racial and Ethnic Overrepresentation in Special Education*
(2013), *available at* https://www.gao.gov/products/GAO-13-137. Indeed, 21 states did not
identify any districts with significant disproportionality, and "[a]mong the almost 15,000 school
districts nationwide that received IDEA funding in school year 2010-11," only 356 (2.4 percent)
were identified as significantly disproportionate. *Id.* at 7. Of the districts identified, over half
were located in only five states, with 73 in Louisiana. *Id.* The GAO therefore recommended "a
standard approach for defining significant disproportionality to be used by all states." *Id.* at 22.

Responding to these findings, in June 2014, ED issued a Request for Information in
which it conveyed its concern "that the definitions and procedures for identifying LEAs with
significant disproportionality that many States have established may set the bar so high that even
LEAs with significant racial and ethnic disparities in the identification of children for special
education are not identified." 79 Fed. Reg. 35154, 35155 (June 19, 2014). Then, in March 2016,

4

ED issued a Notice of Proposed Rulemaking (NPRM) that would require states to use a standard methodology for calculating significant disproportionality. 81 Fed. Reg. 10968 (Mar. 2, 2016).[3] After a comment period, in December 2016, ED adopted final regulations, *see* 34 C.F.R. §§ 300.646, 300.647, with several significant changes designed to address comments, *see* 81 Fed. Reg. 92378 (Ex. A). ED explained that "given the widespread disparities in rates of identification, placement, and disciplinary removal across racial and ethnic groups" and the "relatively low number of LEAs identified as having significant disproportionality," it was concerned "about whether the prior approach [by states] was being implemented to meet Congress' intent." *Id.* at 92456. One issue addressed at length was whether LEAs would be incentivized to use racial quotas to avoid being identified. ED responded to that concern by amending the regulation and in many other ways, which are discussed in more detail in Part II.A.2, *infra,* and concluded that, together, these multiple safeguards adequately addressed any risk. 81 Fed. Reg. at 92382-83, 92385, 92454 (Ex. A). Finally, ED concluded that the regulations' benefits "are substantial and outweigh the estimated costs[.]" *Id.* at 92458. The regulations took effect on January 18, 2017, but ED set the compliance date at July 1, 2018, to allow states time to solicit input from stakeholders, update their data systems, and train their staff and the LEAs. *Id.* at 92378.

## II.    The Delay Regulations

On December 15, 2017, The Washington Post and The New York Times quoted an ED spokesperson as saying that "the department is looking closely at this [significant disproportionality] rule and has determined that, while this review takes place, it is prudent to

---

[3] That methodology uses so-called "risk ratios" to analyze disparities for seven racial or ethnic groups and compares each to all other children within the school district in fourteen different categories. 81 Fed. Reg. 10968, 10973-78.

delay implementation for two years." Moriah Balingit, *DeVos Wants to Delay Special-Education Rule Intended to Protect Minority Students*, WASH. POST (Dec. 15, 2017); Erica L. Green, *DeVos Delays Rule on Racial Disparities in Special Education*, N.Y. TIMES (Dec. 15, 2017); *see* 83 Fed. Reg. at 31311 (Ex. C) (reprinting spokesperson's statement).

Moreover, one month earlier, ED withdrew from its Annual State Application the questions that it had intended to add to collect data regarding implementation of the standard methodology.[4] Under the 2016 Regulations, each state would have been required to report in its Annual Application "all risk ratio thresholds, minimum cell sizes, minimum n-sizes, and standards for measuring reasonable progress … and the rationales for each." 34 C.F.R. § 300.647(b)(7). But in November 2017, ED announced that the application for the 2018-19 school year "no longer includes the requirement to collect and report the significant disproportionality data" required by § 300.647(b)(7) because "the Department continues to analyze the significant disproportionality regulations to further examine issues such as fiscal impact on SEAs and LEAs and unintended consequences of the regulations, particularly on the identification of children with disabilities."[5]

It was not until February 27, 2018—more than three months after it decided not to collect information from states on implementing the standard methodology and two months after it stated that it had determined to delay the 2016 Regulations—that ED issued an NPRM proposing a delay in the regulations' compliance date from July 1, 2018 to July 1, 2020. 83 Fed. Reg. 8396

---

[4] Each state files an Annual State Application with ED to receive federal funds under IDEA. *See* 20 U.S.C. § 1437.
[5] ED announced the removal of the questions in a Paperwork Reduction Act filing with the Office of Management and Budget. Supporting Statement for Paperwork Reduction Act Submission at 2, *available at* https://www.reginfo.gov/public/do/DownloadDocument?objectID=78801301.

(Ex. B). The NPRM invited comments "on proposed delayed compliance dates only." *Id.* at 8396. Consistent with previous indications that a delay was preordained, the NPRM warned that ED "will not consider comments on the text or substance of the final regulations." *Id.*

ED identified five areas of concern warranting study and delay, including whether the regulations incentivize LEAs to establish quotas.[6] *Id.* at 8397.

In considering alternatives to a two-year delay, the NPRM explained that one year is "too little time as a general matter" and three years was too long "given the amount of work on this issue the Department has already done." *Id.* at 8398. The NPRM did not consider non-delay alternatives. Further, in considering costs and benefits, the NPRM estimated that a delay would generate savings for states and LEAs of $10.9-11.5 million over ten years. *Id.* It did not identify any costs of the delay, concluding that there would be none. *Id.*

After receiving comments, including lengthy comments from COPAA opposing delay and proposing alternatives, *see* Part II.C, *infra*, ED adopted the proposed Delay Regulation in full on July 3, 2018—two days after states were required to be in compliance with the 2016 Regulations—without any change from the NPRM. 83 Fed. Reg. 31306 (Ex. C). The final Delay Regulation estimated $7.4-7.8 million in savings over ten years, but once again focused only on savings to regulated entities and largely ignored costs to parents, students, and society. *Id.* at 31315. ED also dismissed as "sunk investments" the substantial funds many states had already spent in reliance on the 2016 Regulations. *Id.* at 31316; *see also* Compl. ¶¶ 113-16.

ED repeatedly stated that it was delaying the 2016 Regulations in order to reconsider the issues presented in that rulemaking. Of the areas for further study noted in the NPRM, ED relied

---

[6] These "concerns" were raised in response to a general solicitation for regulatory reform. Of the more than 16,000 comments responding to the solicitation, only seven formed the basis for ED's NPRM. *See* Compl. ¶ 92; Adams Aff. ¶ 25.

only on its "concern" that a uniform methodology "may create an incentive for LEAs to establish de facto quotas" to avoid being identified as having significant disproportionality. 83 Fed. Reg. 31308 (Ex. C). Notwithstanding ED's acknowledgment that it had addressed quotas when adopting the 2016 Regulations, it claimed in the Delay Regulation that, "even in the absence of changed facts and circumstances," it had not given sufficient weight to the potential risk of such quotas at the time. *Id.* at 31311. ED needed time, it said, to "evaluate whether the numerical thresholds in the 2016 significant disproportionality regulations may incentivize quotas," *id.* at 31308, even as it left states free to use the uniform methodology anyway, *id.* at 31309.

## III.   COPAA

Plaintiff COPAA is a national non-profit organization of more than 2,100 parents of children with disabilities, their attorneys, and their advocates. COPAA has parent members in all 50 States. Its mission is to protect the legal and civil rights of students with disabilities and their families.

COPAA accomplishes its mission in various ways in its daily operations. Among other things, it educates members of the public about the educational experiences of children with disabilities and their families (including the intersection of race and disability). Parents of students with disabilities and their advocates and attorneys also enlist COPAA to help them select the best school district for their child. COPAA maintains an extensive resource library that includes COPAA-created and commercially prepared webinars and other information, and issues reports and policy papers on issues important to its members, including racial disparities. Compl. ¶¶ 12-18, 123; Almazan Aff. ¶¶ 4-5, 9-10, 15, 17.

Data disaggregating placement, identification, and discipline by race *and* disability categories is rarely publicly reported at the school district level, so COPAA relies, in part, on the

determinations of significant disproportionality announced by the states in determining which school districts have the most significant racial disparities in that state. In preparing its educational materials, COPAA also relies on the publicly reported revisions required of LEAs if violations are found. Compl. ¶¶ 12-18, 119, 122; Almazan Aff. ¶¶ 7-8, 16.

The two-year delay of the 2016 Regulations hampers COPAA's public education activities by reducing the amount of information available to it about significant disproportionality at the state and local levels compared to what it would have received under the 2016 Regulations. The delay deprives COPAA of information on which it routinely relies when reported by the existing school districts currently identified. This present lack of additional information directly conflicts with COPAA's mission and frustrates its public education efforts. COPAA is now required to expend resources in states that have taken the delay (which is at least four) to obtain information about significant disproportionality (including state significant disproportionality formulas and thresholds) and effective remedies, through investigations, research, and state and local public records. But for ED's Delay Regulation, COPAA would not need to undertake such extensive efforts anymore. COPAA anticipated spending less annually under the 2016 Regulations, for both the hard costs previously spent and the additional costs required, but COPAA estimates that it will cost over $37,000 annually to engage in efforts targeted at states that took the delay. Compl. ¶¶ 116-23; Almazan Aff. ¶¶ 6, 8, 13-19, 23-24.

COPAA's members have also been individually harmed by the delay. In two states (Colorado and Missouri), COPAA has active members whose children are enrolled in school districts that would have been identified as significantly disproportionate absent the Delay Regulation. Those parents, and likely other COPAA members, have lost important practical services that would have flowed from a determination of disproportionality, including an

automatic review provided by the state of the policies, practices and procedures—including individual review of their child's identification, placement, or discipline—and mandatory revisions of any illegal practices. They also lost the opportunity for their district to engage in a root-cause analysis to ensure that the comprehensive coordinated early intervening services ("CEIS") are used toward reducing such disparities. Compl. ¶¶ 117-19; Almazan Aff. ¶¶ 21-22; Adams Aff. ¶¶ 3-7, 13-17; Cone Aff. ¶¶ 3-5, 7-8; Gerlend Aff. ¶¶ 3-6.

## STANDARD OF REVIEW

For purposes of ED's facial Rule 12(b)(1) motion on standing, the factual allegations of the complaint are accepted as true and all reasonable inferences are drawn in COPAA's favor. *See Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). For purposes of COPAA's motion for summary judgment, COPAA "must support each element of its claim to standing by affidavit or other evidence." *Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 48 n.2 (D.C. Cir. 2016).

Because this is "a case involving review of a final agency action under the Administrative Procedure Act, … [s]ummary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (Contreras, J.).

## ARGUMENT

### I.     COPAA AND ITS MEMBERS HAVE STANDING TO BRING THIS ACTION

ED spends more than 40 pages arguing that COPAA lacks Article III standing. In doing so, it overlooks the three most on-point D.C. Circuit decisions: *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), and *Waterkeeper Alliance v. EPA*, 853 F.3d 527 (D.C. Cir. 2017)—neither of which is cited at all—and *People for the Ethical Treatment of Animals v. USDA ["PETA"]*, 797 F.3d 1087 (D.C. Cir. 2015)—which appears in

its motion only as quoted in other cases. These binding cases, however, resolve the bulk of ED's arguments that COPAA lacks Article III standing in its own right. And its arguments challenging COPAA's associational standing on behalf of its members are even weaker.

## A. COPAA Has Alleged and Proven Organizational Standing

Like an individual, COPAA has organizational standing if it suffers actual or threatened injury that is fairly traceable to the allegedly unlawful agency action and likely to be redressed by a favorable ruling. *See PETA*, 797 F.3d at 1093.

1. ED agrees (Mem. Supp. Mot. to Dismiss 34-35, ECF No. 14 [hereinafter Mem.]) that the denial of information can constitute injury in fact. At minimum, "[a] plaintiff suffers an 'injury in fact' when agency action cuts him off from 'information which must be publicly disclosed pursuant to a statute.'" *Waterkeeper*, 853 F.3d at 533 (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998)). ED has taken the position, and does not dispute here, that each state must publicly disclose its significant disproportionality designations of LEAs.[7] ED agrees (Mem. 35) that IDEA requires public disclosure of revisions made by LEAs that result from the state-provided review that is triggered by being identified as significantly disproportionate. 20 U.S.C. § 1418(d)(2); 34 C.F.R. § 300.646(c)(2). Nor can there be a dispute that COPAA claims that reviewing these public disclosures would help it and its work. Compl. ¶¶ 17, 119-20, 122-23; Almazan Aff. ¶¶ 6, 8, 15-16.

That is all that is necessary to establish COPAA's Article III injury. In *Waterkeeper*, the EPA issued a regulation that "reduce[d] the information that must be publicly disclosed" and

---

[7] *See, e.g.*, 20 U.S.C. § 1418(b)(1) (requiring states to publicly disclose any information that ED requires them to collect); 83 Fed. Reg. at 31313 (Ex. C) (ED requires states to report "whether each LEA was identified"); Supporting Statement for Paperwork Reduction Act Submission, at 4, *available at* https://www.reginfo.gov/public/do/DownloadDocument?objectID=15940702.

"[a]s a result Waterkeeper (and others) who previously sought that information no longer have a statutory right to access it." 853 F.3d at 533. The court of appeals held: "For the purpose of standing, that's injury enough." *Id.* There is no additional requirement because the plaintiff is an organization. Organizations "need not satisfy *Havens* [*Realty Corp. v. Coleman*, 455 U.S. 363 (1982)] requirement for organizational standing" when they have "already established their informational standing by alleging that they were deprived of information to which they are entitled by statute, and demonstrating that there is no reason to doubt their claims that the information would be helpful to them." *Campaign Legal Ctr. v. FEC*, 245 F. Supp. 3d 119, 128 (D.D.C. 2017) (Bates, J.) (citing D.C. Circuit cases).

2. In any event, the D.C. Circuit has twice found organizational standing based on informational injury in circumstances closely aligned with this case. These decisions dispose of ED's arguments (Mem. 16-18, 30-31) that COPAA's injuries are abstract, a generalized interest in enforcement of the law, or a mere frustration in mission or objectives.

In *Action Alliance*, "four organizations that endeavor[ed], through informational, counseling, referral, and other services, to improve the lives of elderly citizens" sued the Department of Health and Human Services (HHS). They alleged the agency had, *inter alia*, promulgated regulations that unlawfully omitted provisions requiring third parties to provide HHS "with a self-evaluation listing all the age distinctions they utilize and the justification for each" and other "compliance information." 789 F.2d at 935. HHS's omissions, in turn, "significantly restrict[ed] that flow" of "information regarding services available to the elderly." *Id.* at 937.

The D.C. Circuit concluded that the plaintiffs had pleaded "the same type of injury as the plaintiffs in *Havens Realty*: the challenged regulations den[ied] the [plaintiffs] access to

12

information … they wish to use in their routine information-dispensing, counseling, and referral activities." *Id*. at 937-38. "Unlike the mere interest in a problem or [an] ideological injury," the plaintiffs had "alleged inhibition of their daily operations, an injury both concrete and specific to the work in which they are engaged." *Id*. at 938 (quotation marks and citations omitted).[8]

Likewise, in *PETA*, the organizational plaintiff alleged that the Department of Agriculture (USDA) had established an informal system for complaints alleging violations of the Animal Welfare Act (AWA), and that, after investigating complaints, the resulting USDA reports were then made available to the public in an online database. PETA had a "normal process of submitting USDA complaints" and used the information reported in the database to educate its members and the public. 797 F.3d at 1094. The USDA, however, had refused to investigate and therefore publicly report on bird-mistreatment allegations. The D.C. Circuit sustained PETA's standing to challenge this refusal on two independent grounds, one of which was informational standing. The court held that USDA's failure to accept complaints about bird-related mistreatment denied PETA "access to bird-related AWA information including, in particular, investigatory information," *id.* at 1095, which in turn "deprive[d] PETA of information on which it routinely relie[d] in its efforts to educate the public," *id.* at 1096 (quoting complaint). PETA responded to this deprivation by "expend[ing] resources to obtain information about the conditions of birds ..., including through investigations, research, and state and local public records requests." *Id.*

The court rejected USDA's claim—made here too (Mem. 17-18)—that, because the USDA did not itself mistreat animals or take actions that "directly result in the mistreatment of

---

[8] Although *Action Alliance*'s correctness has been questioned, it remains binding. *See PETA*, 797 F.3d at 1099 (Millet, J., concurring dubitante) ("The majority opinion hews faithfully to precedential lines, as we must at this procedural juncture.").

animals" by third parties, USDA was not "at loggerheads" with PETA's mission. 797 F.3d at 1095. The court explained that PETA's injuries "do not result from the mistreatment of birds by third parties, but rather from 'a lack of … information for its membership,'" which "*does* hamper and directly conflicts with PETA's stated mission of preventing 'cruelty and inhumane treatment of animals' through, *inter alia,* 'public education.'" *Id.*

Likewise, here, in order to continue to educate the public, policy makers, and its members, COPAA will have to find the same information elsewhere. Such efforts include independent investigation and public records requests to numerous states and LEAs; researching the labyrinth of state significant disproportionality formulas and thresholds; and reaching out to parents directly. These more costly methods hardly guarantee the same information, impairing COPAA's ability to provide the same robust guidance to the public and its members. Compl. ¶¶ 14-18, 119-122; Almazan Aff. ¶¶ 6, 8, 14-16, 23-24. Indeed, in this regard, COPAA's allegations and affidavit mirror the information injury allegations found sufficient in *PETA*.

| Allegations quoted in *PETA*, 797 F.3d at 1095-96 | Allegations from COPAA Complaint |
|---|---|
| "One of the primary ways in which PETA works to prevent cruelty to and inhumane treatment of animals used for entertainment is by educating the public, especially through informational services." ¶ 16 | "COPAA's mission is to protect and enforce the legal and civil rights of students with disabilities and their families." ¶ 12 <br> "In its daily operations, COPAA accomplishes its mission by, among other things: … educating members of the public … about the educational experiences of children with disabilities and their families (including the intersection of race and disability) …" ¶ 14 |
| "The USDA's AWA inspection reports are the primary source of information relied upon by PETA in preparing these educational materials." ¶ 17 | "These reports and analyses are an important source of information relied upon by COPAA in preparing educational materials, …" ¶ 119 |
| "[T]he USDA's failure to regulate birds under the AWA ... deprives PETA of information on which it routinely relies in its efforts to educate the public ..." ¶ 15. | "The Department's failure to require compliance with the 2016 Final Regulations deprives COPAA of information on which it routinely relies …." ¶ 122 |

| | |
|---|---|
| "This embargo on information regarding the conditions of birds used for exhibition directly conflicts with PETA's mission to prevent cruelty to and inhumane treatment of animals and frustrates its public education efforts." ¶ 18. | "This lack of information directly conflicts with COPAA's mission to prevent violations of the IDEA and frustrates its public education efforts." ¶ 122 |
| "As a result of the USDA's failure to regulate birds under the AWA, PETA is required to expend resources to obtain information about the conditions of birds ..., including through investigations, research, and state and local public records requests." ¶ 19. | "As a result of the Department's Delay Regulation, COPAA is required to expend resources to obtain information about significant disproportionality, and effective remedies, through investigations, research, and state and local public records requests." ¶ 122 |
| "But for the USDA's failure to regulate birds under the AWA, PETA would not need to undertake ... extensive efforts..." ¶ 20. | "But for the Department's Delay Regulation, COPAA would not need to undertake such extensive efforts." ¶ 123. |
| "PETA estimates that, as a direct result of the USDA's failure to regulate birds ..., it has been forced to expend more than $10,000 on staff attorney time not related to this litigation and related expenses" and it expects to "continue expending more than $3,000 per year on the same unless and until the court grants the relief requested in this case." ¶ 20. | "The delay in requiring all States to comply with the 2016 Final Regulations has already impaired and will continue to impair COPAA's ability to bring potential IDEA violations to the attention of the Department and to continue to educate the public about racial disproportionality and possible remedies." ¶ 121 |

*PETA* also rejected the argument—likewise made here (Mem. 29-30)—that these concrete resource injuries were "self-inflicted." The court held that so long as the organization "'undertook the expenditures in response to, and to counteract, the effects of the defendants' alleged' unlawful acts 'rather than in anticipation of litigation,'" it does not matter whether the organization "'voluntarily, or willfully ... diverts its resources.'" *PETA*, 797 F.3d at 1096-97 (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)).

3. None of ED's arguments takes this case outside the scope of *Action Alliance* and *PETA*. ED first argues (Mem. 29) that "Plaintiff is currently in the same situation it has always been in and cannot demonstrate any injury to its daily operations and activities" from the two-year delay. That is factually wrong: the delay of the compliance date was not published in the Federal Register until July 3, two days after the period of compliance had started. It is also legally wrong: in judging standing, one compares the world as it exists now and the world as it

15

would exist if the agency had not engaged in the action that allegedly violates the law. *See Air All. Hous. v. EPA*, No. 17-1155, 2018 WL 4000490, at *13 (D.C. Cir. Aug. 17, 2018) ("[T]he baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated."). And it is inconsistent with *Action Alliance* and *PETA*. In *Action Alliance*, the plaintiffs challenged informational limitations in a new regulation. In *PETA*, the agency had not previously compiled investigation materials for bird-related complaints. The allegation in both cases—that unlawful agency action resulted in the organizations not having all the information to which they were legally entitled—was sufficient, even if they had previously not had access to the information.

Second, ED argues that COPAA's informational injury is too speculative because whether there will be more information that must be publicly released is contingent on (1) whether states' implementation of the 2016 Regulations leads to an increase in LEAs identified as significantly disproportionate (Mem. 18-28); and (2) whether the automatic state reviews of any of those newly identified LEAs identify any policies, practices, or procedures that must be revised, which would then trigger the public reporting requirement (Mem. 31-33).

ED's own prior determinations defeat this argument. In promulgating the 2016 Regulations, ED stated that, even taking into account all the regulations' flexibility, it was "highly unlikely" that no additional LEAs would be identified by states under the regulations and that "the most reasonable estimate" was 400 additional LEAs. 81 Fed. Reg. at 92462. And (Ex. A). Likewise, in promulgating the Delay Regulation, ED estimated that the delay would reduce the number of additional LEAs that are identified as significantly disproportionate in the 2018-19 and 2019-20 school years. 83 Fed. Reg. at 31316 (number of additional LEAs identified would drop to 150 in 2018-19, and to 220 in 2019-20). ED appears to suggest that the court cannot

credit these estimates because ED said it could not "know with a high degree of certainty" the precise number of LEAs that would be identified under the 2016 Regulations (Mem. 24-25 (citing 81 Fed. Reg. at 92388)). But a plaintiff's "burden of proof is not to demonstrate certainty" but merely "to show a '*substantial probability*'" of injury. *In re Idaho Conservation League*, 811 F.3d 502, 508 (D.C. Cir. 2016).

Additionally, COPAA has identified four states that have taken advantage of the delay (Colorado, Maine, Missouri, and South Dakota). According to those states' education agencies, three of them would have identified more LEAs if they had applied the 2016 Regulations' standard methodology and one declined to provide that information. Colorado reported that it would not identify any LEAs as significantly disproportionate in the 2018-19 school year under its methodology, but that it would have identified five LEAs under the 2016 Regulations; South Dakota reported that it was identifying one LEA under its methodology, but it would have identified ten LEAs under the 2016 Regulations. And Missouri predicted that it would identify zero LEAs under its methodology, but as many as 33 under the 2016 Regulations. Adams Aff. ¶¶ 3-24. This information plainly moves COPAA's claim of injury beyond the speculative.

Finally, regarding how many of the additionally identified LEAs would publicly report revisions, ED estimated in the 2016 Regulations that "half of the new LEAs identified with significant disproportionality … would need to revise their policies, practices, and procedures," 81 Fed. Reg. at 92461 (Ex. A), an estimate it decided not to modify in promulgating the Delay Regulation, 83 Fed. Reg. at 31316 (Ex. C); *see also* Almazan Aff. ¶ 20. Because COPAA is a "national organization[]" that deals with students with disabilities "throughout the nation," it is "injured by a loss of information in any location" and "need not show that any particular" LEA would publicly report revisions. *Action All.*, 789 F.2d at 939 n.9. ED's own estimate is certainly

17

sufficient to establish that there is a substantial probability that at least one of the additionally identified LEAs would do so, which is all that is necessary to establish COPAA's informational injury-in-fact. *See id.* at 937 (injury "need not be large or intense; an 'identifiable trifle' … is sufficient to meet the constitutional minimum").[9]

4. ED makes similar arguments (Mem. 39-43) in challenging causation and redressability, consistent with its acknowledgement (Mem. 33 n.5, 36 n.6) that its challenge to the existence of injury could alternatively be framed in those terms. These arguments fail for the same reasons discussed above.

A plaintiff has standing to challenge conduct that indirectly results in injury, as long as the injury is fairly traceable to the challenged conduct. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688-89 (1973). The cases cited by ED simply clarify that speculating that a favorable court decision would alter a regulated entity's behavior is insufficient. *See Scenic Am.*, 836 F.3d at 51-53 (finding, and surveying prior cases finding, lack of standing where vacatur of challenged regulation or policy would not make

---

[9] ED also argues (Mem. 33-36) that because LEAs are not required to make the root-cause analysis public, the loss of these analyses cannot qualify as informational injury. But in both *Action Alliance* and *PETA*, there was no legal obligation to disclose information. *See PETA*, 797 F.3d at 1103 (Millet, J., concurring dubitante) ("there is no suggestion that anything in the Animal Welfare Act or any regulation gives PETA any legal *right* to such information or reports"). It is sufficient that the analyses, once created, can be obtained through public records requests. *See Animal Legal Def. Fund, Inc. v. Glickman*, 943 F. Supp. 44, 53 (D.D.C. 1996) (Richey, J.) ("the agency's action in not accepting the individual plans in order to shield them from the public access provisions of FOIA directly results in injury to the [organization's] informational and counseling activities"), *rev'd on other grounds,* 204 F.3d 229, 236 (D.C. Cir. 2000). While there is language in *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016), supporting ED's argument, that case does not cite or discuss *Action Alliance* and *PETA*, and of course was not free to overrule them. In any event, ED does not dispute that public disclosures of significant disproportionality designations and "revisions, if any, made by school districts identified with significant disproportionality to their policies, procedures, and practices" are statutorily required. (Mem. 35; page 11 n.7, *supra*).

regulated entities' allegedly harmful conduct any less "voluntary"). But here, if the Delay Regulation is vacated, the 2016 Regulations will again impose a mandatory obligation on each state regarding how to determine significant disproportionality. That will have real world effects on the conduct of the states. Moreover, as shown above, the Delay Regulation already resulted in some states (at least four) not using the federal methodology and therefore not identifying any (or as many) LEAs as significantly disproportionate. *See* page 17, *supra*. Vacating the Delay Regulation would redress that by requiring all states (including the four identified) to comply with the 2016 Regulations; and three of those states have stated that if that happens, despite all the regulations' flexibilities, they would increase the number of LEAs identified. *See id.*

## B.  COPAA Has Alleged and Proven Associational Standing

Associational standing exists when at least one of the organization's members would otherwise have standing to sue; the interests the organization seeks to protect are germane to its purposes; and neither the claim asserted nor the relief requested requires individual members' participation. *See Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 53 (D.C. Cir. 1988).

ED properly does not challenge the second or third requirements. As an entity whose sole mission is protecting the legal and civil rights of students with disabilities and their families, COPAA's interests are plainly germane to this lawsuit. *See id.* at 56 (requiring "only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together"). Nor do any individual COPAA members need to participate in this litigation for declaratory and injunctive relief. *See id.* at 53 & n.8.

ED contends (Mem. 38-39) that the complaint is deficient because it does not identify by name members who have been injured. "At the pleading stage, . . . the plaintiff need not identify an affected member by name." *Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012) (Berman Jackson, J.), *aff'd*, 746 F.3d 468 (D.C. Cir. 2014). But in

19

any event, COPAA has now identified members whose children are enrolled in LEAs that the states said would have been identified as significantly disproportionate but for the Delay Regulation. Almazan Aff. ¶ 21; Adams Aff. ¶¶ 3-7, 13-17; Cone Aff. ¶¶ 3-5, 7-8; Gerlend Aff. ¶¶ 3-6.

For the reasons discussed above in Part I.A, these named individual members have suffered informational injury caused by the Delay Regulation, which could be redressed by vacating it. *See Waterkeeper*, 853 F.3d at 533. The loss of information to parents undermines IDEA's key emphasis on parental involvement, *see Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 523-24 (2007), by keeping parents ignorant of important developments that shape countless decisions—from picking which school district to live in, to voting for local school boards, to coordinating individual education plans. *See Akins*, 524 U.S. at 21 (finding informational standing where "[t]here is no reason to doubt [plaintiffs'] claim that the information would help them").

ED does not address the additional injury to COPAA's members caused by the Delay Regulation, which is the failure to designate their LEAs as significantly disproportionate and which in turn denied them an automatic state review to identify students that are misidentified, misplaced, or improperly disciplined and correct such mistakes. Compl. ¶ 118; Cone Aff. ¶ 6-7; Gerlend Aff. ¶ 6.[10] As ED itself originally explained, "[i]f the State identifies noncompliance with a requirement of IDEA through this review, … the State must ensure that the LEA has corrected each individual case of noncompliance, unless the child is no longer within the jurisdiction." 81 Fed. Reg. at 92391 (Ex. A). ED thus acknowledged in promulgating the Delay

---

[10] Although the state is required to "provide" the review, ED has said that "the State may select another entity, such as the LEA, to actually conduct the review." 81 Fed. Reg. at 92445. (Ex. A).

Regulation that "as a result of fewer LEAs being identified with significant disproportionality during the period of delay," "some inappropriate policies, practices, and procedures may not be revised." 83 Fed. Reg. at 31316 (Ex. C). If the members have to wait until 2020, it will be too late to detect or remedy this school year's violations.

Even if a member cannot "show that [he or she] was *certain to receive*" corrections to his or her child's treatment or the information flowing from an LEA's revisions to policies, practices, and procedures, that member still suffers "a constitutionally cognizable injury by the loss of an *opportunity*" for automatic annual state review of his or her child's LEA. *See CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (loss of opportunity to compete for contract sufficient injury). Moreover, a student in an LEA that would have been designated significantly disproportionate suffers injury because students of a particular race are over- or under-represented in special education placements or exclusionary discipline, thus diminishing the student's "ability to receive an education in a racially integrated school." *Allen v. Wright*, 468 U.S. 737, 756 (1984) ("diminished ability" is "beyond any doubt" a "judicially cognizable" injury).

COPAA thus has demonstrated both organizational and associational standing.

## II.    THE DELAY REGULATION IS ARBITRARY AND CAPRICIOUS

In promulgating the Delay Regulation, ED ran afoul of basic requirements of reasoned decisionmaking and procedural regularity under the APA. The APA requires agencies to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), to provide a reasoned explanation for departing from prior factfinding, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), to consider all important aspects of the problem, *see State Farm*, 463 U.S. at

43, and to address "reasonably obvious alternatives" to the proposed action, *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 942 (D.C. Cir. 2017). The APA also requires agencies to provide the public a "meaningful opportunity" to participate in the rule making, which means the agency "must remain sufficiently open-minded." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). In adopting the Delay Regulation, ED met none of these requirements. As a result, this Court must "hold unlawful and set aside" ED's action as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "without observance of the procedure required by law." 5 U.S.C. § 706(2)(A), (D).

> **A.**   **ED's Failure to Provide a Reasoned Explanation for Delay Renders the Delay Regulation Arbitrary and Capricious.**

ED failed to provide a reasoned explanation for delaying compliance with the 2016 Regulations. ED repeatedly asserted that it was delaying compliance so it could reconsider the 2016 Regulations but offered no explanation why delay was necessary to enable such reconsideration. ED's stated "concerns" that the 2016 Regulations could incentivize LEAs to resort to racial quotas to avoid a finding of significant disproportionality similarly fall short of the required reasoned explanation for delay: ED offered no valid support for such concerns, and its asserted concerns are inconsistent with its reasoning elsewhere in the Delay Regulation.

> *1.*   *ED Failed to Explain Why It Could Not Re-Evaluate the 2016 Regulations Absent a Delay*

A major theme of the Delay Regulation was that ED needed more time to determine whether the 2016 regulations were beneficial.[11] ED offered no explanation why keeping the previously determined compliance date would prevent it from re-evaluating the regulation.

---

[11] 83 Fed. Reg. at 31308 (Ex. C) ("we believe it is necessary to evaluate further the issues raised in this rulemaking"); *id*. ("further evaluation is needed"); *id*. ("We are delaying the compliance

The D.C. Circuit recently held that a "Delay Rule" promulgated by the EPA was arbitrary and capricious for this very reason. In *Air Alliance Houston v. EPA*, the court held that the "EPA's explanations for its changed position on the appropriate … compliance date[]"—which closely parallel ED's explanations here—were "inadequate under *Fox* and *State Farm*, and therefore arbitrary and capricious." *Air All. Hous.*, 2018 WL 4000490, at *12. The court rejected the EPA's argument that delaying the compliance date was necessary to provide time to consider "any potential revisions or rescission" of the rule. *Id.* EPA did not explain "how the effectiveness of the rule would prevent [it] from undertaking notice and comment or other tasks for reconsideration," "why a delay is necessary to [the agency's] process," or how the rule "becoming effective on schedule would otherwise impede [the agency's] ability to reconsider that rule." *Id.* (citing *Public Citizen v. Steed*, 733 F.2d 93, 102 (D.C. Cir. 1984) ("Without a showing that the old policy is unreasonable, for [the agency] to say that no policy is better than the old policy solely because a new policy *might* be put into place in the indefinite future is as silly as it sounds.")).

As the court explained, "Agencies regularly reconsider rules that are already in effect," and "'a decision to reconsider a rule does not simultaneously convey authority to indefinitely delay the existing rule pending that reconsideration.'" *Id.* (quoting *NRDC v. NHTSA*, 894 F.3d 92, 111-12 (2d Cir. 2018)). The court held: "[T]he mere fact of reconsideration, alone, is not a sufficient basis to delay promulgated effective dates specifically chosen by EPA on the basis of public input and reasoned explanation." *Id.*

---

date to evaluate our regulatory approach …."); *id.* ("important issue[s] to examine further before requiring compliance with the 2016 significant disproportionality regulations"); *id.* at 31309 ("allow the Department to evaluate these important issues further"); *id.* at 31311 ("warrants further examination prior to requiring compliance"); *id.* at 31314 ("We believe that further review of the regulations is necessary ….").

Likewise here, ED asserted that the purpose of the delay is to "explore how to best implement the statute in a legally viable manner that addresses over-identification, without incentivizing under-identification." 83 Fed. Reg. at 31307 (Ex. C). ED offered no reason why it could not, as COPAA's comment urged, "require compliance with the 2016 significant disproportionality regulations until the Department develops a new regulation to supersede it." *Id.* at 31307-08. It stated that it was prudent to undertake its re-evaluation "before" compliance with the existing regulation was required, but offered no reason for its preference. *Id.* at 31308 (question of quotas "is an important issue to examine further before requiring compliance with the 2016 significant disproportionality regulations"); *see also id.* at 31310 ("it is more prudent to delay the compliance date and address that [quota] concern through a review of the standard methodology before States are required to implement the regulations rather than during implementation"). ED nowhere explained how the significant disproportionality rule's compliance date "would prevent [it] from undertaking notice and comment or other tasks for reconsideration," "why a delay is necessary to [the agency's] process," or how the rule "becoming effective on schedule would otherwise impede [ED's] ability to reconsider" the significant disproportionality rule. *Air All. Hous.*, 2018 WL 4000490, at \*12. ED's reliance merely on its interest in reconsidering the 2016 Regulations is not a "sufficient basis to delay" the compliance date specifically chosen by ED in 2016. *Id.*

> 2. *ED's Asserted Concerns About Possible Incentives to Use Racial Quotas Provide No Reasoned Basis For Delaying the Rule*

In 2016, ED determined that multiple safeguards discussed below adequately addressed any risk that the 2016 Regulations would incentivize LEAs to use racial quotas. In adopting the Delay Regulation, ED did not credit that determination. But, at the same time, it did not determine that the safeguards were inadequate or that the regulations would lead to LEAs using

24

quotas. Instead, ED delayed the compliance date because it said it needed more time to evaluate "*whether*" the 2016 Regulations "may incentivize quotas." 83 Fed. Reg. 31308 (Ex. C) (emphasis added). That newfound doubt, based on no relevant intervening facts, is not a reasoned explanation for delay—particularly where there is no impediment to ED considering the question while the states comply with the 2016 Regulations.

In the 2016 rulemaking, ED addressed comments raising concerns that the standard methodology "would create an incentive to not identify children for special education and related services in order to reduce [racial] disproportionality numbers" and thus result in de facto racial quotas. 81 Fed. Reg. at 92454 (Ex. A); *see also id.* at 92385. ED "recognize[d] the possibility that … LEAs may have an incentive to avoid identifying children from particular racial or ethnic groups in order to avoid a determination of significant disproportionality." *Id.* But it determined that the possibility was limited to "cases where States select particularly low risk ratio thresholds." *Id.* Nonetheless, ED identified seven safeguards to reduce that possibility even further:

(1) The 2016 Regulations' preamble twice instructed states and LEAs that "nothing in these regulations establishes or authorizes the use of racial or ethnic quotas limiting a child's access to special education and related services." *Id.* at 92381, 92385.

(2) ED amended the proposed regulatory language to clarify that "[n]othing in this section authorizes a State or an LEA to develop or implement policies, practices, or procedures that result in actions that violate the requirements of this part, including requirements related to child find[12] and ensuring that a free appropriate public education is available to all eligible

---

[12] "Child find" refers to an LEA's duty to identify, locate, and evaluate children in need of special education and related services. *See* 20 U.S.C. § 1412(a)(3).

children with disabilities." 34 C.F.R. § 300.646(f). Because quotas would deny otherwise eligible children special education services, this regulatory provision further protects against such risk. *See* 81 Fed. Reg. at 92393 (Ex. A).

(3) ED affirmed that use of quotas would violate IDEA: "[I]t is a violation of IDEA for LEAs to attempt to avoid determinations of significant disproportionality by failing to identify otherwise eligible children as children with disabilities," *id.* at 92393.

(4) ED warned that use of quotas "would almost certainly result in legal liability under Federal civil rights laws, including title VI of the Civil Rights Act of 1964 and the Constitution," *id.* at 92385. Thus, not only do quotas violate the express prohibition in the regulation, but LEAs face the risk of private civil litigation for damages and attorneys' fees. *See* Compl. ¶¶ 73, 75-76; 42 U.S.C. §§ 1983, 1988, 2000d.

(5) ED gave states flexibility to set their own reasonable risk-ratio thresholds, with the expectation that states would work with stakeholders to identify particular risk-ratio thresholds that help the state address large racial and ethnic disparities without undermining the appropriate implementation of child find and evaluation procedures, 81 Fed. Reg. 92454 (Ex. A). ED further promised to "monitor States for any use of risk ratio thresholds that may be unreasonable and take steps, as needed, to ensure the States' compliance," *id.* at 92419. To do so, ED required states to report variables used in their calculations and the rationales for each choice. 34 C.F.R. § 300.647(b)(7).

(6) ED committed to "publish guidance to help schools to prevent racial discrimination in the identification of children as children with disabilities, including over-identification, under-identification, and delayed identification of disabilities by race." 81 Fed. Reg. 92397 (Ex. A).[13]

(7) ED also committed to conduct "an evaluation of the implementation of this regulation to assess its impact, if any, on how LEAs identify children with disabilities, [which] will include an examination of the extent to which school and LEA personnel incorrectly interpret the risk ratio thresholds and implement racial quotas in an attempt to avoid findings of significant disproportionality by States, contrary to IDEA." *Id.* at 92385; *see also* Compl. ¶¶ 77, 78-79.

In the Delay Regulation, ED did not find that the 2016 regulations would result in racial quotas, or even that they would incentivize racial quotas. Instead, it repeatedly stated that it had "concerns" that the regulations "may" or "potentially" could incentivize LEAs to establish quotas and that "further evaluation" was needed.[14] In terms of the efficacy of the safeguards

---

[13] That guidance was issued by ED's Office for Civil Rights in December 2016. It affirmed that it is unlawful for an LEA not to identify a student with a disability due to the student's race. *See* Dear Colleague Letter: Preventing Racial Discrimination in Special Education, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-racedisc-special-education.pdf. In March 2017, a month after Secretary DeVos took office, ED issued a "Questions and Answers" document about the 2016 Regulations. That document cautioned that states may not "explicitly, or by their choice of risk ratio thresholds, implicitly, set racial quotas for any category of analysis." U.S. Dep't of Ed., Significant Disproportionality (Equity in IDEA): Essential Questions and Answers 6, *available at* https://sites.ed.gov/idea/files/significant-disproportionality-qa-03-08-17.pdf; Compl. ¶ 84.

[14] 83 Fed. Reg. at 31307 (Ex. C) ("We are concerned the 2016 significant disproportionality regulations could result in de facto quotas …."); *id.* at 31308 (quotas are "precisely the risk[] that the Department believes the standard methodology may pose"); *id.* ("The Department is concerned that the 2016 significant disproportionality regulations may create an incentive for LEAs to establish de facto quotas …."); *id.* ("the regulations themselves may, in fact, incentivize quotas"); *id.* ("We want to evaluate whether the numerical thresholds in the 2016 significantly disproportionality regulations may incentivize quotas …."); *id.* at 31309 ("may result in encouraging quotas"); *id.* at 31311 ("may result in de facto quotas"); *id.* at 31312 ("concerned that the 2016 significant disproportionality regulations, potentially creates [sic] an express or implied incentive for LEAs to set quotas").

27

discussed above, ED assessed only the first—that the regulatory preamble to the 2016 regulations expressly stated that the regulation did not permit quotas—and has now said (in rather circular logic) that this disclaimer was "insufficient protection against [LEAs] creating de facto quotas because, regardless of the disclaimer, the regulations themselves may, in fact, incentivize quotas." 83 Fed. Reg. at 31308 (Ex. C). With regard to the other safeguards, most were not discussed at all and for two others (guidance (6) and evaluation (7)) ED said that "[k]nowing if these measures would be effective requires careful review, which we will do during this delay." *Id.* at 31315. ED provided no justification for disregarding its prior determination that these multiple safeguards adequately address concerns about potential use of racial quotas. *See California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1065 (N.D. Cal. 2018) (invalidating a delay regulation where the agency did not provide "new facts or data underlying" its "newfound concern" and merely restated arguments addressed during the original rulemaking). Even if ED had adequately explained its rejection of one or more of the safeguards in isolation, it failed to explain why the safeguards taken together were insufficient to address any risk of quotas or even to acknowledge that it was changing course by rejecting the position that the full set of safeguards would be effective in concert. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) ("[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'")).

ED's purported "concerns" that the 2016 Regulations *could* incentivize racial quotas and the safeguards might not be sufficient do not provide an adequate justification for the Delay Regulation. *See Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL 4154794, at *1 (D.C. Cir. Aug. 10, 2018) (per curiam) (citing *Sorenson Commc'ns, Inc. v. FCC*, 755 F.3d 702 (D.C. Cir.

2014) for the proposition that "agency action based on speculation rather than evidence is arbitrary and capricious"); *Sorenson Commc'ns, Inc.*, 755 F.3d at 708 ("Though an agency's predictive judgments about the likely economic effects of a rule are entitled to deference, deference to such ... judgments must be based on some logic and evidence, not sheer speculation.").

In reversing its prior policy decision that state compliance with the 2016 Regulations should occur on July 1, 2018, ED need not show that "the reasons for the new policy are *better* than the reasons for the old one," but it must demonstrate that "there are good reasons for the new policy." *Fox*, 556 U.S. at 515. Moreover, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" by providing "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515-16.

ED provided no good reasons or factual support to back up its concern about quotas. For example, ED did not cite a single state or LEA that had been incentivized by IDEA to impose racial quotas in the past, even though states have been required to assess significant disproportionality for the past 14 years and even though some have done so under methodologies similar to the standard methodology in the 2016 Regulation. *See* 83 Fed. Reg. at 31309 (Ex. C) ("[p]rior to the 2016 significant disproportionality regulations … many States used versions of the risk ratio"); *see also* 81 Fed. Reg. at 92395 (Ex. A). Nor did it give any credit to the presumption that school officials, like all government officials, will comply with the constitutional prohibition on race discrimination. *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2324

(2018) ("the presumption of legislative good faith" is "not changed by a finding of past discrimination.").

Instead, ED briefly mentioned a single example arising out of Texas, but that example differs in key respects from the circumstances presented by the 2016 Regulation. 83 Fed. Reg. at 31308 (Ex. C). In that instance, Texas established an indicator involving the percentage of children identified by each LEA as students with disabilities. *Id.* But, as ED found, Texas "failed to ensure that its [LEAs] properly implemented the IDEA child find requirements" and "[t]his failure resulted in improper reductions, over a period of years, in the number of children identified as having disabilities."[15] Notably, the Texas example did not involve racial disparities or discrimination. ED did not explain what lessons it could draw from that single example or why that example sheds any light on the very different circumstances presented here. In particular, ED could not have concluded that numerical measurements are inappropriate to ensure compliance with IDEA: IDEA expressly requires states to establish numerical measurements and to use those targets to analyze the performance of each LEA. *See* 20 U.S.C. § 1416(a)(3)(C), (b)(2)(C)(i) (requiring states to use "quantifiable indicators" in priority areas, including "[d]isproportionate representation of racial and ethnic groups in special education," "to analyze the performance of each LEA in the State"); 34 C.F.R. §§ 300.600, 602. Nor could ED have concluded that the 2016 Regulations' safeguards against quotas are inadequate based on an example that apparently lacked such a panoply of safeguards.

---

[15] Enclosure to Letter from ED's Office of Special Education Program to Texas Education Agency, at 13 (Jan. 11, 2018), https://www.ed.gov/fund/data/report/idea/partbdmsrpts/dms-tx-b-2017-enclosure.pdf. ED's letter is available at https://www.ed.gov/fund/data/report/idea/partbdmsrpts/dms-tx-b-2017-letter.pdf.

In response to comments that ED had not provided an adequate justification for changing course, ED asserted in the final rule that it must only "disclose[] what it is doing and why." 83 Fed. Reg. at 31311; *see also Fox*, 556 U.S. at 515. But it is fundamental under the APA that in disclosing what it is doing and why, an agency must "articulate a *satisfactory* explanation for its action including a '*rational* connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (emphasis added). ED failed to do so here.

      3.      *The Delay Regulation Is Internally Inconsistent with Its Rationale Because It Expressly Permitted States to Use the Methodology of the 2016 Regulation, Even Without the Full Set of Safeguards*

Not only did ED fail to back up its stated "concerns" about quotas, it directly contradicted those concerns elsewhere in the Delay Regulation. To downplay the effect of delaying the compliance date, ED repeatedly emphasized that states may voluntarily comply with the 2016 Regulations during the two-year delay. 83 Fed. Reg. at 31309, 31312-13 (Ex. C). Indeed, ED reported that "many States have commented that they intend" to "implement the standard methodology ... even if the Department delays these regulations," *id.* at 31312, and predicted that 20 states would do so for the 2018-19 school year, and ten more would do so for the 2019-20 school year, *id.* at 31316.

ED's clear acceptance of states using the 2016 standard methodology is inconsistent with its purported concern that the methodology by its nature could incentivize the use of quotas. Moreover, ED authorized interim use of the methodology by states even *without* the full panoply of the 2016 Regulations' safeguards (such as ED review of the risk ratios), which the Delay Regulation postponed. This was so even though ED also stated that if, in the future, "the Department were to determine that a risk ratio methodology is permissible, it could only be implemented ... if rigorous legal safeguards and protections are guaranteed." *Id.* at 31309 n.1. Such an internal inconsistency renders the Delay Regulation arbitrary and capricious. *See Dist.*

31

*Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) ("We have often declined to affirm an agency decision if there are unexplained inconsistencies in the final rule."); *Air All. Hous.*, 2018 WL 4000490, at *13 (rejecting EPA's "attempts to minimize the impact of the Delay Rule" because its argument that the Delay affected only the major compliance date but not other subsidiary compliance dates was "incompatible" with its statement—"and the common-sense conclusion"—that the delay will allow for a review of the rule without imposing the substance of the rule).

> 4.    *ED's Remaining Assertions Offer No Reasoned Basis for Delaying the 2016 Regulations.*

ED also stated that a delay was appropriate because "the causes of … significant disproportionality" have not "received sufficient study" and that it "believe[d] that the racial disparities in the identification, placement, or discipline of children with disabilities are not … primarily caused by discrimination." 83 Fed. Reg. at 31306 (Ex. C).[16] But ED did not explain why its agnosticism about the causes of racial disparities drew the 2016 Regulations into question, particularly in light of its 2016 determination that it did "not agree that these regulations should be delayed until further research is conducted because there is sufficient evidence of significant disproportionalities going uninvestigated or unaddressed." 81 Fed. Reg. at 92382 (Ex. A).

The 2016 Regulations were not premised on the notion that the disproportionality was primarily caused by discrimination. To the contrary, as ED admitted in the Delay Regulation, "the preamble to the 2016 significant disproportionality regulations" acknowledged that "[r]acial

---

[16] ED also stated that it did "not agree" that the "remedies for" significant disproportionality "have received sufficient study." 83 Fed. Reg. at 31306. (Ex. C). But Congress, not ED, determined the remedies for a significant disproportionality determination. *See* 20 U.S.C. § 1418(d).

and ethnic disparities in the identification, placement, and discipline of children with disabilities can have a wide range of causes, including systemic issues well beyond the typical purview of most LEAs." *Id.* at 31310 (citing 81 Fed. Reg. at 92383-84).[17] And in promulgating the 2016 Regulations, ED also made clear that it believed the standard methodology was appropriate even "where differential exposure to risk factors contributes to racial disparities in special education." 81 Fed. Reg. at 92383 (Ex. A); *see id.* at 92385 ("these regulations are designed to directly address any underlying factors and IDEA noncompliance that result in or contribute to significant disproportionality"). ED's claim of uncertainty about the causes of racial disparities was not a reason to delay the regulations.

Finally, ED, in passing, suggested that the significant disproportionality regulation was presumptively unconstitutional because risk ratios are calculated by comparing outcomes between racial groups and are therefore "racial classifications" subject to strict scrutiny. 83 Fed. Reg. at 31308. Even if this were true (and ED has not shown it is),[18] it would provide no

---

[17] *See also* 83 Fed. Reg. at 31310 ("as we stated in the 2016 significant disproportionality regulations, appropriate identification where there is higher prevalence of a disability in a particular racial or ethnic group, as well as correlatives of poverty and the presence of specialized schools, hospitals, or community services that may draw large numbers of children with disabilities and their families to an LEA" (citing 81 Fed. Reg. at 92380-81, 92384)); *id.* ("overrepresentation of one racial or ethnic group that rises to the level of significant disproportionality may occur for a variety of reasons, including over-identification of that racial or ethnic group, under-identification of another racial or ethnic group or groups, or appropriate identification with higher prevalence of a disability in a particular racial or ethnic group" (citing 81 Fed. Reg. at 92380-81)).

[18] The single case cited by ED to support this proposition, *Walker v. City of Mesquite*, 169 F.3d 973 (5th Cir. 1999), is not apt. In that case, the Fifth Circuit held that a court order requiring that housing units be built in "predominantly white areas" was an "explicit racial classification" and was thus subject to strict scrutiny. *Id.* at 981. Collecting and analyzing statistics of racial disparity is not constitutionally suspect. *See Morales v. Daley*, 116 F. Supp. 2d 801, 814 (S.D. Tex. 2000) ("requiring a person to self-classify racially or ethnically" on a census form is not subject to strict scrutiny); *Caufield v. Bd. of Educ.*, 583 F.2d 605, 611 (2d Cir. 1978) ("the Constitution itself does not condemn the collection of this data" about race of teachers).

justification for delaying, as opposed to repealing the rule, or for knowingly permitting states to voluntarily comply.

> **B.      ED's Failure to Consider the Costs of Delay Renders the Delay Regulation Arbitrary and Capricious.**

In violation of the requirement that an agency consider all the important aspects of the problem, ED failed to take into consideration significant downside costs of delaying implementation of the significant disproportionality rule. *State Farm*, 463 U.S. at 43. Despite the obvious costs to children, parents, and society of delaying a rule that ED previously found would provide significant benefits, ED initially stated that the delay "imposes no new costs." 83 Fed. Reg. at 8398 (Ex. B). In the final rule, ED reluctantly acknowledged there were costs to the delay but sought to downplay the losses.

Costs are important aspects of regulation, and regulations that ignore important costs are arbitrary and capricious. *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). The relevant costs are broader "than the expense of complying with regulations." *Id.* An agency must take into account "any disadvantage [that] could be termed a cost," including costs to society. *Id.* (requiring the consideration of the "harms that regulation might do to human health or the environment"). An agency thus must "*face* the trade-off[s]" caused by its decisions and explain why "the trade-off" it selected "was worth it." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 956 F.2d 321, 323-24 (D.C. Cir. 1992). Here, ED failed to accurately account for the costs of delay to children, parents, and society as a whole and refused to take into account the costs incurred in reliance on the 2016 Regulations during the almost 18 months between its effective date and the original compliance date. Those failures render the Delay Regulation arbitrary and capricious.

*See Air All. Hous.*, 2018 WL 4000490, at *12-14 (invalidating a delay rule for ignoring the costs of delay to society and regulated entities preparing to comply with the status quo).

1.   <em>Costs to children, parents, and society</em>

In justifying the Delay Regulation, ED failed to properly account for the costs of the delay to children, parents, and society as a whole. As described in the Delay Regulation, ED in 2016 recognized "five sources of benefits from the significant disproportionality regulations": "(1) [g]reater transparency; (2) increased role for the State Advisory Panels; (3) reduction in the use of inappropriate policies, practices, and procedures; (4) increased comparability of data across states; and (5) expansion of activities allowable under comprehensive CEIS." 83 Fed. Reg. at 31315 (Ex. C); *see also* 81 Fed. Reg. at 92457-58 (Ex. A).

In 2016, ED determined that, together, those benefits to children, parents, and society *exceeded* the total costs to states and LEAs, estimated to be between $50.1 and $91.4 million over ten years. 81 Fed. Reg. at 92457 (Ex. A).[19] Yet in the Delay Regulation, ED tepidly stated that it "believes it is reasonable to assume" that the costs to children, parents, and society of a two-year delay were exceeded by the total cost savings to states and LEAs, estimated to be $8 million over ten years. 83 Fed. Reg. at 31317 (Ex. C). Its rationales for concluding that the costs of a two-year delay were less than $8 million were fundamentally flawed.

As to two of the benefits identified in 2016—transparency and increased stakeholder participation—ED failed to account for *any* costs from the delay. ED asserted that these benefits could not "reasonably argued to be delayed as a result of this regulatory action," *id.* at 31316, because the process of preparing to implement the 2016 significant disproportionality rule "had greatly increased the transparency around State determinations and dramatically expanded the

---

[19] ED mistakenly stated in the Delay Regulation that the range was $50.1 million to $60.5 million, which may have skewed its judgment. 83 Fed. Reg. at 31315. (Ex. C).

35

involvement of a diverse range of stakeholders, including State Advisory Panels," *id.* at 31315. But the "transparency" benefit referred to in the 2016 regulations was not just about the initial process. "[P]art of the purpose of the standard methodology" was "to foster greater transparency in how States identify significant disproportionality" by adopting "simple and easily interpreted analyses." 81 Fed. Reg. at 92404 (Ex. A). The Delay Regulation negated that element of the transparency benefits. Nor did ED consider whether, or explain how, any transparency and expanded involvement achieved during the preparatory period would continue if compliance was no longer required.

As to the remaining benefits—increased comparability of inter-state data, reduction in the use of inappropriate policies, practices, and procedures and expanded use of funds for mandatory comprehensive CEIS—ED recognized some loss from the delay, but failed to account for the full extent of that loss. In particular, the value of the reduction in inappropriate policies, practices and procedures and of expanded use of funds for CEIS is contingent on the number of LEAs identified as significantly disproportionate. But the number of additional LEAs identified as significantly disproportionate in this and the next school year will drop significantly due to the Delay Regulation. *See* page 17, *supra*. Students in those LEAs and the broader society will not receive the benefit of a state-provided review of the LEA's policies, practices, and procedures or an evaluation of the root-causes of the disproportionality, and more students will continue to be inappropriately identified, placed, and/or disciplined.

ED asserted, without support, that costs resulting from this reduction in the number of LEAs identified will be "minimize[d]" due to the "the increased focus on these issues since the publication of the 2016 significant disproportionality regulations" and because "several commenters noted that they would use the delay to provide additional technical assistance to

their LEAs to proactively resolve issues." *Id.* ED nowhere explained how such nebulous factors

as "increased focus on these issues" and efforts on the part of "several" commenters to

"proactively resolve issues" could meaningfully reduce the use of inappropriate practices,

policies, and procedures, let alone "minimize" the costs of delaying the 2016 Regulations'

concrete requirements specifically designed to reduce such practices. *Id.*

    ED also relied on the fact that, even without the delay, the statute would still require

states to make "annual determinations regarding significant disproportionality." *Id.* at 31315. But

under that statute-only regime, many states had not identified *any* LEAs with significant

disproportionality. (As reflected on page 17, *supra*, that problem continues in some of the states

that took advantage of the delay.) Delay reverts to a status quo in which myriad LEAs that

should have been identified will continue to not be identified, a status quo that ED itself admits

has "problems" and is "troubling." 83 Fed. Reg. at 31307 (Ex. C); 83 Fed. Reg. at 8397 (Ex. B).

Furthermore, in identifying the benefits yielded by the 2016 Regulations, ED was describing

benefits that were in addition to the status quo baseline of each state following the methodology

of its choice. ED thus failed to account for the full extent of the costs of delaying these benefits.

    ED's failure to consider the full costs of its chosen course of action is particularly

egregious in light of its recognition in 2016 that the 2016 Regulations would "ultimately" result

in "better identification, placement, and discipline of children with disabilities." 81 Fed. Reg. at

92377 (Ex. A); *id.* at 92458 ("we believe that [because of the regulation] LEAs will increase the

number of children participating in the general education curriculum on a regular and sustained

basis, thus accruing benefits to children and society through greater educational gains"). By

failing to accurately assess the costs of delaying the five specific benefits identified in the 2016

Regulations, ED necessarily failed to fully consider the costs of delay to children with disabilities, their parents, and society.

2.    <em>Reliance costs</em>

ED also utterly failed to consider costs incurred by states and LEAs in reliance on the 2016 Regulation. This failure alone makes the delay arbitrary and capricious. *See Encino Motorcars*, 136 S. Ct. at 2126-27 (invalidating an agency regulation for not considering reliance costs). ED attempted to explain away these costs as "sunk investments" and thus not worthy of consideration. 83 Fed. Reg. at 31316 (Ex. C) ("It is clear to the Department that these costs are properly considered sunk investments," and "therefore it would not be appropriate to assign their value as either a cost or benefit of this action.").

But giving the back of the hand to reliance interests runs head-long into Supreme Court and D.C. Circuit precedent. If an agency could disregard costs already spent by regulated entities because those costs are "sunk," reliance interests would never be a cause for judicial scrutiny. In *Encino Motorcars*, 136 S. Ct. at 2126, the industry had organized itself over decades and the Supreme Court took seriously its reliance costs. *See also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 740 (D.C. Cir. 2016) (Kavanaugh, J. dissenting) (reaching argument not addressed by majority and explaining that the expenses the permit holder spent before the EPA reversed course mattered when reviewing the revocation). Under ED's formulation, such costs would be considered "sunk," and thus not included in any calculus. This is not the law.

ED was required to take seriously the reliance costs spent by states to prepare to comply with the 2016 Regulations. In *Air Alliance Houston*, the D.C. Circuit held that an agency issuing a Delay Rule cannot rely on the "status quo" of no regulation. 2018 WL 4000490, at *13 ("the baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated").

38

Instead, the agency must confront and consider costs resulting from the previously enacted regulations. *Id.* ("The status quo would be [the original] Rule that went into effect [on time], with the ongoing compliance efforts by regulated parties to meet the compliance deadlines set in that rule."). States expended their time and resources expecting the 2016 Regulations to go into effect. ED tried to get around this by allowing states to choose whether to comply with the regulations in order to not "waste" those resources spent. 83 Fed. Reg. at 31313 (Ex. C). This is a false choice. States are forced to either declare those costs a waste or spend additional resources implementing the 2016 standard methodology with the possibility of being told in two years that it must change its system again. ED failed to consider these reliance costs, and thus the Delay Regulation is arbitrary and capricious.

### C.    ED's Failure to Consider Reasonable Alternatives to Delay Renders the Delay Regulation Arbitrary and Capricious.

The Delay Regulation is arbitrary and capricious for yet another independent reason: ED failed to adequately consider reasonable alternatives to delay. An agency's reasoned explanation for its action must include the "consider[ation] [of] responsible alternatives to [the agency's] chosen policy," and the agency must also articulate why it has "reject[ed] … such alternatives." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 242 (D.C. Cir. 2008). An "'artificial narrowing of options' is antithetical to reasoned decisionmaking and cannot be upheld." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983).

In proposing the Delay Regulation, ED considered only one solution to its concerns about the standard methodology: delay. 83 Fed. Reg. at 8398 (Ex. B). ED attempted to dress up its closed-mindedness by noting that it did not merely consider a two-year delay—it also considered a one-year, or even a three-year delay. *Id.* Such illusory "alternatives" are insufficient to support reasoned decisionmaking. *See S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959,

965-66 (D.S.C. 2018) (invalidating a delay rule for limiting consideration to different lengths of delay). From the start, ED "artificial[ly] narrow[ed]" its options. *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 817.

In the final rule, ED acknowledged that in the NPRM it had addressed only delay, but stated that it had subsequently "reviewed and considered various alternatives to the proposed rule submitted by commenters in response to the NPRM." 83 Fed. Reg. at 31314 (Ex. C). Its grounds for rejecting these alternatives, however, were cursory and unsupported, and improperly conflated the reasons for delay with the reasons for originally promulgating the 2016 Regulations.

For example, COPAA's response to the NPRM proposed multiple alternatives to delaying the implementation of the standard methodology, including several that directly addressed ED's stated rationale for the delay, namely concern about incentives to resort to racial quotas. Ex. H (COPAA Comment, May 14, 2018). COPAA's suggested alternatives included: (1) requiring compliance with the 2016 final regulation until ED develops, proposes, and promulgates a new regulation that would supersede it; (2) accelerating the evaluation—to which it committed in the 2016 Final Regulations—to examine whether any LEAs in states that already used risk ratios were implementing racial quotas in an attempt to avoid findings of significant disproportionality, rather than wait until the 2018-19 school year was completed; (3) providing more technical assistance and guidance to states and LEAs about avoiding quotas; and (4) initiating reviews of states and LEAs under Title VI of the Civil Rights Act to ensure they are not using racial quotas and publicize these reviews to deter others from doing so. *Id*. ED rejected all these alternatives out of hand.

Regarding the first suggestion—to let the 2016 Regulations go into effect while promulgating a replacement—ED declined because of the "potential unintended consequences" of the standard methodology. 83 Fed. Reg. at 31315 (Ex. C). As explained in Part II.A.2, ED's speculative fears are not acceptable grounds for regulatory delay.

Regarding the remaining three alternatives, ED lumped them together and summarily rejected them, stating only that "[k]nowing if these measures would be effective requires careful review, which we will do during this delay." 83 Fed. Reg. at 31315 (Ex. C); *see also id.* at 31307-08, 31309 (acknowledging COPAA's suggested alternatives but summarily declaring that the alternatives "may not be able to resolve applicable issues" and noting that ED would "evaluate the question during the delay"). When an agency is "rescind[ing] a policy or revers[ing] course," it must explain "why it did not take a more limited action." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 216 (D.C. Cir. 2013). An agency cannot justify delaying a regulation by conflating the decision to delay with the decision to promulgate a new substantive regulation at some point in the future. *See Bureau of Land Mgmt.*, 286 F. Supp. 3d at 1064; *S.C. Coastal Conservation League v. Pruitt*, 2018 WL 2184395, at *7 (D.S.C. May 11, 2018) (litigation challenging rule suspending a regulation is "entirely separate, albeit related in subject matter," from litigation challenging the substance of the regulation). Thus, when an agency decides to delay a regulation's implementation, it must evaluate alternatives *to delay* and explain why it rejected those alternatives. By stating only that it would review the alternatives "during the delay," ED plainly did not consider the proposed alternatives as alternatives to *delay*.

ED compounded this error in dismissing the proposed alternative that ED monitor states for compliance with IDEA. ED stated only that it is "not certain that compliance-driven monitoring will, by itself, effectively address the factors *contributing to significant*

*disproportionality* or enable the Department to best support States to improve their systems" and that it would "evaluate the question during the delay." 83 Fed. Reg. at 31309 (Ex. C) (emphasis added). ED did not explain why it could not use monitoring to alleviate the concern about racial quotas during the reconsideration period instead of delaying implementation of the standard methodology. Instead, it reasoned that monitoring might not "address the factors contributing to significant disproportionality." But addressing significant disproportionality is the goal of the 2016 Regulations (and presumably of whatever replacement to those regulations ED might eventually adopt), not of the Delay Regulation. ED's reasoning thus does not explain why monitoring is an inadequate alternative to delay.[20]

In any event, ED's cursory dismissal of monitoring as an alternative comes nowhere close to meeting the APA's requirement to articulate "'reasons for rejecting alternatives in sufficient detail to permit judicial review.'" *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984). Rejecting an alternative because "[k]nowing if [the alternative] would be effective requires careful review," is no explanation. ED's rejection of the alternatives to delay turned this requirement on its head.

Moreover, ED's failure to respond to COPAA's "significant points" renders "meaningless" the purported opportunity to comment on and "formulat[e] alternatives" to the proposed rule. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) (per curiam). Thus, ED's superficial treatment of every alternative to delay violated its obligation to consider

---

[20] ED's reasoning on this point is flawed in two additional ways. ED again erroneously relies solely on speculation in rejecting monitoring because it is not "certain" it would address significant disproportionality. And it artificially limits its consideration of alternatives by rejecting monitoring because it might not address significant disproportionality "by itself." ED nowhere addresses whether monitoring together with the other proposed alternatives would adequately address its concerns.

all "important aspect[s] of the problem," *State Farm*, 463 U.S. at 43, and renders the delay

regulation arbitrary and capricious.

> **D.     ED's Failure to Provide for Meaningful Participation in the Rulemaking Renders the Delay Regulation Arbitrary and Capricious.**

The Delay Regulation is also unlawful because ED failed to provide for meaningful

participation in the notice-and-comment period. *See* 5 U.S.C. § 553(c). Participation is

meaningful only if ED "remain[s] sufficiently open-minded" in considering and adopting the

regulation. *Rural Cellular Ass'n*, 588 F.3d at 1101. ED's course of conduct and public

statements, combined with the errors discussed above demonstrate its failure to do so here.

First, in December 2017, months before the NPRM was published, an ED spokesperson

issued a statement that "the Department is looking closely at this rule and has *determined* that

while this review takes place, it *is* prudent to delay implementation for two years." 83 Fed. Reg.

at 31311 (Ex. C) (emphasis added). An agency with an open mind on whether to delay would not

have already determined that it *is* prudent to delay prior to soliciting and reviewing comments

from the public. *See Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011)

(agency's internal circulation of a draft order "before most of the responses were received"

followed by a final vote within a week of the response deadline violated the FCC's "obligation to

remain 'open-minded' about the issues raised and engage with the substantive responses

submitted"). ED's post-hoc explanation that this statement meant "no more than the proposal

reflected in the NPRM itself that a delay of two years would be prudent," 83 Fed. Reg. at 31311

(Ex. C), is contrary to its plain terms. The Department did not say that it "has determined … that

it is prudent *to propose* to delay implementation."

ED's more formal activities confirm that it had already made its decision. In July 2017,

ED sought OMB's permission to add questions to the state questionnaires to collect data

necessary to implement the standard methodology. 82 Fed. Reg. 31954 (July 11, 2017). But in November, 2017, it deleted those questions from its request. *See* page 6, *supra*. ED's decision not to even seek approval from OMB to collect the data required by the significant disproportionality regulation suggests that it had already made up its mind.

ED's handling of comments further underscores this conclusion. The February 2018 NPRM stated that ED "will consider comments on proposed delayed compliance dates only and will not consider comments on the text or substance of the final regulations." 83 Fed. Reg. at 8396 (Ex. B). Although ED noted in the final rule that it received a large number of comments and that some commenters acted as if "the NPRM invited comments on the merits of the 2016 significant disproportionality regulation," 83 Fed. Reg. at 31311, it also acknowledged that "a small number of commenters"—not just COPAA—viewed this instruction as a limitation, *id.* at 31310. In response to COPAA's objection to this instruction, ED contended that it merely instructed the public not "to discuss, without reference to the delay, what the text or substance of any new regulations should be." *Id.* at 31311. That is certainly not what the NPRM said and was not the meaning that all commenters took away from it. It is impossible to know how many commenters truncated their comments, and how many additional potential commenters viewed those instructions and elected not to participate. *See S.C. Coastal Conservation League*, 318 F. Supp. 3d at 965-66 ("[I]t is the agencies' decision to promulgate the Suspension Rule without allowing the public to comment on the substance [of the regulation] that renders the notice-and-comment rule making infirm under the APA. An illusory opportunity to comment is no opportunity at all."); *see also Bureau of Land Mgmt.*, 286 F. Supp. 3d at 1072 (finding APA violation because "the Secretary's content restrictions on the comments to the Suspension Rule prevented meaningful comment on key justifications underpinning the Suspension Rule").

As to the comments it did receive, ED gave them remarkably short shrift, dismissing out of hand comments directed to the costs of delay and reasonable alternatives to delay. *See* Parts II.B & C, *supra*. Such cursory treatment of significant comments underscores ED's lack of open-mindedness in the rulemaking. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323 (D.C. Cir. 1988) ("[A]lthough EPA responded to most … comments on the model, its refusal to respond in other cases … as well as its language on the subject … , suggest too closed a mind. Consideration of comments as a matter of grace is not enough.").

These multiple statements and actions taken together betray ED's lack of an open mind. *Cf. Rural Cellular Ass'n,* 588 F.3d at 1101 (holding agency had a sufficiently open mind when agency issued NPRM, collected and responded to comments, and waited until the rulemaking was complete to issue its decision). By entering the rulemaking process with its mind made up, limiting the types of comments it would review and engaging in obvious reasoning errors to reach its preferred outcome, ED failed to provide for meaningful participation.

## CONCLUSION

For the foregoing reasons, this Court should deny ED's motion to dismiss and grant Plaintiff's Motion for Summary Judgment and vacate the Delay Regulation.