**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,** | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-1636-TSC |
| **U.S. DEPARTMENT OF EDUCATION, ELIZABETH DEVOS, Secretary of Education, and JOHNNY W. COLLETT, Assistant Secretary for Special Education and Rehabilitative Services,** | |
| Defendants. | |

<u>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**</u>

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 3

    I.  Plaintiff Cannot Demonstrate Organizational Standing Based On Its Alleged
        Informational Injuries ........................................................................... 3

        A.  Plaintiff's Alleged Injuries Based on a Lack of Access to Information
             Contained in School Districts' Reports Are Speculative ................................. 3

        B.  Plaintiff's Cases Relating to Its Alleged Informational Injuries Are
             Distinguishable ................................................................................ 8

        C.  The Activities Taken by Plaintiff Following Postponement of the
             Regulations' Compliance Date Represent Self-Inflicted Budgetary
             Choices ......................................................................................... 11

        D.  Plaintiff's Cannot Establish Organization Standing Based on an Alleged
             Lack of Access to School Districts' "Root Cause" Analysis ......................... 14

    II.  Plaintiff Cannot Demonstrate Associational Injury .............................................. 15

    III.   Plaintiff Demonstrates Neither Causation Nor Redressability.......................19

CONCLUSION ................................................................................................. 23

# **TABLE OF AUTHORITIES**

**Cases**                                                            **Page(s)**

*Abulhawa v. U.S. Dep't of Treasury*,
  239 F. Supp. 3d 24 (D.D.C. 2017) ............................................................... 7

*Action All. of Senior Citizens of Greater Philadelphia v. Heckler*,
  789 F.2d 931 (D.C. Cir. 1986) ..................................................8, 9, 10, 14

*Allen v. Wright*,
  468 U.S. 737 (1984) .................................................................................16

*Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .................................................................. 14

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ............................................................. 18, 21

*Campaign Legal Ctr. v. Fed. Election Comm'n*,
  245 F. Supp. 3d 119 (D.D.C. 2017) ..........................................................14

*CC Distributors, Inc. v. United States*,
  883 F.2d 146 (D.C. Cir. 1989) ..................................................................17

*Chamber of Commerce of U.S. v. EPA*,
  642 F.3d 192 (D.C. Cir. 2011) ................................................................ 15

*Envtl. Working Grp. v. Food & Drug Admin.*,
  301 F. Supp. 3d 165 (D.D.C. 2018) ..........................................................14

*Fed. Election Comm'n v. Akins*,
  524 U.S. 11 (1998) ................................................................................. 13

*Fla. Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) (en banc) ..................................................... 6

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ........................................................... 10, 11

*Freedom Republicans, Inc. v. Fed. Election Comm'n*,
  13 F.3d 412 (D.C. Cir. 1994) .............................................................. 18, 22

*Friends of Animals v. Jewell*,
  828 F.3d 989 (D.C. Cir. 2016) ............................................................... 13

*Ibrahim v. U.S. Dep't of State*,
  311 F. Supp. 3d 134 (D.D.C. 2018) ..........................................................7

*Int'l Acad. of Oral Med. & Toxicology v. The U.S. Food & Drug Admin.*,
    195 F. Supp. 3d 243 (D.D.C. 2016) ............................................................................13

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 4, 18, 20, 21

*Nat'l Fair Hous. All. v. Carson*,
    No. CV (BAH) 18-1076, 2018 WL 3962930 (D.D.C. Aug. 17, 2018) ..................... 11

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ................................................................................ 11

*Nat. Law Party of U.S. v. Fed. Election Comm'n*,
    111 F. Supp. 2d 33 (D.D.C. 2000) ...................................................................... 21-22

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ........................................................................ 8, 9, 10

*Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*,
    489 F.3d 1267 (D.C. Cir. 2007) .......................................................................... 19, 20

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
    836 F.3d 42 (D.C. Cir. 2016) ............................................................................. 3-4, 21

*Simon v. Eastern Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ....................................................................................................9

*State Nat'l Bank of Big Spring v. Lew*,
    795 F.3d 48 (D.C. Cir. 2015) ................................................................................... 4

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................................... 15

*Turlock Irrigation Dist. v. Fed. Energy Regulatory Comm'n*,
    786 F.3d 18 (D.C. Cir. 2015) .................................................................................. 10

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) .................................................................................. 20

*Waterkeeper All. v. Envtl. Prot. Agency*,
    853 F.3d 527 (D.C. Cir. 2017) ..................................................................................8

*Zivotofsky v. Sec'y of State*,
    444 F.3d 614 (D.C. Cir. 2006) ................................................................................14

## **Statutes**

20 U.S.C. § 1418(d)(2)(A) ............................................................................................. 16

**Administrative and Executive Materials**

34 C.F.R. § 300.646 ................................................................................................. *passim*

34 C.F.R. § 300.647 .............................................................................................6, 11, 12

\*Assistance to States for the Education of Children With Disabilities; Preschool Grants
for Children with Disabilities,
    81 Fed. Reg. 92,376-01 (Dec. 19, 2016) ............................................................ *passim*

Assistance to States for the Education of Children With Disabilities; Preschool Grants
for Children With Disabilities,
    83 Fed. Reg. 31,306-01 (July 3, 2018) ......................................................................4

**Other Authorities**

Letter from U.S. Dep't of Educ. to an Anonymous Individual (Mar. 7, 2012),
    https://www2.ed.gov/policy/speced/guid/idea/letters/2012-
    1/redacted030712vvsurvey1q2012.pdf ......................................................................7

U.S. Dep't of Educ., *A Guide to the Individualized Education Program* (July 2000),
    https://www2.ed.gov/parents/needs/speced/iepguide/iepguide.pdf ............................ 7

**INTRODUCTION**

The rule at issue in this case postpones for two years the compliance date of regulations issued by the U.S. Department of Education ("ED") in 2016 (the "2016 Regulations").  Those regulations would have required States to use certain common parameters for analysis when determining whether significant disproportionality based on race and ethnicity is occurring in a State and its school districts with respect to the identification, placement, and discipline of children with disabilities.  Plaintiff brings suit to challenge ED's final rule, claiming informational injuries in its organizational capacity and various injuries to its members.  These purported injuries do not result from any direct action by ED to Plaintiff or its members.  Rather, they allegedly flow from ED's lack of regulation of the States and failure to require compliance with the 2016 Regulations and their attendant requirements.  Plaintiff thus confronts the substantially more difficult task of establishing standing, as the alleged injury is, at best, an indirect consequence of the Government's *non*-regulation of third-parties not before the Court. Moreover, any redress ordered by the Court would by definition extend only to actions Defendants could take with respect to those third-parties, and not to Plaintiff.

Nothing in Plaintiff's "Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiff's Cross-Motion for Summary Judgment" ("Opposition"), ECF No. 15, suffices for Plaintiff to carry its heavy burden. In attempting to demonstrate an informational injury for organizational standing, Plaintiff cites to statements made in ED's final rules and evidence it obtained through records requests made to four States.  But those documents contain specific statements of uncertainty, and indeed, in the case of ED's final rule, it is *explicit* in the fact that it is employing an assumption, proffered without explanation or analytical support.

Accordingly, Plaintiff's alleged informational injuries are speculative.  Plaintiff's reliance on three D.C. Circuit cases and the declaration it proffers to explain and expound upon its alleged informational injuries are also unavailing.  The former are distinguishable because they do not involve situations where, as here, the collection or creation of the information sought is contingent on the actions of non-parties to the litigation.  And the latter shows that Plaintiff is currently engaged in the same activities in which it would be forced to engage *even absent* ED's postponement of the regulations' compliance date, and thus any resources expended constitute self-inflicted budgetary choices.

Plaintiff's attempt to demonstrate associational standing similarly fails.  Because Plaintiff's Complaint provides no basis for finding associational standing, Plaintiff relies on declarations that attempt to establish the identity of members who have suffered certain injuries-in-fact.  But those declarations do not substantiate Plaintiff's contentions, and Plaintiff's legal arguments are based on a misreading of ED's regulations and final rule.

Finally, Plaintiff cannot establish causation and redressability, which require the application of more exacting scrutiny due to the fact that Plaintiff's alleged injuries are dependent on speculative actions of third-parties.  Despite this more exacting scrutiny, Plaintiff's Opposition provides no argument at all on causation and traceability for the actual injuries on which it relies.  And, in any event, Plaintiff cannot demonstrate that, as case law requires, there is "little doubt" that the relief it seeks would redress the injuries of which it complains.  Indeed, redress of Plaintiff's alleged injuries would depend on the way in which the States and school districts decide, in their discretion, to conduct certain reviews and analyses required by the 2016 Regulations.

For these reasons, and those previously set forth in Defendants' "Memorandum of Points and Authorities in Support of Its Motion to Dismiss" ("Motion"), ECF No. 14-1, the Court should dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1) due to the absence of jurisdiction.[1]

## ARGUMENT

### I.    Plaintiff Cannot Demonstrate Organizational Standing Based On Its Alleged Informational Injuries

#### A.    Plaintiff's Alleged Injuries Based on a Lack of Access to Information Contained in School Districts' Reports Are Speculative

The alleged injury-in-fact on which Plaintiff primarily relies for organizational standing is its purported lack of access to information in reports that school districts would have issued under 34 C.F.R. § 300.646(c) if ED had not postponed the compliance date of the 2016 Regulations.  In its Opposition, Plaintiff does not dispute that this alleged injury is contingent on (1) increases in the number of school districts that would have been identified with significant disproportionality had ED not postponed the

---

[1] Plaintiff asserts that Defendants failed to comply with Local Civil Rule 7(n)(1) because they "did not file the certified list of the contents of the administrative record as required" with their Motion. Opp'n at 1 n.1.  That rule provides that in a case "involving the judicial review of administrative agency actions, unless otherwise ordered by the Court, the agency must file a certified list of the contents of the administrative record with the Court . . . simultaneously with the filing of a dispositive motion."  Local Civ. R. 7(n)(1). The apparent logic of the rule presupposes that the motion implicates the contents of the administrative record.  Indeed, in directing counsel to file an appendix of administrative record material in addition to the certified list, the rule specifically instructs counsel not to "burden the appendix with excess material from the administrative record that does not relate to the issues raised in the motion or opposition."  *Id.*; *see also* Local Civ. R. 7(n) cmt.1 ("This rule is intended to assist the Court in cases involving a voluminous record . . . by providing the Court with copies of relevant portions of the record *relied upon in any dispositive motion*." (emphasis added)).  Defendant's Motion raises only jurisdictional issues and does not depend upon the content of any document other than the allegedly final agency action challenged in Plaintiffs' Complaint.

regulations' compliance date, and (2) resultant increases in the number of reports issued by school districts after being identified with significant disproportionality and revising their policies, practices, and procedures to achieve compliance with the Individuals with Disabilities Education Act ("IDEA").  *See* Opp'n at 16.  This renders standing "substantially more difficult to establish" because Plaintiff's alleged injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 50 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).  Where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed."  *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S. at 562).

Nothing in Plaintiff's Opposition suffices to carry its heavy burden.  Plaintiff points to ED's estimates of costs in the final rules announcing 2016 Regulations and then postponing the regulations' compliance date.  Opp'n at 16.  In the former, ED stated that its "most reasonable estimate" for the number of school districts that would be newly identified with significant disproportionality under the regulations was 400.  Assistance to States for the Education of Children with Disabilities, 81 Fed. Reg. 92,376, 92,462 (Dec. 19, 2016).  It employed that figure again in its 2018 final rule when estimating the total number of school districts that would be identified in 2020 following the postponed compliance date.  Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 31,306-01, 31,316 (July 3, 2018).

But ED expressed far more uncertainty when setting forth these estimates than Plaintiff lets on.  ED emphasized that the regulations "largely focus on methodological issues related to the consistency of State policies"—they did not "require States to identify [school districts] at a higher rate than they currently do."  81 Fed. Reg. at 92,458. Moreover, ED "[did] not specifically know what risk ratio thresholds, minimum n-sizes, and minimum cell sizes States [would] set . . . and therefore [did] not know the number of [school districts] that would be identified under those new thresholds."  *Id.*  Accordingly, ED acknowledged that a "reasonable" estimate, albeit a "lower-bound" one, would be that "no additional [school districts] above the baseline number would be identified" under the 2016 Regulations, *id.* at 92,462, an unsurprising possibility given that forty-five States already used some form of a risk ratio before ED announced the regulations in 2016, *see* 81 Fed. Reg. at 10,972-73.  Under such a scenario, neither Plaintiff nor any of its members would suffer any of the injuries on which Plaintiff relies.

Plaintiff thus also points to evidence it collected via records requests made to four States—Colorado, Maine, Missouri, and South Dakota—which it contends shows that "three of them would have identified more [school districts] if they had applied the 2016 Regulations' standard methodology."  Opp'n at 17.  But even this evidence is uncertain. The South Dakota Department of Education merely identified districts that were "projected to be identified with significant disproportionality" under the new regulations, ECF No.15-5 at 33, and the Missouri Department of Elementary and Secondary Education could only identify districts where "two years of data indicat[ed] they were on a trajectory to possibly be identified [with significant disproportionality] if nothing changed" because "a third year of data analysis" would be required before identification

5

could occur, *id.* at 24.  Indeed, the Missouri Department of Elementary and Secondary
Education included the specific caveat that because 39% of the districts "with one year of
data meeting [significant disproportionality] criteria dropped upon review of the second
year of data," the office "anticipated that several more of the [districts] with two years of
data . . . [would] also drop from the list" of districts that would be identified with
significant disproportionality after a third year's worth of data was included.  *Id.*
Moreover, none of the three States that provided substantive responses to Plaintiff's
records requests[2] mentioned whether they did or would exercise any of the discretion
afforded to them under the 2016 Regulations—most notably, the discretion to refrain
from identifying a school district with significant disproportionality until the district has
exceeded a particular risk ratio threshold for up to three prior consecutive years, or where
the district has demonstrated reasonable progress in lowering its risk ratio in each of the
two prior years.  *See* 34 C.F.R. § 300.647(d)(1), (2).  Plaintiff's evidence thus does not
take its alleged injuries out of the speculative realm.

The same is true with regard to Plaintiff's arguments for why it is substantially
probable that more school districts identified with significant disproportionality will issue
reports under 34 C.F.R. § 300.646(c) after, first, conducting a review of their policies,
practices, and procedures, and then, second, making revisions to them.  Plaintiff does not
dispute that such revisions are only necessary under § 300.646(c) if a determination is
made that the school district's policies, practices, or procedures fail to comply with the
IDEA.  Opp'n at 20.  Plaintiff's primary basis for suggesting that the reviews
conducted—whether by the State, the school district, or some other entity, *see* Opp'n at

---

[2] Maine reported "no records responsive to [Plaintiff's] request."  ECF No. 15-5 at 17.

20 n.10—will unearth statutory noncompliance is ED's "assum[ption]" in its regulatory economic analysis in the 2016 final rule that "half of the new [school districts] identified with significant disproportionality . . . would need to revise their policies, practices, and procedures."  81 Fed. Reg. at 92,461; *see also* Opp'n at 17-18.  But it is notable that in conducting this required estimate of the potential costs of the regulation, ED provided no explanation for, or any specific analysis underlying, that standalone "assum[ption]," and the D.C. Circuit "routinely refuse[s] to permit such predictive assumptions to establish standing."  *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc).

Indeed, one cannot simply assume that a finding of significant disproportionality will result in a finding of noncompliance with the IDEA.  As ED noted in its final rule in 2016, even under the standard methodology, a district may be found to have significant disproportionality and yet be correct in identifying, placing, and disciplining its students.  *See* 81 Fed. Reg. at 92,444 (noting that "not all factors contributing to a determination of significant disproportionality can be remedied through a review of policies, practices, and procedures").  For example, significant disproportionality could result from the presence in the school district of a magnet program for autistic children or a juvenile justice facility, either of which could skew various populations analyzed for significant disproportionality.  A finding of significant disproportionality alone is not, therefore, indicative of any necessity for revisions to the district's policies, procedures, or practices to ensure compliance with the IDEA.

Plaintiff also offers declarations from two of its members who aver that they have "witnessed violations of the IDEA occurring in [their] child's school [district]."  ECF Nos. 15-7 ¶ 7; *see also* 15-6 ¶ 6.  But whether a violation of the IDEA has occurred is a

legal conclusion and not a factual assertion that can be provided in a declaration.[3]  *See Ibrahim v. U.S. Dep't of State*, 311 F. Supp. 3d 134, 140 (D.D.C. 2018) ("A declaration by an interested party cannot establish legal conclusions . . . .").  Moreover, these statements neither connect the alleged (but unidentified) IDEA violations to any policies, procedures, or practices of the school districts, nor provide any factual basis on which to conclude that a State or school district's review of those districts' policies, procedures, and practices would identify ones that violate the IDEA.  Rather, such a conclusion would depend on "speculation upon speculation about how third parties might act," which is insufficient to demonstrate standing.  *Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 35 (D.D.C. 2017).

  **B.** **Plaintiff's Cases Relating to Its Alleged Informational Injuries Are Distinguishable**

---

[3] The statements set forth in Heather Cone's declaration, ECF No. 15-6, do not demonstrate a violation of the IDEA.  She states that her four-year-old child has been identified as having a disability, and that in September of this year, the school district removed her child from an early childhood special education program and placed the child into standard daycare "against [her] will and without being benefit [sic] of consultation with the educational team."  *Id.* ¶¶ 4, 6.  Decisions regarding student placement must be made by "a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."  34 C.F.R. § 300.116(a)(1); *see also* U.S. Dep't of Educ., *A Guide to the Individualized Education Program* at 12 (July 2000), https://www2.ed.gov/parents/needs/speced/iepguide/iepguide.pdf (last visited Oct. 9, 2018).  While, in some circumstances, placement decisions can be made by the student's individualized education program team, in other circumstances, "this decision may be made by another group of [qualified] people."  *Id.*  And while a parent has the right to be a part of any group that makes decisions regarding the educational placement of a student, 34 C.F.R. § 300.501(c)(1), "[t]he parent does not have the power to veto the decision of . . . the group that makes the placement for their child."  Letter from U.S. Dep't of Educ. to an Anonymous Individual (Mar. 7, 2012) at 6, https://www2.ed.gov/policy/speced/guid/idea/letters/2012-1/redacted030712vvsurvey1q2012.pdf (last visited Oct. 9, 2018).

In responding to Defendants' Motion, Plaintiff places greatest reliance on a trio of D.C. Circuit cases, which it characterizes as "on-point" for purposes of organizational standing: *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), *Waterkeeper Alliance v. EPA*, 853 F.3d 527 (D.C. Cir. 2017), and *People for the Ethical Treatment of Animals v. U.S. Department of Agriculture* ("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015).  Opp'n at 10.  Indeed, Plaintiff contends that "[n]one of ED's arguments takes this case outside the scope of *Action Alliance* and *PETA*."  *Id*. at 15.

Insofar as none of those cases involves an alleged informational injury that arises from the Government's non-regulation of non-parties to the litigation and which is therefore contingent on how third-party actors will exercise their discretion, as is the case here, those cases are distinguishable.  *Action Alliance* concerned a challenge to regulations by the U.S. Department of Health and Human Services ("HHS") that allegedly improperly omitted certain provisions—specifically, provisions that required programs receiving federal financial assistance to provide HHS "a self-evaluation listing all the age distinctions they utilize and the justification for each" and other "compliance information."  789 F.2d at 935.  *Waterkeeper Alliance* involved reporting and disclosure obligations for regulated parties upon "any release of a hazardous substance over a threshold set by the EPA," as imposed by the Comprehensive Environmental Response, Compensation, and Liability Act and the Emergency Planning and Community Right-to-Know Act.  853 F.3d at 531, 533-34.  And *PETA* concerned an alleged failure by the U.S. Department of Agriculture ("USDA") to apply the protections of the Animal Welfare Act ("AWA") to birds, which meant that "USDA was not creating bird-related inspection

reports that PETA could use to raise public awareness." 797 F.3d at 1089, 1091. There, PETA had alleged that "[w]hen it submits complaints to the USDA regarding AWA-covered animal mistreatment . . . 'resulting USDA inspection reports are made available in an online database,'" and USDA did not deny that if the AWA applied to birds, it would "employ the same inspection reports and redress mechanisms for birds that it currently uses for other species." *Id*. at 1095.

Each of these three cases thus involved regimes in which it was undisputed that the defendant agency would collect or create certain information, the lack of which was alleged to have inflicted harm on the plaintiff. None involved a situation such as that presented here, where the trigger for information creation and collection—namely, the issuance of reports by school districts following (1) an identification of significant disproportionality based on exceeding a risk ratio threshold established by an individual State, and (2) a revision of the school district's policies, practices, or procedures in order to achieve compliance with the IDEA, *see* 34 C.F.R. § 300.646(c)—is contingent on the actions of non-parties to the litigation.

Indeed, the D.C. Circuit in *Action Alliance* specifically distinguished such a situation from the facts there. The court noted a "line of cases" following the Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26 (1976), where "causality and remediability were [found] doubtful because the plaintiffs' injury resulted from the action of third parties not before the court." *Action All.*, 789 F.2d at 938. Indeed, *Eastern Kentucky* itself involved a situation where the Supreme Court found no standing where the defendant agency had "only speculative and indirect control over the . . . behavior" of third-parties not before the court—specifically, "nonprofit

hospitals that limited their aid to indigents to emergency room services"—because the only thing the agency could offer the hospitals was the "favorable tax status as 'charitable' corporations."  *Id*.

In contrast, *Action Alliance*, per the court's own description, could not "sensibly be viewed as dependent upon the actions of third parties," and thus it fell outside the realm of *Eastern Kentucky*.  789 F.2d at 938.  As the alleged injuries on which Plaintiff relies are similarly dependent on the actions of third parties, the instant case is similarly distinguishable.

C.   **The Activities Taken by Plaintiff Following Postponement of the Regulations' Compliance Date Represent Self-Inflicted Budgetary Choices**

Plaintiff disputes the suggestion that any actions it has taken in response to ED's postponement of the regulations' compliance date constitute self-inflicted budgetary choices, which demonstrate no perceptible impairment to its daily operations and activities.  *See* Opp'n at 15; *see also Turlock Irrigation Dist. v. Fed. Energy Regulatory Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (noting that an organization must "allege that the defendant's conduct 'perceptibly impaired' the organization's ability to provide services"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (requiring "an 'inhibition of [the organization's] daily operations'" (alteration in original) (quoting *PETA*, 797 F.3d at 1094)).  Plaintiff's own affidavit is to the contrary.

In explaining and expounding upon Plaintiff's alleged injuries, Selene Almazan states in her declaration that ED's postponement of the regulations' compliance date has allegedly "forced COPAA to divert resources toward establishing a common baseline for comparing significant disproportionality among [school districts]."  Decl. of Selene Almazan in Supp. of Pl's Cross-Mot. for Summ. J. at ¶ 15 ("Almazan Decl."), ECF No.

15-4. "With each state employing a different formula, COPAA must obtain the raw data and convert it on its own." *Id.* Thus, she contends that "[w]ithout comparable information on racial disproportionality, COPAA cannot provide its members the information they need to ensure that school districts remain IDEA-compliant (and educate the public about those facts) or accurately compare the progress (or regress) of States and school districts in different States." *Id.* ¶ 16. As an alleged consequence, Plaintiff is "deprived . . . of information it routinely relies on in carrying out its mission, including its public education functions," and is "now required to expend resources to obtain information about significant disproportionality." *Id.* ¶¶ 15, 16.

This explanation confirms that Plaintiff is not incurring "operational costs beyond those normally expended" and thus cannot demonstrate standing. *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)). Rather, Plaintiff is "largely engaged in the same kinds of activities now" as it would if the compliance date of the 2016 Regulations had not been postponed. *Nat'l Fair Hous. All. v. Carson*, No. CV (BAH) 18-1076, 2018 WL 3962930, at *22 (D.D.C. Aug. 17, 2018). As Plaintiff acknowledges, States have "substantial flexibility" in terms of how they choose to implement the 2016 Regulations. Compl. ¶ 69. To provide States the necessary "flexibility to tailor [the regulations] to the needs of their populations," 81 Fed. Reg. at 92,398, ED entrusted the States with the responsibility for setting the risk ratio thresholds, minimum cell sizes, and minimum n-sizes that would permit application of the regulations in the first instance. 34 C.F.R. §§ 300.647(b)(1)(i)(A), (B), (C), (b)(1)(iii)(B). Indeed, States have the flexibility to select "up to 15 different risk ratio thresholds" for each impairment and for various placements

and disciplinary removals identified in the regulations.  81 Fed. Reg. at 92,421; *see also* 34 C.F.R. § 300.647(b)(1)(ii).  Only if one of those risk ratios is exceeded may a State potentially identify a school district with significant disproportionality.[4]  34 C.F.R. § 300.647(b)(6).

Thus, under the 2016 Regulations, Plaintiff will still lack "comparable information on racial disproportionality."  Almazan Decl. ¶ 16.  As they did before, States will each "employ[] a different formula," tailored to their own populations, in which the regulations' standard methodology is triggered at different points and where identifications of significant disproportionality are made at different levels. *Id*. ¶ 15.  As a consequence, the release of information (in the form of school district reports) will occur in different circumstances, depending on the minimum cell sizes, minimum n-sizes, and risk ratio thresholds selected by the States for different impairments and placements, and depending on how each State chooses to exercise its discretion *not* to identify districts with significant disproportionality in certain circumstances.  In short, the amount and types of information made available through school districts' reports will still necessarily vary, even under the 2016 Regulations.  Thus, in order to "establish[] a common baseline for comparing significant disproportionality among [school districts]," Plaintiff will be obligated to, as it is doing now, "expend resources to obtain information about significant disproportionality . . . through investigations, research, and state and local public records requests." *Id*.

---

[4] Even then, a State may decline to identify a school district with significant disproportionality until it exceeds that risk ratio threshold for up to three prior consecutive years, or where it has demonstrated reasonable progress in lowering that risk ratio in each of the two prior years.  34 C.F.R. § 300.647(d).

It is therefore not at all clear how or why Plaintiff is being forced, as a result of

ED's postponement of the regulations' compliance date, to incur costs beyond those

normally expended and that constitute an inhibition of its daily operations.  *See Int'l*

*Acad. of Oral Med. & Toxicology v. U.S. Food & Drug Admin.*, 195 F. Supp. 3d 243, 256

(D.D.C. 2016) (querying "whether the organization truly 'diverted' any resources at all;

in other words, did the challenged agency action cause it to incur 'operational costs

beyond those normally expended' to carry out its day-to-day mission of educating the

public or advancing its advocacy mission?").  Rather, Plaintiff has simply chosen to use

its resources to engage in the same activities now that it would have also done under the

2016 Regulations.

### D.      Plaintiff Cannot Establish Organizational Standing Based on an Alleged Lack of Access to School Districts' "Root Cause" Analysis

In their Motion, Defendants relied on *Friends of Animals v. Jewell*, 828 F.3d 989

(D.C. Cir. 2016), *see* Opp'n at 18 n.9, in arguing that an alleged lack of access to school

districts' "root cause" analysis does not constitute a viable informational injury-in-fact

because no statute requires such information to be disclosed.  *See Friends of Animals*,

828 F.3d at 1040 ("[A] plaintiff 'suffers an injury in fact when the plaintiff fails to obtain

information which must be publicly disclosed pursuant to a statute.'" (quoting *Fed.*

*Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998))).  Plaintiff contests Defendants'

reliance on *Friends of Animals*, even as it acknowledges that "language in *Friends of*

*Animals* . . . support[s] ED's argument."  Opp'n at 18 n.9.  Moreover, *Friends of Animals*

post-dates both *Action Alliance* and *PETA*, the cases on which Plaintiff relies, and courts

in this circuit have reiterated the same point made in *Friends of Animals* before and after

the opinion.  *See, e.g.*, *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*,

*Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) ("For purposes of informational standing, a plaintiff 'is injured-in-fact . . . because he did not get what the statute entitled him to receive.'" (quoting *Zivotofsky v. Sec'y of State*, 444 F.3d 614, 618 (D.C. Cir. 2006))); *Campaign Legal Ctr. v. Fed. Election Comm'n*, 245 F. Supp. 3d 119, 125 (D.D.C. 2017) ("[A] plaintiff does not suffer an injury in fact if it seeks only information that the applicable statute does not require to be disclosed."). There thus continues to be no reason to credit Plaintiff's alleged injury based on a lack of access to school districts' "root cause" analysis.

Moreover, even if this alleged lack of access constituted a viable injury-in-fact, it is nonetheless not clear how "the loss [of such information] actually inhibits the organization's ongoing work in a 'concrete and specific' manner." *Envtl. Working Grp. v. United States Food & Drug Admin.*, 301 F. Supp. 3d 165, 171 n.4 (D.D.C. 2018) (quoting *Action All.*, 789 F.2d at 938). As noted in Defendants' Motion, 34 C.F.R. § 300.646(d)(1)(ii), which sets forth the "root cause" analysis, merely imposes certain restrictions on a school district's use of IDEA funds after an identification of significant disproportionality is made. Specifically, a district must "reserve the maximum amount of funds under section 613(f) of the [IDEA]" to identify and address factors contributing to the significant disproportionality. 34 C.F.R. § 300.646(d). This regulation does not require the creation of any documents or information by the districts, and the funding restriction did not exist prior to the 2016 Regulations.

## II.     Plaintiff Cannot Demonstrate Associational Injury

Plaintiff proffers in its Opposition three arguments in support of its assertion of associational standing. All lack merit. First, Plaintiff contends that its members suffer an

informational injury insofar as "[t]he loss of information to parents undermines IDEA's key emphasis on parental involvement by keeping parents ignorant of important developments that shape countless decisions," such as "picking which school district to live in, to voting for local school boards, to coordinating individual education plans." Opp'n at 20.  But "it is not enough [for Plaintiff] to aver that unidentified members have been injured" in this way."  C*hamber of Commerce of U.S. v. E.P.A*., 642 F.3d 192, 199 (D.C. Cir. 2011).  Rather, Plaintiff "must specifically 'identify members who have suffered the requisite harm.'"  *Id*. (quoting *Summers v. Earth Island Inst*., 555 U.S. 488, 499 (2009)).

Because Plaintiff does not do so in its Complaint, it proffers two declarations from members who make the same attestation: "If the school district had its policies, practices, and procedures reviewed for compliance with the IDEA, and then revised them in some way, I would read any documents or records about those revisions if they were made publicly available by my school district."  ECF Nos. 15-6 ¶ 8; 15-7 ¶ 7.  The simple fact that these members would *read* school district reports issued under 34 C.F.R. § 300.646(c) does not, however, demonstrate that the absence of those reports has or will imminently *undermine their parental involvement*, much less in any of the ways discussed by Plaintiff in its Opposition, which are not mentioned anywhere in the members' declarations.

Second, Plaintiff asserts that postponement of the 2016 Regulations will deprive its members of "an automatic state review to identify students that are misidentified,

misplaced, or improperly disciplined and correct such mistakes."[5]  Opp'n at 20.  Neither

the IDEA nor ED's regulations, however, require such reviews to identify *individual*

*instances* of student misidentification, misplacement, or improper discipline in this

context.  Rather, they simply mandate a "review and, if appropriate, revision of the

*policies, procedures, and practices* used in [school district] identification or placement."

20 U.S.C. § 1418(d)(2)(A); *see also* 34 C.F.R. § 300.646(c)(1) (requiring an "annual

review and, if appropriate, revision of the policies, practices, and procedures used in

identification or placement in particular education settings, including disciplinary

removals").

Plaintiff relies on ED's statement in its 2016 final rule that "[i]f the State

identifies noncompliance with a requirement of IDEA through this review, . . . when

verifying the correction of identified noncompliance, the State must ensure that the

[school district] has corrected each individual case of noncompliance, unless the child is

no longer within the jurisdiction."  Opp'n at 20 (quoting 81 Fed. Reg. at 92,391).  But

this text merely makes clear that, if in the course of conducting its review, the school

district identifies an instance of noncompliance—whether one regarding its policies,

practices, or procedures, or one arising in the context of an individual student—such

noncompliance with the IDEA must be rectified.  *See* 81 Fed. Reg. at 92,391 ("[T]he

State must ensure that the noncompliance is corrected . . . .").  But this duty to correct

---

[5] Plaintiff is incorrect to suggest that "ED [did] not address the . . . automatic state review
to identify students that are misidentified, misplaced, or improperly disciplined and
correct such mistakes."  Opp'n at 20.  The speculation inherent in this alleged injury and
Plaintiff's failure to identify in its Complaint any members who would suffer such an
injury were directly addressed in Defendants' Motion at pages 36 through 39.

does not serve to *expand* the scope or focus of the review beyond a school district's policies, practices, and procedures to include review for individual instances of noncompliance with regard to every student in a category with significant disproportionality.[6] Indeed, Plaintiff's suggestion that such a review would need to "identify students that are misidentified," Opp'n at 20, would potentially require an assessment or reassessment of *every student* in a given school district for whether he or she is incorrectly identified as having or not having a disability—a significant endeavor not required by the IDEA or any ED regulation.[7]

Finally, Plaintiff contends, in conclusory fashion, that a student in a school district that would have been identified with significant disproportionality under the 2016 Regulations will suffer an injury because where "students of a particular race are over- or under-represented in special education placements or exclusionary discipline," it "diminish[es] [a] student's 'ability to receive an education in a racially integrated school.'" *Id*. at 21 (quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984)). This argument

---

[6] Even if Plaintiff were correct regarding the scope of a school district's review, it nonetheless would not demonstrate a viable injury-in-fact. The extent to which a review would "detect or remedy . . . violations," Opp'n at 21, is dependent on the quality and nature of the review. Accordingly, such an injury is rooted in speculation about third-party conduct.

[7] Plaintiff also suggests that its members suffer a "loss of an opportunity" for a school district's policies, procedures, and practices to be reviewed. Opp'n at 21 (emphasis omitted). But this "opportunity" is merely an opportunity for *someone else* (the State, school district, or other entity) to take action on something for which the member has only an attenuated, third-party interest (review of the school district's policies, procedures, and practices). This is a wholly different situation than that presented in the case on which Plaintiff relies, *CC Distributors, Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989), where the plaintiff had alleged that it, itself, had lost the opportunity to bid on certain Government contracts. *Id*. at 150. Thus, unlike here, *CC Distributors* involves an alleged loss of opportunity for *the plaintiff* to take action on something that had the opportunity to benefit *the plaintiff* directly.

fails for multiple reasons.  First, Plaintiff fails to offer any explanation for how or why

such misidentifications and misplacements result *per se* in less racial integration, and thus

any such injury is speculative.  Second, Plaintiff again fails to identify any member who,

due to the nature of the school district or IDEA placement of a student in a particular

class, has or will imminently suffer such an injury.  The declaration from Heather Cone,

ECF No. 15-6, does not suffice—it mentions no erroneous placements or discipline of

children with disabilities, and merely references "an *impact* on the racial composition of

the classes [her] child attends," with no discussion of racial integration.  *Id.* ¶ 12

(emphasis added).  Third, Plaintiff's argument raises problems of causation and

redressability, as any injury arising from a diminished ability to be educated in a racially

integrated school is more properly traced to the actions of the school district, and redress

of such injury would require action by nonparties to this litigation—most obviously, the

school district itself.

### III.     Plaintiff Demonstrates Neither Causation Nor Redressability

Causation and redressability are just as crucial to the analysis of standing as the

element of injury-in-fact.  *See Lujan*, 504 U.S. at 560.  However, because the injuries on

which Plaintiff relies will only arise if certain non-parties to this litigation take certain

actions, Plaintiff must satisfy a higher burden in demonstrating causation and

redressability than normal.  When a plaintiff's "asserted injury stems from 'the

government's allegedly unlawful regulation (or lack of regulation) of someone else,' the

'fairly traceable' and redressability prongs of standing analysis require more exacting

scrutiny."  *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 416 (D.C.

Cir. 1994) (quoting *Lujan*, 504 U.S. at 562).  There must be "substantial evidence of a

causal relationship between the government policy and the third-party conduct, leaving little doubt as to causation and the likelihood of redress." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (citation omitted). Indeed, for redressability, there must be "a substantial likelihood that the third party directly injuring the plaintiff would cease doing so as a result of the relief the plaintiff sought." *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

In attempting to satisfy this more exacting scrutiny, Plaintiff simply notes the (uncontested) fact that if the rule at issue is vacated, there will be "a mandatory obligation" on the States to use the standard methodology set forth in the 2016 Regulations. Opp'n at 19. The result of this, Plaintiff postulates, would be an "increase [in] the number of [school districts] identified" with significant disproportionality. *Id.*

For the reasons offered at Part I.A *supra*, Plaintiff's allegations and evidence regarding a potential increase in the number of identifications of significant disproportionality do not suffice to demonstrate injury-in-fact, and thus *a fortiori* they do suffice to demonstrate causation and redressability under the more exacting scrutiny applied here. But even if they did suffice, Plaintiff's arguments are still insufficient because the injuries of which it complains *are not premised simply on the number of school districts identified with significant disproportionality*. Rather, for organizational standing, Plaintiff's alleged injuries arise from a lack of access to information (1) contained in reports issued by school districts that would have been identified with significant disproportionality under the 2016 Regulations, following revisions to their policies, practices, or procedures, and (2) made available as a result of those school districts' "root-cause" analyses. Compl. ¶¶ 119-123. And for associational standing,

20

Plaintiff's injuries arise from alleged errors in student identification, placement, or discipline that would have been identified through school districts' reviews, in the absence of ED's postponement of the regulations' compliance date. *Id*. ¶ 118; Opp'n at 20. Plaintiff offers *no* argument at all for why these alleged injuries are either traceable to ED or would be redressed by vacatur of the 2018 final rule. *See* Opp'n at 19 (characterizing the relief sought as vacatur).

In any event, each basis fails to demonstrate standing. Regarding Plaintiff's alleged injury relating to access to school districts' reports, Plaintiff has not shown "little doubt" that vacatur would redress such an injury because those reports only issue if it is determined that a school district's policies, practices, or procedures violate the IDEA. Whether such a determination is made will depend on the nature, scope, and operation of the review conducted under 34 C.F.R. § 300.646(c), which may be done by either the State itself, the school district, or some other entity altogether. *See* Opp'n at 20 n.10. Plaintiff bears "the burden . . . to adduce facts showing that [third-party] choices have been or will be made in such manner as to produce causation and permit redressability." *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24-25 (D.C. Cir. 2000) (quoting *Lujan*, 504 U.S. at 562)). Yet it provides no argument, citation, evidence, or allegations as to how any such reviews will be conducted in any given instance. Plaintiff also fails to explain how or why such reviews will identify policies, practices, or procedures that necessitate revision to achieve compliance with the IDEA. Without this, Plaintiff cannot demonstrate the requisite "substantial likelihood" that vacatur of ED's rule would redress its alleged injury by resulting in the issuance of more school district reports. *Renal Physicians*, 489 F.3d at 1275.

Nor has Plaintiff demonstrated "little doubt" that vacatur would redress Plaintiff's alleged lack of access to school districts' "root-cause" analyses.  As noted above, 34 C.F.R. § 300.646(d)(1)(ii) does not require school districts to create any documentation or information for this "root-cause" analysis.[8]  Indeed, the regulation does not specify how a district should conduct such an analysis or what the analysis should encompass.  Rather, it simply requires a school district to "identify . . . the factors contributing to the significant disproportionality" and "reserve the maximum amount of funds under section 613(f) of the [IDEA]" to provide comprehensive coordinated early intervening services that "address [those] factors."  § 300.646(d).  How the district goes about making such an identification is left to its own discretion—whether, for example, through the creation of a report or some other method deemed appropriate by the district under the broad statutory and regulatory language, such as in-person consultation—and Plaintiff provides no argument, citation, evidence, or allegation to the contrary.  This means that whether any available information exists for Plaintiff to obtain—whether sought through public records requests or other investigatory means, since no public disclosure of this analysis is required by the 2016 Regulations, *see supra* Part I.A—will necessarily "depend[] on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict."  *Scenic Am.*, 836 F.3d at 50 (quoting *Lujan*, 504 U.S. at 560).  To use the examples above: if the identification of factors contributing to significant disproportionality is done via a report, then Plaintiff's alleged injury might be redressed,

---

[8] Rather, ED's regulations merely require "[a] State and [its school districts] [to] keep records to show its compliance with program requirements."  34 C.F.R. § 76.731.

but if done orally through in-person consultations, then it would not.  This "reliance on

the anticipated action of unrelated third parties" undermines Plaintiff's ability to

demonstrate standing.  *Arpaio*, 797 F.3d at 20.

      Finally, as to the alleged errors in student identification, placement, or discipline,

which would have only been identified if ED had not postponed the compliance date of

the regulations and more school districts were identified with significant

disproportionality as a result, Plaintiff cannot establish causation or redressability.  *See*

*Nat. Law Party of U.S. v. Fed. Elec. Comm'n*, 111 F. Supp. 2d 33, 49 (D.D.C. 2000)

("When [a] claim hinges, as in this case, on an agency's failure to prevent injurious third

party behavior, the 'fairly traceable and redressability inquiries appear to merge.'"

(quoting *Freedom Republicans*, 13 F.3d at 418)).  As explained at Part II *supra*, the focus

of the review conducted by such a school district is whether any of its policies, practices,

or procedures fails to comply with the IDEA.  The review is not intended to uncover

individual instances of student misidentification, misplacement, or improper discipline.

Rather, a school district is required to address such individualized instances of

noncompliance only to the extent that they are identified during the course of reviewing

policies, practices, and procedures.  Accordingly, redress of such alleged injuries would

not be accomplished by vacatur of ED's final rule alone.  Rather, redress is further

dependent on the scope of such a review and the way in which the review is conducted.

There is, in other words, more than a "little doubt" as to the prospect of redress by a

favorable judicial order.

## CONCLUSION

      For the foregoing reasons, as well as those discussed in Defendants' Motion,

Defendants respectfully request that the Court dismiss Plaintiff's Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction.

Dated:  October 9, 2018                          Respectfully submitted,


                                                 JODY HUNT
                                                 Assistant Attorney General

                                                 CARLOTTA WELLS
                                                 Assistant Branch Director
                                                 Federal Programs Branch

                                                 */s/ Jason Lee*
                                                 JASON LEE (CA Bar No. 298140)
                                                 Trial Attorney
                                                 United States Department of Justice
                                                 Civil Division, Federal Programs Branch
                                                 20 Massachusetts Avenue NW
                                                 Washington, DC 20001
                                                 (202) 514-3367
                                                 (202) 616-8470 (fax)
                                                 Jason.Lee3@usdoj.gov

                                                 *Counsel for Defendants*