**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.,** | |
| Plaintiff, | |
| v. | Case No. 1:18-cv-1636-TSC |
| **U.S. DEPARTMENT OF EDUCATION, ELIZABETH DEVOS, Secretary of Education, and JOHNNY W. COLLETT, Assistant Secretary for Special Education and Rehabilitative Services,** | |
| Defendants. | |

**<u>DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    I.   Statutory and Regulatory Background ................................................................ 3

        A.  The IDEA ................................................................................................ 3

        B.  The 2016 Regulations ............................................................................. 4

        C.  Postponement of the 2016 Regulations ................................................. 5

    II.  Procedural History ......................................................................................... 7

STANDARD OF REVIEW ...................................................................................... 7

ARGUMENT ........................................................................................................... 8

    I.   Plaintiff Lacks Standing to Proffer Its APA Challenge ................................. 8

    II.  ED Reasonably Delayed the Compliance Dates for the 2016 Regulations in Light of Its Rational Concern that the Regulations Could Incentivize Under-Identification and Result in the Use of De Facto Quotas ....................................... 8

        A.  From the Beginning, Commenters Warned that the Regulations Could Result in De Facto Racial or Ethnic Quotas ................................................................. 9

        B.  Commenters on the Proposed Postponement Noted that ED's Own Investigation in Texas Provided New Evidence Confirming that the 2016 Regulations Could Incentivize De Facto Quotas .......................................... 11

        C.  Given This New Evidence, ED's Final Rule Postponing the Compliance Dates of the 2016 Regulations Is Neither Arbitrary Nor Capricious .............. 16

    III. None of Plaintiff's Arguments Demonstrate that the 2018 Final Rule Is Arbitrary or Capricious .................................................................................................... 20

        A.  ED Reasonably Explained the Basis for Its Final Rule ................................. 20

              1.   *ED's Explanation for the Timing of the Delay and the Discussion of Its Findings from Texas* ............................................................ 20

              2.   *Safeguards Discussed in the 2016 Final Rule* ........................ 24

              3.   *ED's Decision Not To Require National Compliance with the 2016 Regulations Was Internally Consistent* .......................... 27

        B.  Plaintiff Fails to Identify Any Basis for a Cognizable APA Claim Concerning ED's Weighing of Costs ................................................................................ 29

C.  ED Gave Sufficient Consideration to Viable Alternatives ............................. 34

D.  ED Conducted the Rulemaking with an Open Mind and Provided A
    Meaningful Opportunity for Notice and Comment ......................................... 38

IV. If the Court Were to Rule in Favor of Plaintiff, Remand to ED (and not Vacatur)
    Would Be the Appropriate Remedy ...................................................................... 42

CONCLUSION............................................................................................................ 44

# TABLE OF AUTHORITIES

## Cases

*Abington Mem'l Hosp. v. Burwell*,
  216 F. Supp. 3d 110 (D.D.C. 2016) ........................................................................ 41, 42

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ................................................................................... 27

*Air Alliance Houston v. EPA*,
  No. 17-1155, 2018 WL 4000490 (D.C. Cir. Aug. 17, 2018) ........................................ 21

*Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ..................................................................................... 43

*Air Transp. Assoc. of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) ............................................................................... 29-30, 42

*Alliance for Natural Health v. Sebelius*,
  775 F. Supp. 2d 114 (D.D.C. 2011) ............................................................................. 30

*Am. Ass'n of Cosmetology Schs. v. DeVos*,
  258 F. Supp. 3d 50 (D.D.C. 2017) ............................................................................... 35

*Am. Med. Ass'n v. Reno*,
  57 F.3d 1129 (D.C. Cir. 1995) ..................................................................................... 41

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
  452 U.S. 490 (1981) ..................................................................................................... 30

*Am. Trucking Assocs., Inc. v. Fed. Motor Carrier Safety Admin.*,
  724 F.3d 243 (D.C. Cir. 2013) ............................................................................... 31, 32

*Assoc. of National Advertisers v. Fed. Trade Comm'n*,
  627 F.2d 1151 (D.C. Cir. 1979) ................................................................................... 40

*Ass'n of Private Sector Colleges & Universities v. Duncan*,
  110 F. Supp. 3d 176 (D.D.C. 2015) ............................................................................... 8

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ....................................................................................................... 8

*City of Brookings Mun. Tel. Co. v. FCC*,
  822 F.2d 1153 (D.C. Cir. 1987) ....................................................................... 35, 36, 37

*City of Portland v. EPA*,
  507 F.3d 706 (D.C. Cir. 2007) ..................................................................................... 30

*Competitive Enterprise Inst. v. Nat'l Highway Traffic Safety Admin.*,
   956 F.2d 321 (D.C. Cir. 1992) ...................................................................................... 31

*Consumer Elecs. Ass'n v. FCC*,
   347 F.3d 291 (D.C. Cir. 2003) ................................................................................. 31, 32

*Consumer Elecs. Ass'n*,
   347 F.3d 303 ...................................................................................................................... 32

*Ctr. for Auto Safety v. Peck*,
   751 F.2d 1336 (D.C. Cir. 1985) ............................................................................... 31, 32

*Defenders of Wildlife v. Jackson*,
   791 F. Supp. 2d 96 (D.D.C. 2011) ............................................................................... 30

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) .............................................................................................. 35, 36

*Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Office of Foreign Assets Control*,
   857 F.3d 913 (D.C. Cir. 2017) ...................................................................................... 16

* *F.C.C. v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .............................................................................................. *passim*

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.*,
   19 F. Supp. 3d 111 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C.
   Cir. 2015) ......................................................................................................................... 29

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................................................ 43

*Flaherty v. Bryson*,
   850 F. Supp. 2d 38 (D.D.C. 2012) ............................................................................... 40

*Fry v. Napoleon Cmty. Schs.*,
   137 S. Ct. 743 (2017) ........................................................................................................ 3

*Hous. Study Grp. v. Kemp*,
   736 F. Supp. 321 (D.D.C. 1990) ................................................................................... 40

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ...................................................................................... 16

*Latif v. Obama*,
   666 F.3d 746 (D.C. Cir. 2011) ...................................................................................... 26

*Louisiana v. Salazar*,
   170 F. Supp. 3d 75 (D.D.C. 2016) .................................................................................. 7

*Lutheran Church -Missouri Synod v. FCC*,
   141 F.3d 344 (D.C. Cir. 1998) ........................................................ 17, 19, 37

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017) ................................................................ *passim*

*Meyer v. Bush*,
   981 F.2d 1288 (D.C. Cir. 1993) ................................................................ 29

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ................................................................................ 31

*Mingo Logan Coal Co. v. EPA*,
   829 F.3d 710 (D.C. Cir. 2016) ................................................................... 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................ *passim*

*Nat'l Ass'n of Home Builders v. EPA*,
   682 F.3d 1032 (D.C. Cir. 2012) ................................................................. 30

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013) ......................................................... 35, 36, 37

*Nicopure Labs, LLC v. Food & Drug Admin.*,
   266 F. Supp. 3d 360 (D.D.C. 2017), *appeal filed* No. 17-5196 (Aug. 31, 2017) ... 30, 31

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ................................................................................... 19

*Styrene Info. & Research Ctr., Inc. v. Sebelius*,
   944 F. Supp. 2d 71 (D.D.C. 2013) ....................................................... 27, 38

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
   135 S. Ct. 2507 (2015) ............................................................................... 23

*United Source One, Inc. v. U.S. Dep't of Agric., Food Safety & Inspection Serv.*,
   865 F.3d 710 (D.C. Cir. 2017) ................................................................... 16

*United States v. Morgan*,
   313 U.S. 409 (1941) ................................................................................... 39

*United Steelworkers of Am., AFL-CIO-CLC v. Marshall*,
   647 F.2d 1189 (D.C. Cir. 1980) ................................................................. 39

*Watson v. Fort Worth Bank & Trust*,
   487 U.S. 977 (1988) ................................................................................... 19

*Waukesha Cnty. Environmental Action League v. U.S. Dep't of Transportation*,
No. 15-CV-801-PP, 2018 WL 5085519 (E.D. Wis. Oct. 18, 2018) ...................... 27, 28

**Statutes**

5 U.S.C. § 706(2) ............................................................................................................ 7

20 U.S.C. § 1406(c) ...................................................................................................... 28

20 U.S.C. § 1418(d) ................................................................................................... 3, 31

Individuals with Disabilities Education Act Amendments for 1997,
Pub. L. No. 105-17, 111 Stat. 37 (1997) ........................................................ 3

Individuals with Disabilities Education Improvement Act of 2004,
Pub. L. No. 108-446, 118 Stat. 2647 (2004) ................................................. 4

**Regulations**

34 C.F.R. § 300.646 ........................................................................................... *passim*

34 C.F.R. § 300.647(b)(2) ................................................................................. *passim*

Assistance to States for the Education of Children With Disabilities; Preschool
Grants for Children With Disabilities,
81 Fed. Reg. 10,968-01 (Mar. 2, 2016) ............................................. *passim*

Assistance to States for the Education of Children With Disabilities; Preschool
Grants for Children With Disabilities,
83 Fed. Reg. 8,396-01 (Feb. 27, 2018) ...................................... 5, 11, 41, 42

Assistance to States for the Education of Children With Disabilities; Preschool
Grants for Children With Disabilities,
83 Fed. Reg. 31,306-01 (July 3, 2018) .............................................. *passim*

With Disabilities and Preschool Grants for Children With Disabilities,
71 Fed. Reg. 46,540-01 (Aug. 14, 2006) ..................................................... 4

Assistance to States for the Education of Children With Disabilities; Preschool Grants for
Children with Disabilities,
81 Fed. Reg. 92,376 (Dec. 19, 2016) .......................................... 5, 10, 24, 26

Agency Information Collection Activities; Comment Request; Annual State Application
Under Part B of the Individuals With Disabilities Education Act,
82 Fed. Reg. 31,954-01 (July 11, 2017) ........................................... *passim*

## INTRODUCTION

In July 2018, the U.S. Department of Education ("ED") postponed the compliance dates for regulations previously announced in December 2016 (the "2016 Regulations").  Those regulations would have required States to use a standard methodology when determining whether significant disproportionality based on race and ethnicity is occurring with respect to the identification, placement, and discipline of students with disabilities under the Individuals with Disabilities Education Act ("IDEA").  ED postponed the compliance dates for the regulations to provide time for further evaluation in light of concerns that they could incentivize school districts to limit the number of students in a particular racial or ethnic group identified as having a disability, placed in a restrictive setting, or disciplined to avoid a finding of significant disproportionality.  This would have effectively resulted in the use of de facto quotas.

In light of this risk, ED's decision was neither arbitrary nor capricious.  Rather, it was the product of reasoned decisionmaking in which ED considered allowing the standard methodology to be implemented as planned, but rejected that course of action due to concerns about the behavior the methodology could incentivize while review of the regulations took place.  Such concerns were supported by comments noting that Texas had indirectly incentivized similar behavior by setting a State-wide standard identification rate for students with disabilities in its State monitoring system, which resulted in school districts artificially depressing the number of students identified as having a disability under the IDEA in order to fall below that standard rate. ED made findings regarding these outcomes *after* it had issued the 2016 Regulations, and this example made concrete the concerns that ED had previously dismissed.  Thus, given the risk that the 2016 Regulations could incentivize school districts to adopt improper policies aimed at avoiding a finding of significant disproportionality and the accompanying restriction on 15% of a district's IDEA funds, ED chose to postpone the compliance dates of the regulations to provide

time for further evaluation and study of the issue.  ED's final rule thus evinces a rational connection between the facts found and choice made, which is all the Administrative Procedure Act ("APA") requires.

Nothing in Plaintiff's cross-motion for summary judgment merits a different result. Contrary to Plaintiff's arguments, ED explained its reasoning for choosing postponement while it studied the issue further, noting its disinclination to require use of a methodology that could incentivize de facto quotas while such study occurred.  It also explained why it now found the safeguards upon which it had previously relied to be inadequate given the new evidence from Texas.  ED thus reasonably provided for the continuation of the status quo, in which States were free to choose their own methodology—including adoption of the standard methodology—while it evaluated the 2016 Regulations and related issues.

Nor do Plaintiff's other arguments under the APA entitle it to summary judgment. Plaintiff's challenge to ED's consideration of costs in the final rule fails because any alleged deficiency in ED's cost analysis would rest on a purported violation of the *Executive Orders* (and not the APA) that required such analysis in the first place, and judicial review of any such violations is not available.  Even if review were available under the APA, ED's analysis evinced no clear error of judgment that would compel a finding of arbitrary or capricious decisionmaking.  Plaintiff is also wrong to suggest that ED's consideration of alternatives was insufficient, as ED gave cogent explanations for why it rejected each of the alternatives proposed by Plaintiff.  Finally, Plaintiff's procedural challenges to ED's final rule are unpersuasive—none of Plaintiff's evidence of a supposed lack of open-mindedness by ED suffices to overcome the presumption of regularity afforded to agency rulemaking, and ED's notice of proposed rulemaking contained sufficient detail to afford the public a meaningful opportunity to comment.

For these reasons, the Court should enter summary judgment in Defendants' favor and deny Plaintiff's cross-motion for summary judgment.

## BACKGROUND

### I.      Statutory and Regulatory Background

#### A.      The IDEA

The IDEA was enacted to help ensure that children with disabilities receive needed special education services.  *See Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017).  Under Part B of the IDEA, ED provides grants to States, outlying areas, and freely-associated States to assist in providing special education and related services to children with disabilities.  Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 81 Fed. Reg. 10,968-01, 10,970 (Mar. 2, 2016).

Congress has amended the IDEA to address the overrepresentation of children from racial and ethnic minority backgrounds in special education programs.  The first such amendment occurred in 1997, when Congress added a requirement that States collect and examine data to determine if "significant disproportionality" based on race is occurring in the identification and placement of children with disabilities.  Individuals with Disabilities Education Act Amendments for 1997, Pub. L. No. 105-17, § 618(c), 111 Stat. 37 (1997) (codified as amended at 20 U.S.C. § 1418(d)(1)).  If a State found significant disproportionality, the amendments required the State to provide for the review and, if appropriate, revision of the policies, practices, and procedures used in identifying and placing children with disabilities.  *Id*. § 618(c)(2) (codified as amended at 20 U.S.C. § 1418(d)(2)(A)).  Seven years later, Congress amended the IDEA again to require the States to also collect and examine data to determine if significant disproportionality based on race and ethnicity is occurring with respect to incidences, durations, and types of disciplinary actions, including suspensions and expulsions.  Congress further mandated that where a State

finds significant disproportionality, the school district must publicly report on any revisions

made to its policies, practices, and procedures based on the review described above and reserve a

portion of its IDEA funds for the provision of comprehensive coordinated early intervening

services.  Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-

446, § 618(d)(2)(B), (C), 118 Stat. 2647 (2004) (codified as amended at 20 U.S.C. §

1418(d)(2)(B), (C)).

###           B.        The 2016 Regulations

Through 2016, ED provided each State with "the discretion to define ['significant

disproportionality'] for [its own school districts] and for the State in general," and to "determine

statistically significant levels" at which significant disproportionality would be found.

Assistance to States for the Education of Children With Disabilities and Preschool Grants for

Children With Disabilities, 71 Fed. Reg. 46,540-01, 46,738 (Aug. 14, 2006).  Following a report

by the Government Accountability Office in February 2013, ED published a proposed rule

containing regulations that would "require States to use a standard methodology . . . when

making determinations of significant disproportionality."  Assistance to States for the Education

of Children With Disabilities; Preschool Grants for Children With Disabilities, 81 Fed. Reg.

10,968-01, 10,978 (Mar. 2, 2016).

On December 19, 2016, ED issued a final rule that set forth "common parameters for

analysis, which each State must use to determine whether significant disproportionality is

occurring at the State and local level."  Assistance to States for the Education of Children With

Disabilities; Preschool Grants for Children with Disabilities, 81 Fed. Reg. 92,376, 92,391 (Dec.

19, 2016) ["2016 Final Rule"].  States were required to use risk ratios in analyzing disparities

across seven specified racial and ethnic groups using fourteen categories of analysis.  34 C.F.R. §

300.647(b)(2)-(4).  Under this approach, risk ratios for the seven racial or ethnic groups are compared to those of all other racial and ethnic groups within the district.  *Id*. § 300.647(a)(6).  If the risk ratio for a group within any of the fourteen categories of analysis exceeds the applicable "risk ratio threshold"—the point at which disproportionality based on race or ethnicity can be deemed significant, *see id*. § 300.647(a)(7)—a school district may be identified, but is not required to be identified, with significant disproportionality.  *Id*. § 300.647(b)(6).

If a finding of significant disproportionality is made, there must be a review and, if appropriate, revision of the school district's policies, practices, and procedures used in the identification of students with disabilities or placement of such students in particular educational settings, including disciplinary removals, for compliance with the IDEA.  *Id*. § 300.646(c)(1).  The school district must also "identify and address the factors contributing to the significant disproportionality" through directed use of 15% of its IDEA Part B funds.  *Id*. § 300.646(d)(1)(ii).

## C.    Postponement of the 2016 Regulations

Under the 2016 Final Rule, States participating in the IDEA Part B program were required to comply with the regulations starting July 1, 2018.  81 Fed. Reg. at 92,378.  On February 27, 2018, ED issued a notice of proposed rulemaking wherin the agency would "postpone the compliance date [of the 2016 Regulations] by two years, from July 1, 2018, to July 1, 2020" and "the date for including children ages three through five in the analysis of significant disproportionality, with respect to the identification of children as children with disabilities and as children with a particular impairment, from July 1, 2020, to July 1, 2022."  Assistance to States for the Education of Children With Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 8,396-01, 8,396 (Feb. 27, 2018) ["2018 Proposed Rule"].  In seeking

comments on the proposed rule, ED stated that it would "consider comments on proposed

delayed compliance dates only and [would] not consider comments on the text or substance of

the final regulations."  *Id*.

 On July 3, 2018, ED issued a final rule postponing the compliance dates of the 2016

Regulations, citing concerns that the "regulations may not meet their fundamental purpose,

namely to ensure the proper identification of [school districts] with significant disproportionality

among children with disabilities."  Assistance to States for the Education of Children With

Disabilities; Preschool Grants for Children With Disabilities, 83 Fed. Reg. 31,306-01, 31,314

(July 3, 2018) ["2018 Final Rule"].  ED noted that the regulations "may create an incentive for

[school districts] to establish de facto quotas in identification, placement, and discipline—or

otherwise create a chilling effect on such identification—to avoid being identified with

significant disproportionality and having to reserve 15 percent of their IDEA Part B subgrant to

provide comprehensive coordinated early intervening services."  *Id*. at 31,308.

In explaining that risk, ED cited comments discussing an example in Texas where the

State, as part of its monitoring system, "measured the percentage of children identified as

children with disabilities and receiving special education and related services under IDEA

against a standard identification rate of 8.5 percent."  *Id*.  In response, many school districts

"reduced the number of children they identified as children with disabilities under IDEA to no

more than 8.5 percent of their student populations" to avoid exceeding the State's standard

identification rate, thus resulting in the use of de facto quotas.  *Id*.  ED found this to be "a clear

example of what can happen when schools are required to meet numerical thresholds in

conjunction with serving children with disabilities."  *Id*.  Given this specific example, ED found

it "more prudent to delay the compliance date [of the regulations] and address that concern

6

through a review of the standard methodology before States are required to implement the regulations rather than during implementation." *Id.* at 31,310.

In Fall 2018, as part of its Unified Agenda, ED stated that it "plans to issue a notice of proposed rulemaking to amend regulations under Part B of the [IDEA]," which "requires States to determine if there is significant disproportionality based on race and ethnicity within the State and [school districts]" in the identification, placement, and discipline of children with disabilities.[1]  The Unified Agenda set forth an estimated date of February 2019 for issuing the notice of proposed rulemaking.

## II.     Procedural History

Plaintiff, an organization comprised of "parents of children with disabilities, their attorneys, and their advocates," Compl. ¶ 12, filed its Complaint on July 12, 2018, setting forth one claim under the APA.  ECF No. 1.  On September 17, 2018, Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), contending that Plaintiff lacks standing to bring suit.  ECF No. 14.  Plaintiff filed a combination opposition to Defendants' motion to dismiss and a cross-motion for summary judgment on October 1, 2018.  ECF Nos. 15, 16.

### STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure states that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "In an APA case, however, the standard set forth in Rule 56 does not apply because of the limited role of a court in reviewing

---

[1] Unified Agenda, U.S. Department of Education (Fall 2018), Significant Disproportionality Part B of the IDEA (Fall 2018), https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=1820-AB80 (last visited Nov. 5, 2018).

agency action." *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016). Rather, "[i]n the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Id.* That standard instructs courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

Agency action will be upheld where it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). "[C]ourts will not set aside such action unless the agency, for instance, 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 110 F. Supp. 3d 176, 190 (D.D.C. 2015) (quoting *State Farm*, 463 U.S. at 43).

## ARGUMENT

### I.     Plaintiff Lacks Standing to Proffer Its APA Challenge

As Defendants explained in their memorandum and reply in support of their motion to dismiss, ECF Nos. 14, 19, which Defendants incorporate by reference, Plaintiff cannot demonstrate standing to bring suit. The injuries on which Plaintiff relies for organizational standing are speculative and dependent on actions that nonparties to this litigation would allegedly take absent postponement. For associational standing, Plaintiff cannot identify any member who would have standing to bring the APA claim it proffers. Plaintiff also fails to

satisfy the more exacting scrutiny applied when assessing causation and redressability where the asserted injury stems from an alleged lack of regulation of a nonparty.  Thus, summary judgment can and should be entered in Defendants' favor on this basis.

**II.     ED Reasonably Delayed the Compliance Dates for the 2016 Regulations in Light of Its Rational Concern that the Regulations Could Incentivize Under-Identification and Result in the Use of De Facto Quotas**

Even if Plaintiff has standing, its APA claim lacks merit.  Since enactment of the 2016 Regulations, commenters had warned that use of risk ratio thresholds to identify significant disproportionality could incentivize school districts to under-identify students with disabilities and avoid a finding of significant disproportionality, including the restrictions on their IDEA funding that would follow.  After seeking comments on a proposed postponement of the regulations' compliance dates in order to provide the agency sufficient time in which to evaluate them, commenters pointed out that ED itself had found evidence that use of numerical thresholds could incentivize such behavior.  Specifically, ED had concluded that Texas's use of a standard identification rate for students with disabilities resulted in many districts limiting the number students they identified as having a disability under the IDEA.  Given such evidence, ED chose to postpone the compliance dates of the 2016 Regulations while it studied the issue further, so as to avoid incentivizing the use of such quotas while its evaluation took place.  There was nothing arbitrary or capricious in deciding to do so.

**A.     From the Beginning, Commenters Warned that the Regulations Could Result in De Facto Racial or Ethnic Quotas**

When the 2016 Regulations were originally proposed, a range of commenters expressed concerns that the standard methodology could incentivize school districts to under-identify students with disabilities through the use of de facto quotas.  The 2016 Regulations generally result in a finding of significant disproportionality where the risk ratio for a particular group

exceeds the applicable risk ratio threshold set by the State, subject to a State's exercise of discretion in certain circumstances.  Many commenters warned of certain "unintended consequences" that could result from use of this methodology.  AR-000521.[2]  For example, the Massachusetts Department of Elementary and Secondary Education ("MDESE") noted that the standard methodology was "likely to [result in] an increased risk of [school] districts establishing 'quotas' for identification and placement" in an effort to avoid exceeding risk ratio thresholds. *Id*.  A district might "inform[] parents and others that IDEA compliance requirements related to disproportionality preclude [it] from supporting certain eligibility determinations or placement decisions for students with specific races or ethnicities" where the district is already at or close to exceeding the applicable risk ratio thresholds.  *Id*.  Such conduct could occur, MDESE noted, even though it would be "inconsistent—and moreover inappropriate—in the context of IDEA," and would "likely . . . result in the denial of [a free and appropriate public education] for students affected by these erroneous decisions."  *Id*.

Many commenters echoed these concerns.  *See, e.g.*, AR-000234 (comment from the Missouri Council of Administrators of Special Education arguing that because "the proposed regulations rely exclusively on a mathematical calculation to identify disproportionate representation . . . schools [would] be forced to constantly watch their numbers for quota targets" to avoid a finding of significant disproportionality); AR-000473 (comment from the Council of Administrators of Special Education arguing that "[d]etermining disproportionality based on how many students are identified in certain disability categories could lead to a quota system for special education and deny services to students who truly need those supports"); AR-000935 (comment from the Center for Evaluation & Education Policy at Indiana University noting "a

---

[2] "AR" refers to administrative record in this case.

danger that [school districts] with significant disproportionality will let it be known, formally or informally, that fewer students in that racial/ethnic category should be referred").

In the 2016 Final Rule, ED acknowledged that "in cases where States select particularly low risk ratio thresholds, [school districts] may have an incentive to avoid identifying children from particular racial or ethnic groups in order to avoid a determination of significant disproportionality." 81 Fed. Reg. at 92,385. ED also agreed that the use of racial or ethnic quotas "would almost certainly result in legal liability under Federal civil rights laws, including title VI of the Civil Rights Act of 1964 and the Constitution." *Id*. ED suggested, however, that the risk of incentivizing de facto quotas was mitigated by the fact that the regulations "provide[] States the flexibility to set their own reasonable risk ratio thresholds," which could "help States and [school districts] to address large racial and ethnic disparities without undermining the appropriate implementation of child find procedures." *Id*. ED further noted that "nothing in the[] regulations establishes or authorizes the use of racial or ethnic quotas," and that use of such quotas "to avoid a finding of significant disproportionality[] would almost certainly conflict with the[] [district's] obligations to comply with other Federal statutes." *Id*.

In terms of amending the proposed regulations, ED noted it had "added a new § 300.646(f) to make clear that these regulations do not authorize a State or [school district] to develop or implement policies, practices, or procedures that result in actions that violate any IDEA requirements." *Id*. This subsection was not specifically added in response to concerns about racial or ethnic quotas. Rather, ED included it as part of a general effort to clarify that nothing in the regulations "supersedes or replaces other applicable constitutional, statutory, or regulatory requirements including those related to ensuring proper implementation of IDEA requirements for child find, free appropriate public education (FAPE), or placement in the least

restrictive environment (LRE)," and thus do not displace "any Federal civil rights protection from discrimination, including discrimination based on race, color, national origin, sex, or disability." *Id*. at 92,386.

### B. Commenters on the Proposed Postponement Noted that ED's Own Investigation in Texas Provided New Evidence Confirming that the 2016 Regulations Could Incentivize De Facto Quotas

ED revisited the 2016 Regulations as part of a regulatory review exercise prompted by Executive Order ("EO") No. 13,777. 83 Fed. Reg. at 8,396. As part of that review, ED sought comments on a proposal to postpone the regulations' compliance dates for two years, given concerns that they "may not appropriately address the problem of significant disproportionality." *Id*. at 8,397. In response, ED received comments "not[ing] that compliance with numerical thresholds can have unintended consequences." 83 Fed. Reg. at 31,308. Those comments pointed to Texas's experience in setting a numerical threshold for the identification of students with disabilities in its "Performance-Based Monitoring and Analysis System" ("PBMAS"), and to ED's findings with regard to the incentives the system created. *Id*.; *see also* AR-001422, 1433, 1888.

Since 2004, the PBAMS has assessed school districts in Texas across a variety of program areas, termed "performance indicators." AR-000030. In the 2016-17 school year, there were four general categories of performance indicators: bilingual education/English as a second language, career and technical education, No Child Left Behind-related indicators, and special education. AR-000050, 62, 72, 82. For each indicator, the Texas Education Agency would assign a school district a "performance level," which reflected the district's performance as judged against a State-established standard. AR-001291. In the PBMAS, "the higher the [district's performance level] is, the lower the district's performance is." AR-000041. School districts were selected for monitoring interventions by the Texas Education Agency based on

their performance levels and other criteria.  AR-000047.

The PBMAS included an indicator that measured the percentage of enrolled children in each school district receiving special education and related services under the IDEA.  AR-001291.  In 2016, a school district was assigned a performance level of 0 when the percentage of students enrolled in the district receiving special education services fell between 0% and 8.5%.  AR-000095.  A performance level of 1 applied when the percentage fell between 8.6% and 11%.  *Id.*  A performance level of 2 applied when the percentage fell between 11.1% and 15%.  *Id.*  A performance level of 3 applied when the percentage was 15.1% or higher.  *Id.*

In February 2017, ED conducted a one-week monitoring visit to the Texas Education Agency and twelve of its districts.  AR-001290.  During this visit, ED learned that school districts in Texas had "[taken] actions specifically designed to decrease the identification of children for special education and related services under the IDEA when [the Texas Education Agency] indicated that the [school district's] rate exceeded 8.5 percent."  *Id.*; *see also* AR-001292 (noting that school districts "often analyzed trend data based on the 8.5 percent indicator," and in some cases, took "action[] . . . to decrease the percentage of children in the [district] identified as eligible for special education and related services under the IDEA").  These actions were motivated by a belief that a district would receive less monitoring on this performance indicator if the district kept its identification rate under 8.5% and thus was able to obtain a performance level of 0.  AR-001291-92.  Among the examples found:

- One school district stated in "Improvement Plans" issued between 2004 and 2012 that it would "reduce the percentage of children receiving special education services . . . through the use of differentiated instruction, related aids and services."  AR-001292.  It would also "develop[] and implement[] a new Child Study System" that would result in "fewer referrals for special education evaluation and decreased [special education] representation."  *Id.*  These efforts led to a drop in special education identification in the district from 12.5% in 2005 to a low of 9.8% in 2012.  AR-001293.

- In another district, the superintendent told ED staff that "he takes steps to reduce special education identification" by "us[ing] data to monitor the number of children in special education and then . . . 'leans on the administrators' if the numbers are too high because the school board 'leans on him.'"  *Id.*  A monitoring report from the 2006-07 school year acknowledged that the district "took actions to reduce the number of children identified for special education . . . 'and ultimately reduce the number of students who require special education services.'"  *Id.*  The percentage of children enrolled in special education and related services in that district dropped from 12.5% in 2005 to 7.8% in 2016.  *Id.*

- Another district indicated in a corrective action plan it issued for the 2009-10 school year that it would "decrease the percentage of enrolled students receiving [special education] services in order to meet the state average," setting forth a specific goal of "decreasing the 'special education population' by 4 to 6 percent."  *Id.*  The percentage of children identified for special education in the district dropped from 15.3% in 2005 to between 10% and 11.7% in the years that followed.  *Id.*

Efforts to avoid identifying students suspected of having a disability took a variety of forms.  For example, Texas uses a multi-tiered instructional framework, also called "response to intervention" ("RTI") strategies, designed to help schools identify students at risk for poor learning outcomes.  AR-000001-2.  ED learned that some districts resorted to using RTI strategies in order to "delay or deny a timely evaluation for children suspected of having a disability and needing special education and related services."  AR-001302.  There were instances in which a student might have had a disability, but no referral for an evaluation under the IDEA was made "because the child was already receiving services through RTI."  AR-001297.  There was also evidence that school district staff would "deny the initial evaluation [where] the child ha[d] not completed all tiers of the RTI process, even if there [was] reason to suspect the child has a disability."  *Id.*  Parents also reported "difficulty in obtaining an initial evaluation under the IDEA when their child was participating in the RTI process, even if they had contacted the school to request a referral for an initial evaluation."  *Id.*

Other delay tactics relied on aids and services available under Section 504 of the

Rehabilitation Act of 1973.  Section 504 permits the provision of "regular or special education

and related aids and services that are designed to meet the individual educational needs of

children with disabilities."  *Id*.  ED found that school districts in Texas increased their use of

Section 504-related aids and services "as a means of providing struggling learners with

additional services and supports, without referring children for an evaluation under the IDEA

when those children were suspected of needing special education."  AR-001302.  Parents faced

"delays in trying to secure a special education evaluation [under the IDEA] when Section 504

related aids and services were already being provided."  AR-001298.  There were also "situations

where children with disabilities [were] not referred for an evaluation under the IDEA because the

child [was] receiving related aids and services under Section 504, even though there [might have

been] reason to suspect that the child has a disability under the IDEA and needs special

education and related services under that statute."  *Id*.  The fact that "a growing number of

children with disabilities in Texas received related aids and services under Section 504," when

"taken into consideration along with the evidence collected during the monitoring visit, raised . .

. the possibility that Section 504 related aids and services were used to delay or deny the

identification and evaluation of children suspected of having a disability."  *Id*.

In total, this data showed that, "in many instances, children who should have been

referred for an initial evaluation under the IDEA were instead provided other services for

struggling learners for extended periods of time, even after there was continued reason to suspect

that the student may have a disability and be in need of special education and related services."

AR-001301.  What resulted was "either a delay or complete denial of these students' evaluations

under the IDEA."  *Id*.  Indeed, "interview data indicated that staff in many schools and [districts]

appeared to view special education under the IDEA as a 'last resort,' *which should be avoided*

*whenever possible to ensure that the child is instructed in a general education environment.*"  *Id.* (emphasis added).

Based on this evidence and these findings, ED concluded that the Texas Education Agency's use of an 8.5% indicator when measuring the number of students identified as having a disability led school districts to "[take] actions specifically designed to decrease the percentage of children identified as children with disabilities under the IDEA to 8.5 percent or below."  AR-001290.  This resulted in an overall decline in Texas's special education identification rate from 11.6% in 2004 to 8.6% in 2016.[3]  *Id.*

### C.     Given This New Evidence, ED's Final Rule Postponing the Compliance Dates of the 2016 Regulations Is Neither Arbitrary Nor Capricious

When assessed in the context of the evidence ED obtained during its monitoring visit to Texas, ED's decision to postpone the compliance dates of the 2016 Regulations while it evaluates them is neither arbitrary nor capricious.  A court's review of administrative action under the APA is "'highly deferential' to the agency."  *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury, Office of Foreign Assets Control*, 857 F.3d 913, 918 (D.C. Cir. 2017) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).  It is also "narrow," limited to determining whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168).

"In evaluating whether the agency has met this standard, the court must 'not . . . substitute its [own] judgment for that of the agency.'"  *Mayo v. Reynolds*, 875 F.3d 11, 19-20 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43) (alterations in original).  Indeed,

---

[3] Texas no longer uses such an indicator in the PBMAS.  Following ED's monitoring visit, Texas enacted a law that "prohibits the use of a performance indicator based on the number or percentage of children who receive special education services."  AR-001302.

"[w]hether [the Court] would have done what the agency did is immaterial," so long as the

agency engages in an appropriate decisionmaking process. *Mingo Logan Coal Co. v. EPA*, 829

F.3d 710, 718 (D.C. Cir. 2016).  The only question in adjudicating a challenge under the APA is

whether the agency's decision "was the product of reasoned decisionmaking." *State Farm*, 463

U.S. at 52.  To that end, the Court must "uphold a decision of less than ideal clarity if the

agency's path may reasonably be discerned." *United Source One, Inc. v. U.S. Dep't of Agric.,*

*Food Safety & Inspection Serv.*, 865 F.3d 710, 716 (D.C. Cir. 2017) (quoting *State Farm*, 463

U.S. at 43).

Here, ED's decisionmaking path is readily discerned in the 2018 Final Rule, which

explains the reasonable basis for its decision to postpone the compliance dates for the 2016

Regulations.  ED noted that "financial 'pressure' or 'incentive to meet' racial 'numerical goals'

can violate the Constitution, even when accompanied by a stated command not to discriminate."

83 Fed. Reg. at 31,308 (citing *Lutheran Church v. FCC*, 141 F.3d 344, 352 (D.C. Cir. 1998));

*see also Lutheran Church*, 141 F.3d at 354 ("[W]e do not think it matters whether a government

hiring program imposes hard quotas, soft quotas, or goals.  Any one of these techniques induces

an employer to hire with an eye toward meeting the numerical target.  As such, they can and

surely will result in individuals being granted a preference because of their race.").  ED also

noted that such pressures have similar force "in the education context."  83 Fed. Reg. at 31,308.

ED found that, in operation, the 2016 Regulations could incentivize school districts to

adopt de facto quotas in an effort to avoid a finding of significant disproportionality and the

consequences that follow.  Any school district where the risk ratio for a particular group

(including certain minority and ethnic groups) exceeds the applicable risk ratio threshold may be

identified with significant disproportionality.  If that happens, 15% of the district's IDEA Part B

subgrant from ED must be directed towards providing comprehensive coordinated early

intervening services that address factors contributing to the disproportionality.  *See id.*  This can

constitute a substantial restriction on a school district's budget.  For example, as one commenter

noted in support of postponement, a finding of significant disproportionality would require his

district to direct $300,000 of its $2 million IDEA subgrant to providing comprehensive

coordinated early intervening services—funds that could be "better spent [on] other initiatives"

such as "curriculum materials, assistive technology, equipment and talented instructional

personnel."  AR-001393.  Given the potential financial pressure *not* to exceed a risk ratio

threshold and thus avoid any restriction on a district's IDEA funds, ED had "concern[s] that the

2016 significant disproportionality regulations may create an incentive for [school districts] to

establish de facto quotas in identification, placement, and discipline—or otherwise create a

chilling effect on such identification—to avoid being identified with significant

disproportionality."  83 Fed. Reg. at 31,308.

  Commenters had noted—and ED agreed—that the evidence and findings from ED's

monitoring visit to Texas confirmed such a risk.  As ED noted in its final rule, the Texas

Education Agency "measured the percentage of children identified as children with disabilities

and receiving special education and related services under IDEA against a standard identification

rate of 8.5 percent."  *Id.*  Exceeding the 8.5% standard identification rate "was not prohibited";

rather, a district's performance level on that indicator would simply "determine the level of

monitoring the [school district] would receive."  *Id.*  Nonetheless, ED found that school districts

"around the State reduced the number of children they identified as children with disabilities

under IDEA to no more than 8.5 percent of their student populations" to avoid exceeding the

standard identification rate, "thereby potentially depriving many children of the special education

and related services to which they were entitled under IDEA." *Id.*

Though Texas's example did not involve racial or ethnic quotas *per se*, and though Texas had since "eliminated the 8.5 percent indicator," ED found that the State's experience with the indicator and the conduct it incentivized constituted "a clear example of what can happen when schools are required to meet numerical thresholds in conjunction with serving children with disabilities," *id.*—one with relevance for the 2016 Regulations.  While performance levels under the PBMAS simply affected the amount of monitoring to which a district would be subjected, a finding of significant disproportionality under the IDEA triggers more onerous consequences—most notably, the restriction on the use of 15% of the district's IDEA Part B subgrant.

Relevant precedent confirms the reasonableness of ED's concerns and its decision to postpone the compliance dates of the 2016 Regulations pending reevaluation in light of those concerns.  In *Lutheran Church-Missouri Synod*, for example, which ED cited in the 2018 Final Rule, the D.C. Circuit concluded that Equal Employment Opportunity Commission guidelines for broadcast license holders operated as de facto quotas that "pressure[d] license holders to engage in race-conscious hiring." 141 F.3d at 352.  The guidelines set forth numerical goals for the hiring of minority groups and women.  *Id.* at 353.  Compliance with those goals was "used to select stations for in-depth EEO review when their licenses came up for renewal." *Id.* at 352. Noting that "[n]o rational firm . . . welcomes a government audit," the D.C. Circuit declared that "[i]t cannot seriously be argued that this screening device does not create a strong incentive to meet the numerical goals." *Id.* at 353; *see also id.* at 354 (noting that the approach "induces an employer to hire with an eye toward meeting the numerical target").  The Supreme Court has similarly recognized in the employment context that "a 'focus on statistics could put undue pressure on employers to adopt inappropriate prophylactic measures,'" which "would amount to

a de facto quota system." *Ricci v. DeStefano*, 557 U.S. 557, 581-82 (2009) (quoting *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 992 (1988)).

This was exactly the type of behavior that ED found in Texas, and which it worried could arise absent postponement of the 2016 Regulations' compliance dates. ED had seen the myriad of ways school districts sought to limit or reduce the number of students identified for special education and related services to avoid exceeding Texas's 8.5% standard identification rate. Given the more onerous restrictions on districts' IDEA funding that accompany a finding of significant disproportionality, ED acted on reasonable concerns that districts operating under the 2016 Regulations might take similar steps to artificially reduce their rates of student identification, placement, and discipline in order to avoid exceeding applicable risk ratio thresholds pending "evaluat[ion] [of] the regulations." 83 Fed. Reg. at 31,307.

\* \* \* \* \*

An agency's "predictive judgment" as to the likely result of its regulatory actions "merits deference" "even in the absence of evidence." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 521 (2009). Here, ED's concerns that the 2016 Regulations could incentivize the use of de facto racial or ethnic quotas in the absence of postponement were substantiated by evidence from its monitoring visit in Texas and consistent with applicable case law. Use of such quotas would have contravened the goal of the IDEA because "if to stay under a State-mandated risk ratio threshold, [school districts] are not properly identifying, placing, or disciplining children, then [the districts] are not providing special education and related services based on the needs of each individual child as IDEA requires." 83 Fed. Reg. 31,308. ED acted neither arbitrarily nor capriciously in postponing the compliance dates of regulations that it believed could undermine the purpose of the very statute it was trying to implement, while it assessed the regulations and

the issues they raised.

### III.    None of Plaintiff's Arguments Demonstrate that the 2018 Final Rule Is Arbitrary or Capricious

#### A.    ED Reasonably Explained the Basis for Its Final Rule

##### 1.    *ED's Explanation for the Timing of the Delay and the Discussion of Its Findings from Texas*

Plaintiff raises a number of objections to the sufficiency of ED's explanation in the 2018

Final Rule but none demonstrates that ED's decision was arbitrary or capricious.  First, Plaintiff

acknowledges ED's stated intention in the rule to "thoughtfully and soundly evaluate the

regulations" during the postponement and "explore how to best implement the statute in a legally

viable manner that addresses over-identification, without incentivizing under-identification."  83

Fed. Reg. at 31,307; *see also* Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss and in

Supp. of Pl.'s Cross-Mot. for Summ. J. at 24 ("Pl.'s Mot.").  Despite this explanation, Plaintiff

charges that ED "offered no reason for its preference" to "undertake its re-evaluation 'before'

compliance with the existing regulation was required."  Pl.'s Mot. at 24.  This is plainly wrong.

Throughout the rule, ED discusses its concerns about incentivizing the use of racial or ethnic

quotas, explaining that "[t]he Secretary is reluctant to implement a methodology that may result

in encouraging quotas or significantly reducing the number of children with disabilities

identified, placed, and disciplined."  83 Fed. Reg. at 31,309.  Thus, instead of moving forward

with implementation accompanied by that risk, ED found it "more prudent to delay the

compliance date and address [its] concern through a review of the standard methodology before

States are required to implement the regulations rather than during implementation."[4]  *Id.* at

---

[4] This case is thus distinguishable from *Air Alliance Houston v. EPA*, No. 17-1155, 2018 WL 4000490 (D.C. Cir. Aug. 17, 2018).  *See* Pl.'s Mot. at 23-24.  In that case, EPA delayed the effective date of a final rule to provide it time "to conduct a reconsideration proceeding and to

31,309.

Plaintiff also charges that ED's concern about unintentionally incentivizing the use of racial or ethnic quotas was "based on no relevant intervening facts." Pl.'s Mot. at 25. Again, this argument is meritless, as ED specifically relied on comments raising the agency's findings from its monitoring visit to Texas in 2017, where ED found evidence that "[school districts] around the State reduced the number of children they identified as children with disabilities under IDEA to no more than 8.5 percent of their student populations" to avoid exceeding Texas's standard identification rate.[5]  83 Fed. Reg. at 31,308.

Plaintiff acknowledges ED's reliance on its findings from Texas but argues that ED "did not explain what lessons it could draw from that single example or why that example sheds any light on the very different circumstances presented here," as the Texas example "did not involve racial disparities or discrimination." Pl.'s Mot. at 30. Plaintiff errs in suggesting that ED failed to identify the lessons it learned from Texas, as the 2018 Final Rule explains ED's conclusion that Texas's experience in setting numerical thresholds for the identification of students with disabilities corroborated its prior concerns that the 2016 Regulations could incentivize the use of

---

consider other issues that may benefit from additional comment." *Air All.*, 2018 WL 4000490, at *4. The D.C. Circuit suggested such an explanation would be arbitrary and capricious because EPA failed to explain why delay was necessary for such reconsideration, or how implementation would impede its ability to reconsider the rule. *Id.* at *12. Here, however, ED postponed the compliance dates of the 2016 Regulations due to the risk that school districts might be incentivized to employ de facto quotas while it reassessed the regulations. In short, ED chose postponement pending reevaluation to avoid a specific, undesirable outcome—here, incentivizing the use of de facto quotas—while its study of such issues took place, in contrast to EPA's explanation for delay, which rested on "the mere fact of reconsideration alone." *Id.*

[5] For similar reasons, Plaintiff is wrong to suggest that ED's concerns were speculative, *see* Pl.'s Mot. at 28-29, and lacked "good reasons or factual support," *id.* at 29. To the contrary, evidence from ED's monitoring visit corroborated its previously acknowledged concerns. And ED's "predictive judgment" as to how school districts were likely to respond to the 2016 Regulations would "merit[] deference" "even in the absence of [such] evidence." *Fox Television Stations*, 556 U.S. at 521.

racial or ethnic quotas.  As ED noted, exceeding Texas's standard identification rate for students with disabilities "was not prohibited" under the PBMAS—rather, a district's performance on this indicator would merely "determine the level of monitoring the [district] would receive."  83 Fed. Reg. at 31,308.  Nonetheless, districts "around the State reduced the number of children they identified as children with disabilities under IDEA to no more than 8.5 percent of their student populations" to reduce the risk of incurring such monitoring.  *Id*.  ED found that this represented "a clear example of what can happen when schools are required to meet numerical thresholds in conjunction with serving children with disabilities."  *Id*.  This thus confirmed ED's concerns that similar behavior could result under the 2016 Regulations, especially as a finding of significant disproportionality carries heavier consequences than that which applied under the PBMAS.  If Texas school districts artificially depressed their identifications of students with disabilities simply to avoid monitoring interventions, the 2016 Regulations were as likely (if not more) to incentivize such behavior because districts identified with significant disproportionality would be forced to "reserve 15 percent of its IDEA Part B . . . funds" for providing comprehensive coordinated early intervening services.  *Id*.

Plaintiff is also wrong in arguing that an absence of racial disparities or discrimination in Texas rendered ED's findings from that example irrelevant to its analysis.  ED concluded that the 2016 Regulations might give rise to de facto racial or ethnic quotas because the standard methodology requires States to establish risk ratio thresholds for certain racial and ethnic groups. 34 C.F.R. § 300.647(b)(2).  Thus, if school districts were to take steps to depress the number of students identified with a disability to avoid exceeding risk ratio thresholds, similar to how school districts in Texas responded to its standard identification rate, the result could be de facto quotas applied along racial or ethnic lines.  In other words, the Texas example was relevant

because it demonstrated how school districts *responded* to numerical thresholds. *See* 83 Fed.

Reg. at 31,308.  In Texas, those thresholds were not based on race, so there was no reason to

expect resultant behavior to bear any relationship to race.  But because the standard methodology

is tied to specific racial and ethnic categories, any resulting quotas would be applied on the basis

of race or ethnicity, which would "raise serious constitutional concerns."  *Tex. Dep't of Hous. &*

*Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507, 2523 (2015).

### 2.      *Safeguards Discussed in the 2016 Final Rule*

Plaintiff also relies on seven "safeguards" purportedly included in ED's 2016 Final Rule,

which Plaintiff asserts were identified by ED to "reduce [the] possibility" that school districts

would employ de facto quotas to avoid a finding of significant disproportionality.  Pl.'s Mot. at

25.  This includes:

1.  Statements in the preamble of the rule noting that nothing in the regulations establishes or authorizes the use of racial or ethnic quotas;

2.  ED's addition of 34 C.F.R. § 300.646(f);

3.  ED's statement in the rule that it would constitute "a violation of IDEA for [districts] to attempt to avoid determinations of significant disproportionality by failing to identify otherwise eligible children as children with disabilities," 81 Fed. Reg. at 92,393;

4.  ED's warning that use of racial or ethnic quotas would "almost certainly" result in legal liability under federal civil rights laws, 81 Fed. Reg. at 92,385;

5.  The ability of States to set their own risk ratio thresholds;

6.  ED's statement that it intended to publish guidance to help schools prevent racial discrimination in the identification of children with a disability;

7.  ED's statement that it intended to evaluate the 2016 Regulations to assess whether districts "implement[ed] racial quotas in an attempt to avoid findings of significant disproportionality," 81 Fed. Reg. at 92,385.

Pl.'s Mot. at 25-27.  Plaintiff argues that ED provided inadequate justification "for disregarding

its prior determination that these multiple safeguards adequately address concerns about potential

use of racial quotas," and it asserts that ED was irrational in relying on the Texas example due to the purported absence of such safeguards.  *Id*. at 28, 30.

The explanations provided in ED's final rule more than suffice to pass scrutiny under the APA.  When an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *Fox Television Stations*, 556 U.S. at 515.  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id*.

Here, ED was clearly conscious of its change in position from the conclusions previously set forth in the 2016 Final Rule.  *See, e.g.*, 83 Fed. Reg. at 31,308 (noting its prior "attempt[] to address . . . concern about quotas" in the 2016 Final Rule).  ED also provided a sufficient explanation for why it believed that postponing the compliance dates of the regulations was a better choice than allowing them to take effect while it reevaluated them, despite the safeguards cited by Plaintiff.  For example, ED referenced the first four of Plaintiff's safeguards, noting that in the 2016 Final Rule, it had "attempted to address the concern about quotas . . . by noting that quotas were prohibited" and adding "specific language in the 2016 significant disproportionality regulations"—namely, 34 C.F.R. § 300.646(f)—"to note that nothing in the rule abrogated the right to [a free and appropriate public education] in the least restrictive environment."  *Id*.  ED concluded, however, that these efforts were "insufficient" because "regardless of [its] disclaimer" of any intent to incentivize quotas, in operation, the regulations could, "in fact, incentivize quotas" all the same.  *Id*.

Texas's experience with setting a State-wide standard identification rate and ED's findings from its monitoring visit confirm the reasonableness of this conclusion.  The PBMAS

was "designed to meet statutory requirements," and it set forth a specific admonition to districts that they are "obligated to identify and provide a free appropriate public education to all students with disabilities who require special education services." AR-000034, 95. Despite this, ED found that "noncompliance with the IDEA . . . [still] occurred to the extent that [school district] efforts to decrease the percentage of children who were eligible for special education and related services under the IDEA caused delays or denials of evaluations for special education and related services for children who were suspected of having a disability." AR-001292. This demonstrates how, as ED noted in the 2018 Final Rule, regulatory incentives can still motivate behavior, even where explicit warnings to the contrary are provided.[6]

As for the ability of States to set their own risk ratio thresholds, ED found that incentives to avoid exceeding numerical thresholds could arise, even where those thresholds are "State-established." *See* 83 Fed. Reg. 31,308 (finding that the 2016 Regulations could "creat[e] an environment where [districts] and schools . . . engage in practices designed to artificially avoid exceeding the State-established risk ratio threshold"). Again, this was the case in Texas, where the standard, identification-rate threshold in its monitoring system was "State-established," and thus should have in theory been set at a level that would not unintentionally incentivize the use of de facto quotas. This theory was not, however, borne out by the facts on the ground, as ED

---

[6] For this reason, Plaintiff is wrong to suggest that the 2018 Final Rule is arbitrary and capricious because it fails to "give any credit to the presumption that school officials, like all government officials, will comply with the constitutional prohibition on race discrimination." Pl.'s Mot. at 29. In Texas, ED found evidence that deprivations of students' entitlement to a free and appropriate public education had occurred, in violation of the IDEA, despite explicit reminders in the PBMAS manual of districts' statutory obligations. ED was therefore not required to weigh a default presumption that, by definition, applies in the *absence* of countervailing evidence. *See Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011) (noting that the presumption of regularity applies in the absence of clear evidence to the contrary). Moreover, Plaintiff's argument is inconsistent with its own theory of standing, which is predicated on the basis that school districts do *not* comply with their obligations under the IDEA. *See* Compl. ¶¶ 116, 118-20.

26

learned during its monitoring visit.

The sixth and seventh safeguards identified by Plaintiff similarly fail to demonstrate any arbitrary or capricious action by ED.  The sixth "safeguard" is a statement by ED in the 2016 Final Rule expressing ED's intention "to publish guidance to help schools to prevent racial discrimination in the identification of children as children with disabilities."  81 Fed. Reg. at 92,397.  This action was *not* identified as a way to mitigate the risk of incentivizing racial or ethnic quotas.  Rather, the planned guidance was intended to help educate school districts about how to appropriately identify a student as having a disability.  *See id.* (referring to "guidance regarding the appropriate identification of children as children with disabilities").  As such, ED was not obliged to address that prior statement, which pertained to a different topic and concern. Finally, regarding ED's intention to conduct an after-the-fact evaluation of the regulations to see whether they did indeed incentivize racial or ethnic quotas, ED explained why this post hoc course of action was undesirable: because the regulations "may create an incentive for [districts] to establish de facto quotas," ED sought to conduct its evaluation "*before* requiring compliance with . . . [the] regulations" to avoid any use of quotas in the interim.[7]  83 Fed. Reg. at 31,308; *see*

---

[7] Plaintiff suggests that ED concluded in the 2016 Final Rule "that, together, these multiple safeguards adequately addressed any risk."  Pl.'s Mot. at 5.  Plaintiff thus argues that the 2018 Final Rule is arbitrary and capricious because ED "failed to explain why the safeguards taken together were insufficient to address . . . quotas," despite its earlier conclusion.  *Id.* at 28.  This argument fails for multiple reasons.  First, none of Plaintiff's citations to the 2016 Final Rule evinces such a conclusion by ED regarding the combined effect of such safeguards.  *See id.* at 5 (citing 81 Fed. Reg. 92,382-83, 92,385, 92,454).  Second, Plaintiff fails to demonstrate that this argument was ever raised before the agency and thus administratively exhausted.  *See Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 79 (D.D.C. 2013) ("[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." (quoting *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005))).  Certainly, Plaintiff did not raise this point anywhere in its comment.  *See* AR-001925-40.  Finally, even if the argument were exhausted, ED was not obliged to consider the combined efficacy of

*also id*. ("We are delaying the compliance date to evaluate our regulatory approach to ensure that it implements the statute in a manner that does not incentivize quotas.").

### 3. ED's Decision Not To Require National Compliance with the 2016 Regulations Was Internally Consistent

Plaintiff next contends that by permitting States to "voluntarily comply with the 2016 Regulations during the two-year delay," ED "directly contradicted" its "purported concern that the [standard] methodology . . . could incentivize the use of quotas." Pl.'s Mot. at 31. Plaintiff is mistaken. All ED did in the 2018 Final Rule was leave the status quo unchanged, under which States were free to continue using their current methodology for identifying significant disproportionality or adopt a different methodology for doing so, including one that aligned with or deviated from the 2016 Regulations. Indeed, in the absence of the 2016 Final Rule, States would have had the same range of options and methodologies available to them.

Plaintiff is effectively arguing that ED could only have been "[]consistent with its purported concern [about] the [standard] methodology" if it had *prohibited* States from adopting, of their own volition, the standard methodology. *Id*. But as Plaintiff points out, "ED did not find that the 2016 regulations would *result* in racial quotas, or even that they would *incentivize* racial quotas." *Id*. at 27 (emphasis added). Rather, ED simply concluded that "the regulations 'may' or 'potentially' could incentivize [districts] to establish quotas." *Id*.

In light of this perceived risk, ED chose not to require nationwide compliance with the standard methodology while it studied the issue. At the same time, it chose not to divest States of the ability to decide for themselves what type of methodology to use. Indeed, as the 2018

---

safeguards where it determined each individual safeguard to be inadequate. *Cf. Waukesha Cnty. Envtl. Action League v. U.S. Dep't of Transportation*, No. 15-CV-801-PP, 2018 WL 5085519, at *10 (E.D. Wis. Oct. 18, 2018) ("[D]efendants' failure to consider a combination of individually ineffective alternatives did not constitute clear error" absent "grounds in the record for concluding that some combination of alternatives might be effective.").

Proposed Rule had not raised the possibility that States could be *barred* from using the standard methodology, such an approach would have required an entirely new round of rulemaking, which could not have been completed prior to the start of the 2018-19 school year given the 75-day comment period mandated by the IDEA.  *See* 20 U.S.C. § 1406(c).  It was therefore neither arbitrary nor capricious for ED to eschew both options—declining compulsory compliance with the standard methodology given concerns about racial and ethnic quotas, and leaving unchanged the status quo, where States continue to be free to choose their own methodology.

### B.      Plaintiff Fails to Identify Any Basis for a Cognizable APA Claim Concerning ED's Weighing of Costs

Plaintiff next asks the Court to find the 2018 Final Rule arbitrary and capricious on the basis that it "failed to accurately account for the costs of delay to children, parents, and society as a whole and refused to take into account the costs incurred in reliance on the 2016 Regulations."  Pl.'s Mot. at 34.  Plaintiff fails, however, to identify a valid basis, statutory or otherwise, for such a claim.

ED conducted its analysis of costs, which was part of its regulatory impact analysis, not because the APA or IDEA required it to, but rather pursuant to Executive Orders Nos. 12,866, 13,563, and 13,771.  83 Fed. Reg. at 31,314.  Thus, to the extent Plaintiff argues that ED erred in this analysis, such a claim is premised on an alleged violation of one of these Orders.  Review is precluded, however, because alleged violations of such Executive Orders "cannot give rise to a cause of action" under the APA.  *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015).  "An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not . . . subject to judicial review."  *Meyer v. Bush*, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993).  Executive Orders Nos. 12,866, 13,563, and 13,771

are precisely such orders.  *See* EO No. 13,771, § 5(c), 82 Fed. Reg. 9,339, 9,341 (Jan. 30, 2017)

("This order is not intended to, and does not, create any right or benefit, substantive or

procedural, enforceable at law or in equity . . . ."); EO No. 13,563, § 7(d), 76 Fed. Reg. 3,821,

3,823 (Jan. 18, 2011) (setting forth the same language); EO No. 12,866, § 10, 58 Fed. Reg.

51,735 (Sept. 30, 1993) ("This Executive order is intended only to improve the internal

management of the Federal Government and does not create any right or benefit, substantive or

procedural, enforceable at law or equity . . . .").

Such language expressly precludes judicial review.  *See Air Transp. Ass'n of Am. v. FAA*,

169 F.3d 1, 8 (D.C. Cir. 1999) (reviewing similar language in another Executive Order and

concluding that the plaintiff's challenges to the agency's cost-benefit analysis were "not subject

to judicial review").  Courts in this district have thus rejected attempts to obtain APA review of

cost-benefit analyses conducted pursuant to such Executive Orders.  *See, e.g.*, *Defs. of Wildlife v.

Jackson*, 791 F. Supp. 2d 96, 120 (D.D.C. 2011) ("[P]laintiffs' attempt to enforce this order is

made hopeless by the language of the order itself, which explicitly rules out the possibility of

judicial review."); *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 135 n.10 (D.D.C.

2011) ("By the terms of the Executive Order, the plaintiffs may not sue for any alleged

violations.").  This Court should not chart a different course.

Nor is review available under the APA through the IDEA.  Whether an agency is required

to engage in a cost-benefit analysis, thus permitting review of such analysis under the APA,

depends on the text of the authorizing statute.  *See Nicopure Labs, LLC v. Food & Drug Admin.*,

266 F. Supp. 3d 360, 400-03 (D.D.C. 2017) (concluding that the "agency was not required to

undertake a cost-benefit analysis" where there was no "statutory obligation to undertake the

analysis"), *appealed on other grounds* No. 17-5196 (D.C. Cir. Aug. 31, 2017).  "When Congress

has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981); *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir. 2012) ("[W]hen Congress . . . authorize[d] regulations addressing lead-paint hazards, it instructed EPA to 'tak[e] into account reliability, effectiveness, and safety'—but did not mention cost." (citation omitted)); *City of Portland, Or. v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007) (noting that when "Congress wanted EPA to undertake cost-benefit analysis, it said so expressly").

Nowhere in the provisions of the IDEA under which the 2016 and 2018 Final Rules issued did Congress require the agency to conduct a cost-benefit analysis. The provision simply instructs ED to "provide for the collection and examination of data to determine if significant disproportionality based on race and ethnicity is occurring in the State and the local educational agencies of the State." 20 U.S.C. § 1418(d)(1). This distinguishes this case from others where courts found an analysis of costs to be required, such as *Michigan v. EPA*, 135 S. Ct. 2699 (2015), on which Plaintiff relies. *See* Pl.'s Mot. at 34. There, the Supreme Court found that the statutory "phrase 'appropriate and necessary' require[d] at least some attention to cost." *Michigan*, 135 S. Ct. at 2707. Where, as here, no similar language is used, "*Michigan v. EPA* is distinguishable."[8] *Nicopure Labs*, 266 F. Supp. 3d at 401.

In any event, even if the agency were required under the IDEA to conduct a formal cost-benefit analysis, ED's analysis would pass muster under the deferential standard that would apply. The principle "that a court is not to substitute its judgment for that of the agency" is

---

[8] The language Plaintiff cites from *Competitive Enterprise Institute v. National Highway Traffic Safety Administration*, 956 F.2d 321 (D.C. Cir. 1992), *see* Pl.'s Mot. at 34, is dicta and non-binding, as it merely shows the D.C. Circuit opining on "three basic choices" that had been available to the agency, any of which it could have taken. 956 F.2d at 323.

"especially true when the agency is called upon to weigh the costs and benefits of alternative polices." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (quoting *State Farm*, 463 U.S. at 43 & *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985)). Accordingly, courts "review an agency's cost/benefit analysis deferentially." *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013). When reviewing a challenge to an agency's cost-benefit analysis, a court limits its role to determining whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ctr. for Auto Safety*, 751 F.2d at 1342 (citation omitted).

Under this standard, Plaintiff's "burden to show error is high." *Am. Trucking Ass'ns.*, 724 F.3d at 254 (citation omitted), and none of its arguments suffices to carry that heavy burden. Regarding ED's analysis of the purported costs to children, parents, and society as a result of postponement, Plaintiff asserts that ED's "rationales for concluding that the costs of a two-year delay were less than $8 million were fundamentally flawed." Pl.'s Mot. at 35. But this argument effectively asks the Court to re-weigh those costs and judge for itself whether "the costs to children, parents, and society of a two-year delay were exceeded by the total cost savings to states and [school districts]," as ED had found. *Id*. The APA does not permit the Court to do so. *See Consumer Elecs. Ass'n*, 347 F.3d 303 (noting "that a court is not to substitute its judgment for that of the agency," especially where "the agency is called upon to weigh the costs and benefits of alternative polices" (quoting *State Farm*, 463 U.S. at 43)).

Moreover, ED considered each of the line items identified by Plaintiff and made no clear error of judgment, which is all the APA requires. *See Ctr. for Auto Safety*, 751 F.2d at 1342. Expressing its judgment that "the full scope of 'costs' identified by commenters will [not] result" from postponement, ED explained that some of the "five sources of benefits" that it previously

identified in the 2016 Final Rule had already accrued.  83 Fed. Reg. at 31,315.  As a result of

State collaboration with "a wide range of stakeholders, including their State Advisory Panels"

regarding "the issue of significant disproportionality and their current [State] practices,"

"increased . . . transparency" and "expanded . . . involvement of a diverse range of stakeholders"

had occurred.  *Id*.  As for the costs from a potential "reduction in the use of inappropriate

policies, practices, and procedures," ED found that "increased focus on these issues since the

publication of the 2016 significant disproportionality regulations . . . may actually minimize the

effects thereof."[9]  *Id*. at 31,316.  Thus, for each of these line items, ED acknowledged the

existence of certain costs but found them to be mitigated, at least in part.

Plaintiff's argument that ED failed to "consider the full costs of its chosen course of

action" thus simply reflects Plaintiff's own disagreement with how ED weighed those costs.  *See,

e.g.*, Pl.'s Mot. at 36-37 (arguing that postponement "negated" certain transparency benefits); *id*.

at 36 (arguing that ED "failed to account for the full extent" of costs from reduced "reduction in

inappropriate policies, practices and procedures"); *id*. at 37 (arguing that ED did not explain how

the benefits it identified could "meaningfully reduce" costs); *id*. (arguing that higher costs would

result because fewer determinations of significant disproportionality would be made).  The 2018

Final Rule makes clear, however, that ED considered these costs, and its decision is neither

arbitrary nor capricious because Plaintiff disagrees with its conclusion.

The same is true of Plaintiff's arguments regarding the purported costs expended by

States in anticipation of adopting the standard methodology, which ED recognized and

---

[9] As for Plaintiff's reference to the "expanded use of funds for [comprehensive coordinated early
intervening services]," Pl.'s Mot. at 36, ED noted that "nothing in [its] final rule would prohibit
States and [school districts] from using funds for comprehensive [coordinated early intervening
services] to serve . . . children with disabilities."  83 Fed. Reg. at 31,316.

considered.  Because those "expenditures [were] already incurred," ED found that it "would not

be appropriate to assign their value as either a cost or benefit of this action."  83 Fed. Reg. at

31,316.  Despite that conclusion, ED "[n]onetheless . . . made related adjustments to its cost

estimates" based on those expenditures and reduced its estimate of cost savings resulting from

postponement.  *Id*.  It is thus clear that ED considered such "sunk investments."  *Id*.

It is, moreover, untrue that postponement would have meant that States would be "forced

to either declare those costs a waste or spend additional resources implementing the 2016

standard methodology" two years later—a "false choice" suggested by Plaintiff.  Pl.'s Mot. at 39.

The 2018 Final Rule makes clear that "States may implement the standard methodology" despite

the postponement, in which case, any resources already expended would not be wasted.  83 Fed.

Reg. at 31,309.  Even if a State ultimately chooses to maintain its existing methodology, ED

found that certain benefits had already accrued as a result of the State's prior efforts, including

increased transparency, expanded involvement of stakeholders, and increased focus on issues

relating to significant disproportionality, which could offset such reliance costs.  *Id*. at 31,315-

16.  Finally, because "nothing in [the 2018 Final Rule] invalidates the work already performed

by States," for those that postpone implementation of the standard methodology, they would not

"be required to recreate the work already completed" in two years' time.  *Id*. at 31,316.

Accordingly, such efforts would still be put to productive use.[10]

### C.   ED Gave Sufficient Consideration to Viable Alternatives

Plaintiff's arguments regarding ED's consideration of alternative approaches are

---

[10] Plaintiff references the "possibility" that States might "be[] told in two years that [they] must
change [their] system again."  Pl.'s Mot. at 39.  Costs arising from such a revision of a State's
system and methodology would be properly considered in a proposed rule that amends or
modifies the standard methodology, and not in a rule that simply postpones the compliance dates
of the methodology without making any changes to it or requiring any action by the States.

similarly misplaced.  For example, Plaintiff erroneously suggests that ED "considered only one solution to its concerns about the standard methodology: delay."  Pl.'s Mot. at 39; *see also id*. at 41 (contending that ED "did not consider . . . alternatives to delay" (emphasis omitted)).  But ED clearly considered the possibility of *not* postponing the regulations' compliance dates, which it rejected due to concerns that the regulations "could result in de facto quotas, which in turn could result in a denial of services based on a child's ethnic or racial status/group."  83 Fed. Reg. at 31,307; *see also id*. at 31,308 ("We agree with commenters that the 2016 significant disproportionality regulations may create an incentive for [districts] to establish de facto quotas . . . .").

Moreover, Plaintiff acknowledges that ED "reviewed and considered various alternatives to the proposed rule."  *Id*. at 40 (quoting 83 Fed. Reg. at 31,314).  Plaintiff argues, however, that ED's reasoning in rejecting those alternatives was "cursory and unsupported."  *Id*.  Specifically, Plaintiff asserts that ED insufficiently considered the following alternative courses of action, which it raised in its comment on the 2018 Proposed Rule: (1) requiring compliance with the regulations pending proposal of new, superseding regulations, (2) accelerating ED's post-implementation evaluation of the regulations, (3) providing more technical assistance and guidance to States and districts regarding quotas, and (4) conducting reviews to ensure districts are not using quotas and then publicizing the results of those reviews.  *Id*.

Under the APA, an agency is not required to "consider *all* possible policy alternatives in reaching its decision."  *Am. Ass'n of Cosmetology Schs. v. DeVos*, 258 F. Supp. 3d 50, 75 (D.D.C. 2017) (emphasis added).  "Rather, an agency must consider only 'significant and viable' and 'obvious' alternatives."  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C.

Cir. 1987)).  The obligation of an agency to respond to points raised in a comment varies in

conjunction with the depth and thoroughness of the discussion of those points in the comment.

*See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2128 n.2 (2016) (Ginsburg, J.,

concurring) (noting that "the extent to which [an agency] is obliged to address reliance will be

affected by the thoroughness of public comments it receives on the issue," and that "[a]n agency

cannot be faulted for failing to discuss at length matters only cursorily raised before it").

Given Plaintiff cursory proposal of these alternatives, which were offered without any

explanation as to why they would be effective or how they could address ED's concerns, *see*

AR-001938, ED was not required to independently address them as separate alternatives, and its

explanation for rejecting them sufficed under the APA.  Indeed, Plaintiff's "alternatives" simply

constitute variations on approaches that ED explicitly addressed and rejected: (1) requiring States

to use the standard methodology while ED reassessed the regulations, or (2) adopting safeguards

to mitigate the risk that school districts might resort to using de facto quotas.

For example, Plaintiff's first alternative, in which ED would have required nationwide

adoption of the standard methodology and then later promulgated superseding regulations, was

rejected because, as previously discussed, it could result in the use of de facto racial or ethnic

quotas in the interim.  ED therefore "declin[ed] this suggestion" due to concerns about "the

potential unintended consequences of implementing the 2016 significant disproportionality

regulations."  83 Fed. Reg. at 31,315.  As for Plaintiff's other proposals, ED stated that it did not

"know[] if these measures would be effective" without conducting a "careful review," which it

planned to do "during th[e] delay."  *Id.*; *see also* Pl.'s Mot. at 41.

ED's concern about the efficacy of such proposals was reasonable.  Apart from the fact

that, as discussed above, conducting *post-implementation* evaluations and reviews could have

resulted in the use of de facto quotas in the interim, it is not clear (and nowhere does Plaintiff explain in its comment) why such alternatives would have been "viable." *Nat'l Shooting Sports Found.*, 716 F.3d at 215 (quoting *City of Brookings Mun. Tel.*, 822 F.2d at 1169). Indeed, from the outside, data from districts where no significant disproportionality exists would look similar, if not identical, to data from districts employing de facto quotas to artificially depress student identification, placement, and discipline. In both cases, no risk ratio thresholds would be exceeded, and there would be no finding of significant disproportionality.[11] It is therefore not "obvious" how ED could have used such evaluations and reviews to identify districts employing de facto quotas or deter other districts from doing so, thus remedying ED's concerns. *Id.*

The same is true of the possibility that ED could provide technical assistance and guidance to States and school districts regarding quotas. Providing technical assistance would not have addressed ED's concerns about the *incentives* to restrict or reduce the number of students identified as having a disability to avoid a finding of significant disproportionality. As for providing guidance to districts regarding quotas, such an approach was shown to be of limited efficacy in Texas.[12] *See* AR-000095 (reminding districts of their obligation "to identify and provide a free appropriate public education to all students with disabilities").

Finally, Plaintiff errs in asserting that ED's explanation for "why it could not use monitoring to alleviate the concern about racial quotas" was inadequate because ED simply expressed uncertainty that "compliance-driven monitoring will, by itself, effectively address the

---

[11] Indeed, ED reached its conclusions in Texas only after engaging in "document review, listening sessions, and interviews during [its] monitoring visit." AR-001296.

[12] Courts have acknowledged the limited efficacy of agency warnings to deter the use of unlawful quotas. *See Lutheran Church-Missouri Synod*, 141 F.3d at 353 (finding a use of de facto quotas, even where the agency had "emphasized that the guidelines should not be interpreted as a quota").

factors contributing to significant disproportionality."  Pl.'s Mot. at 42 (emphasis omitted).  This

argument misunderstands the points to which ED was responding.  Those comments suggested

that ED engage in "close monitoring of States for compliance with IDEA," and discussed ways

ED could monitor for significant disproportionality and ensure that proper student identification,

placement, and discipline occurs.[13]  83 Fed. Reg. at 31,309; *see also, e.g.*, AR-001556 ("The

department needs to monitor states more closely for compliance with fairness and equity and not

let them continue to follow their own paths."); AR-001824 ("[F]ederal policymakers instead

should be monitoring for under-identification . . . ."); AR-001825 (commenter attaching his own

article arguing that "policymakers should be monitoring for under-identification"); AR-001878

(urging ED to "use its statutory role in monitoring, enforcing, and providing technical assistance

to states so that the status of students, including those currently identified with disabilities, can

improve"); AR-001885 (supporting an approach whereby ED would "monitor

disproportionality" using a "'differential treatment' standard").  These were issues that motivated

issuance of the 2016 Regulations in the first place,[14] and ED thus appropriately responded with

its view that monitoring might not "effectively address the factors contributing to significant

disproportionality."  83 Fed. Reg. at 31,309.  Given the focus of these comments, ED's response

---

[13] ED's explanation for why "increase[d] monitoring . . . to prevent racial quotas" would be insufficient is set forth in a different part of the final rule.  *See* 83 Fed. Reg. at 31,315.  That explanation suffices under the APA for the same reason ED's rejection of Plaintiff's proposal for conducting post-implementation reviews (a materially indistinguishable alternative) sufficed.

[14] The other alternatives referenced by ED in the same sentence—that ED, and not the States, could "mandate[e] a specific risk ratio threshold, and establish[] an appropriate identification rate"—confirm that this subset of comments focused on issues the 2016 Regulations had sought to address.  *See, e.g.*, AR-001373 (arguing that "there ought to be language that identifies broadly the requirements of a 'reasonable' threshold"); AR-001478 ("Please delay this regulation and then rewrite it to focus on what the statute requires: whether children of a particular race are 'overidentified' compared to the appropriate rate . . . .").

was neither arbitrary nor capricious.[15]

### D.      ED Conducted the Rulemaking with an Open Mind and Provided A Meaningful Opportunity for Notice and Comment

Plaintiff's final arguments under the APA are similarly unavailing.  First, Plaintiff asserts that ED "enter[ed] the rulemaking process with its mind made up."  Pl.'s Mot. at 45.  As evidence of ED's purportedly closed mind, Plaintiff relies on (1) a statement by an ED spokesperson that ED had found it "prudent to delay implementation for two years"; and (2) ED's removal of questions relating to the 2016 Regulations when seeking OMB approval to engage in information collection.  *See id*. at 43-44.  As the former merely expresses ED's unremarkable view regarding the prudence of a course of action it would later pursue, and as the latter did not bind ED to any approach with regard to the standard methodology, none of Plaintiff's evidence demonstrates the existence of a "closed mind" sufficient to overcome the presumption of regulatory in agency action.

Courts have long recognized the "presumption of regularity afforded an agency in fulfilling its statutory mandate."  *State Farm*, 463 U.S. at 43 n.9.  This includes the presumption that an administration official is "capable of judging a particular controversy fairly on the basis of its own circumstances."  *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) (quoting *United States v. Morgan*, 313 U.S. 409, 421 (1941)).  The fact that an official "has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute [in rulemaking] cannot overcome that presumption."  *Id*.

---

[15] Plaintiff faults ED for not "address[ing] whether monitoring together with the other proposed alternatives would adequately address its concerns."  Pl.'s Mot. at 42 n.20.  As this argument was never raised below, it has not been administratively exhausted.  *See Styrene Info. & Research Ctr.*, 944 F. Supp. 2d at 79.

Such is the case here, where the ED spokesperson simply expressed the agency's view that postponement would be prudent.  There is nothing remarkable about such a statement—indeed, if ED did *not* find such action prudent, it would not have proposed such an action in the first place.  ED's view regarding the prudence of the course of action that it later pursued "do[es] not bear on any specific factual issues, but rather reveal[s] a general predisposition on a matter of policy, of the sort held legally harmless."  *Id*. at 1210.  As such, it provides no evidence of a closed mind sufficient to overcome the presumption of regularity applicable to ED's actions.  *See, e.g.*, *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 333 (D.D.C. 1990) (noting that "an expression of opinion prior to the issuance of a proposed rulemaking does not, without more, show that an agency member cannot maintain an open mind during the hearing stage of the proceeding" (quoting *Ass'n of Nat'l Advertisers v. Fed. Trade Comm'n*, 627 F.2d 1151, 1173 (D.C. Cir. 1979))); *see also Flaherty v. Bryson*, 850 F. Supp. 2d 38, 71 (D.D.C. 2012) ("An administrator's statement of an opinion, based upon review of the action's subject matter and relevant regulatory guidance, suggests conscious thought rather than prejudgment, and does not lead to the conclusion that the administrator would not change his or her mind . . . .").

The same is true of ED's decision to omit questions relating to the 2016 Regulations when seeking approval for information collection efforts.  ED had previously indicated that it would include such questions pursuant to "the reporting requirement in 34 CFR 300.647(b)(7)."  Agency Information Collection Activities; Comment Request; Annual State Application Under Part B of the Individuals With Disabilities Education Act, 82 Fed. Reg. 31,954-01 (July 11, 2017).  That regulation requires States to provide, "at a time and in a manner determined by the Secretary," information regarding their risk ratio thresholds, minimum cell sizes, minimum n-sizes, and standards for measuring reasonable progress.  34 C.F.R. § 300.647(b)(7).

ED's decision not to collect such information in 2017 thus provides no evidence of prejudgment sufficient to overcome the presumption of regularity in this case.  The timing for commencing information-collection efforts under § 300.647(b)(7) is left to the Secretary's discretion.  Accordingly, even though ED decided against starting such efforts in 2017, ED was still free to either postpone the compliance dates of the 2016 Regulations or let the regulations be implemented as planned, depending on its review of the comments received on the proposed rule.  Put differently, because § 300.647(b)(7) does not require that information-collection efforts begin *prior to* implementing the standard methodology, ED still could have chosen to leave the compliance dates of the 2016 Regulations unchanged and eschew postponement.  ED's actions relating to § 300.647(b)(7) therefore do not demonstrate the existence of a closed mind.

Finally, Plaintiff takes issue with the statement in the 2018 Proposed Rule that ED would "consider comments on proposed delayed compliance dates only and [would] not consider comments on the text or substance of the final regulations."  83 Fed. Reg. at 8,396.  Despite acknowledging that ED meant to communicate its solicitation of comments on "the question of whether [ED] should postpone the compliance date of the 2016 significant disproportionality regulations," as opposed to "what the text or substance of any new regulations should be," 83 Fed. Reg. at 31,311, Plaintiff speculates about commenters who might have "truncated their comments" or "elected not to participate" as a result of misunderstanding ED's statement in its proposed rule.  Pl.'s Mot. at 44.

This is, in effect, an argument that ED's notice of proposed rulemaking was deficient.  As such, "what matters most is whether the policy change was clear on the face of the proposed rule such that the agency provided the public with a fair opportunity to address it."  *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 134 (D.D.C. 2016).  There must be "sufficient detail on

41

[the proposed rule's] content . . . to allow for meaningful and informed comment." *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132-33 (D.C. Cir. 1995).

The 2018 Proposed Rule easily satisfies this standard. ED states in the "Summary" section of the notice that it was "propos[ing] to postpone the compliance date [of the 2016 Regulations] by two years." 83 Fed. Reg. at 8,396. Further down in the notice, ED again states that it was "proposing to postpone the compliance [dates] by two years in order that [ED] may review the regulation." *Id.* Then, again, in the opening sentence of the section titled "Proposed Regulations," ED says that it "proposes to postpone the compliance date for implementing the [2016] [R]egulations to July 1, 2020 from July 1, 2018." *Id.* at 8,397. The 2018 Proposed Rule thus provided sufficient notice of the issue for which ED was seeking comment and offered the public a fair opportunity to address it. *See Abington Mem'l Hosp.*, 216 F. Supp. 3d at 131 (considering the entirety of the agency's notice of proposed rulemaking in concluding that it was sufficient).

Plaintiff is, "in essence, making a 'dog that did not bark' notice argument regarding" the proposed rule's alleged "lack of clarity." *Id.* at 134. But hundreds of commenters,[16] including Plaintiff, clearly understood the action ED was proposing and submitted comments on that issue. *See, e.g.*, AR-001925 (Plaintiff's comment "oppos[ing] a delay in the implementation of the regulations"); *see also, e.g.*, AR-001421, 1455, 1464, 1481, 1646. And Plaintiff does not suggest any way in which it was harmed by the supposed "truncation" of certain hypothetical comments. "[T]he D.C. Circuit has long treated the submission of relevant comments as evidence that

---

[16] ED received comments from 390 parties on its 2018 Proposed Rule, which represented an approximate 25% increase over the number of comments submitted on the agency's 2016 Proposed Rule. 83 Fed. Reg. at 31,311.

sufficient notice was given." *Abington Mem'l Hosp*., 216 F. Supp. 3d at 134.  These

submissions, including Plaintiff's own comment, which provides the basis for its legal challenges

here, undermine Plaintiff's argument.[17]

**IV.  If the Court Were to Rule in Favor of Plaintiff, Remand to ED (and not Vacatur) Would Be the Appropriate Remedy**

For the reasons provided above, the Court should enter summary judgment in

Defendants' favor and deny Plaintiff's cross-motion for summary judgment.  If the Court

disagrees, however, remand to the agency for further analysis or explanation (and not vacatur, as

Plaintiff requests) would be the appropriate remedy.

Plaintiff's theory under the APA is that the 2018 Final Rule is arbitrary and capricious

because ED provided an insufficient explanation for its decision.  *See* Pl.'s Mot. at 2 (arguing

that ED "provided no reasoned explanation for the delay" and "failed to consider important

aspects of the problem").  Where a court concludes that "the record before the agency does not

support the agency action, [or] if the agency has not considered all relevant factors . . . the proper

course, except in rare circumstances, is to remand to the agency for additional investigation or

explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also N. Air

Cargo v. U.S. Postal Serv*., 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses

agency action and determines that the agency acted unlawfully, ordinarily the appropriate course

is simply to identify a legal error and then remand to the agency, because the role of the district

court in such situations is to act as an appellate tribunal.").  There would be no reason for the

Court to deviate from this "proper course" in these proceedings.

---

[17] Plaintiff also suggests that ED's "cursory treatment" of comments on "the costs of delay and reasonable alternatives" "underscores ED's lack of open-mindedness."  Pl.'s Mot. at 45.  As discussed above, ED's responses to such comments sufficed under the APA.

Indeed, in the context of "an inadequately explained agency action," vacatur is only appropriate after consideration of whether "(1) the agency's decision is so deficient as to raise serious doubts whether the agency can adequately justify its decision at all; and (2) vacatur would be seriously disruptive or costly." *N. Air Cargo*, 674 F.3d at 860-61.  Though Plaintiff takes issue with the sufficiency of ED's explanation, nowhere does it argue or demonstrate the existence of serious doubts as to whether ED would be able to provide an adequate justification if the Court were to remand without vacatur.  As detailed above, ED's findings from its monitoring visit in Texas and its discussion of that example in the 2018 Final Rule suffice on their own to merit entry of summary judgment in Defendants' favor.  But even if the Court were to disagree, it is still plausible, if not highly likely, that ED could provide a more fulsome explanation of what occurred in Texas, the lessons it took from that experience, and the reasons why the conclusions it drew from that example support the action it took in the 2018 Final Rule.

Additionally, vacatur would be highly disruptive.  It could require States and their school districts to switch to using the standard methodology in the midst of a school year, even though they may already be using their prior methodology or some altered version.  For any new findings of significant disproportionality made under the standard methodology, districts would be required to conduct a root-cause analysis and reserve 15% of their IDEA Part B subgrant to providing comprehensive coordinated early intervening services that address the factors contributing to the significant disproportionality.  34 C.F.R. § 300.646(d)(1)(ii).  This could be extremely disruptive, especially where districts have already set their budgets for the school year and are currently operating under them.  And for those States that submitted comments to ED expressing their need for additional time in which to finalize their implementation of the standard methodology, *see, e.g.*, AR-002091 (noting Kentucky "need[s] more time to analyze fiscal issues

in CCEIS, the implications of including early childhood in the calculations, and the impact that

the alternate risk ratio will have on our smaller districts"), those States would be required to

reach final decisions on a host of issues (risk-ratio thresholds, minimum cell-sizes and n-sizes,

protocols for the exercise of discretion, etc.), and potentially reengage with stakeholders and

State Advisory Panels, *see* 34 C.F.R. § 300.647(b)(1)(iii)(A), all in an expedited and unexpected

timeframe.  Students would not be served through vacatur and the disruption that would ensue.

## CONCLUSION

For the foregoing reasons, Defendants request that the Court enter summary judgment in

Defendants' favor and deny Plaintiff's cross-motion for summary judgment.

Dated:  November 12, 2018            Respectfully submitted,

                                    JODY HUNT
                                    Assistant Attorney General

                                    CARLOTTA WELLS
                                    Assistant Branch Director
                                    Federal Programs Branch

                                    */s/ Jason Lee*
                                    JASON LEE (CA Bar No. 298140)
                                    Trial Attorney
                                    United States Department of Justice
                                    Civil Division, Federal Programs Branch
                                    20 Massachusetts Avenue NW
                                    Washington, DC 20001
                                    (202) 514-3367
                                    (202) 616-8470 (fax)
                                    Jason.Lee3@usdoj.gov

                                    *Counsel for Defendants*