## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC.<br><br>Plaintiff,<br><br>v.<br><br>ELIZABETH (BETSY) DEVOS, SECRETARY OF EDUCATION; JOHNNY W. COLLET, ASSISTANT SECRETARY FOR SPECIAL EDUCATION AND REHABILITATIVE SERVICES; U.S. DEPARTMENT OF EDUCATION,<br><br>Defendants. | Civil No. 18-CV-01636-TSC |

### PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**[ORAL HEARING REQUESTED**
**PURSUANT TO LOCAL RULE 7(f)]**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION .............................................................................................1

ARGUMENT .....................................................................................................3

I.   COPAA HAS ESTABLISHED ITS STANDING..............................................3

   A.   COPAA And Its Members Have Experienced Injury Due To The Delay Regulation. ................................................................................3

   B.   Vacating The Delay Regulation Will Redress COPAA's And Its Members' Injuries That Were Caused By The Delay Regulation. ........................10

II.  ED'S EXCLUSIVE RELIANCE ON THE INAPT TEXAS EXAMPLE DEMONSTRATES THAT THE DELAY REGULATION IS ARBITRARY AND CAPRICIOUS. .........................................................................12

   A.   The Texas Example Did Not Provide Any New Insights Or Evidence Unknown To ED In 2016 About The Risks Of The Standard Methodology. ............................................................13

   B.   The Texas Example Did Not Provide Any New Insights Or Evidence Unknown To ED In 2016 About The Incentives *Not* To Engage In Racial Discrimination. .......................................................16

   C.   In The Absence Of New Evidence, ED Had No Grounds To Delay The Regulation. ........................................................19

III. BEYOND ED'S FAILURE TO JUSTIFY ITS DELAY REGULATION WITH ANY NEW EVIDENCE, THE DELAY IS ARBITRARY AND CAPRICIOUS ON SEVERAL INDEPENDENT GROUNDS...............................20

   A.   ED Failed To Explain Why Delay Was Necessary Despite The Safeguards Described In The 2016 Regulations.......................................21

   B.   ED Cannot Delay Because It Thought It Might Want To Change Its Mind..........24

   C.   ED's Reasoning Was Internally Inconsistent. ......................................26

   D.   ED Failed To Consider Reasonable Alternatives To Delay. ................................27

   E.   By Failing To Account For Key Costs, ED Ignored Significant Aspects Of The Problem.........................................................32

   F.   ED Provided No Meaningful Opportunity To Comment On The Delay Regulation. ......................................................35

IV.  THE APPROPRIATE REMEDY IS VACATUR. ......................................40

CONCLUSION....................................................................................................45

REQUEST FOR A HEARING..............................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AARP v. EEOC,*
  292 F. Supp. 3d 238 (D.D.C. 2017) ....................................................................40

*Abulhawa v. U.S. Dep't of Treasury,*
  239 F. Supp. 3d 24 (D.D.C. 2017), *aff'd*, No. 17-5158, 2018 WL 3446699
  (D.C. Cir. June 19, 2018) ..............................................................................11

*Action All. of Senior Citizens of Greater Phila. v. Heckler,*
  789 F.2d 931 (D.C. Cir. 1986) ........................................................................4

*\*Air All. Hous. v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) .........................................................24, 25, 41, 43

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................41

*Allina Health Servs. v. Sebelius,*
  746 F.3d 1102 (D.C. Cir. 2014) ......................................................................40

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n,*
  389 F.3d 536 (6th Cir. 2004) ........................................................................8, 9

*Am. Great Lakes Ports Ass'n v. Zukunft,*
  301 F. Supp. 3d 99 (D.D.C. 2018), *appeal docketed*, No. 18-5167 (D.C. Cir.
  May 31, 2018) ..............................................................................................42

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) ........................................................................11

*ASPCA v. Feld Entm't, Inc.,*
  659 F.3d 13 (D.C. Cir. 2011) ......................................................................4, 7

*Ass'n of Nat'l Advertisers v. FTC,*
  627 F.2d 1151 (D.C. Cir. 1979) ......................................................................35

*Bauer v. DeVos,*
  No. 17-1330, 2018 WL 4483783 (D.D.C. Sept. 17, 2018) ....................................44

*BellSouth Telecomms., Inc. v. FCC,*
  469 F.3d 1052 (D.C. Cir. 2006) ......................................................................20

*Beyond Nuclear v. U.S. Dep't of Energy,*
  233 F. Supp. 3d 40 (D.D.C. 2017) ....................................................................39

*California v. Bureau of Land Mgmt.*,
   286 F. Supp. 3d 1054 (N.D. Cal. 2018) ...................................................36

*Campaign Legal Ctr. v. FEC*,
   245 F. Supp. 3d 119 (D.D.C. 2017) ...........................................................7

*CC Distribs., Inc. v. United States*,
   883 F.2d 146 (D.C. Cir. 1989) ..................................................................10

*Chamber of Commerce v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006) ..................................................................40

*Comcast Corp. v. FCC*,
   579 F.3d 1 (D.C. Cir. 2009) ......................................................................40

*Connecticut v. U.S. Dep't of the Interior*,
   No. CV 17-2564 (RC), 2018 WL 4681619 (D.D.C. Sept. 29, 2018) ......12

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
   793 F.2d 1322 (D.C. Cir. 1986) ................................................................11

*Desoto Gen. Hosp. v. Heckler*,
   766 F.2d 182 (5th Cir. 1985) ....................................................................20

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017), *petition for cert. filed* (U.S. Aug. 30, 2018)
   (No. 18-267) ...............................................................................................7

*Encino Motocars v. Navarro*,
   136 S. Ct. 2117 (2018) ..............................................................................34

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) ....................................................................11

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ..................................................................................41

*Friends of Animals v. Jewell*,
   824 F.3d 1033 (D.C. Cir. 2016) ..................................................................7

*Friends of Animals v. Jewell*,
   828 F.3d 989 (D.C. Cir. 2016) ....................................................................4

*Greater Bos. Television Corp. v. FCC*,
   444 F.2d 841 (D.C. Cir. 1970) ..................................................................38

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ...............................................................................7, 8

*Ill. Commerce Comm'n* v. *ICC*,
    776 F.2d 355 (D.C. Cir. 1985)..................................................................30

*Ill. Pub. Telecommc'ns Ass'n v. FCC*,
    123 F.3d 693 (D.C. Cir. 1997)..................................................................41

*Int'l Ladies' Garment Workers' Union* v. *Donovan*,
    722 F.2d 795 (D.C. Cir. 1983)..................................................................30

*Lefrancois v. Mabus*,
    910 F. Supp. 2d 12 (D.D.C. 2012)............................................................39

*Level the Playing Field v. FEC*,
    232 F. Supp. 3d 130 (D.D.C. 2017)..........................................................38

*Lutheran Church – Missouri Synod v. FCC*,
    141 F.3d 344 (D.C. Cir. 1998)..................................................................19

*Mendoza v. Perez*,
    72 F. Supp. 3d 168 (D.D.C. 2014)............................................................43

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015)..............................................................................32

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..............................................................................30, 32

*N. Air Cargo v. U.S. Postal Serv.*,
    674 F.3d 852 (D.C. Cir. 2012)..................................................................41

*N.C. Growers' Ass'n, Inc. v. United Farm Workers*,
    702 F.3d 755 (4th Cir. 2012) ........................................................37, 38, 40

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C.), *adhered to on denial of reconsideration*, 315 F.
    Supp. 3d 457 (D.D.C. 2018), *appeal docketed*, No.18-5245 (D.C. Cir. Aug.
    13, 2018) ............................................................................................41, 44

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012)................................................................32

*Nat'l Fuel Gas Supply v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006)..................................................................20

*Nat'l Lifeline Ass'n v. FCC*,
    No. 18-1026, 2018 WL 4154794 (D.C. Cir. Aug. 10, 2018)....................19

*Nat'l Venture Capital Ass'n v. Duke*,
    291 F. Supp. 3d 5 (D.D.C. 2017)................................................................43, 44

*NRDC v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007)........................................................................44

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015)..........................................................................4

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009)....................................................................35, 36

*Shell Oil v. EPA*,
    950 F.2d 741, 752 (D.C. Cir. 1991)..................................................................38

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010)................................................................40, 45

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976)............................................................................................11

*Sorenson Commc'ns, Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)..........................................................................20

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003)..........................................................................38

*State Nat'l Bank of Big Spring* v. *Lew*,
    795 F.3d 48 (D.C. Cir. 2015)............................................................................11

*Styrene Info. & Research Ctr., Inc. v. Sebelius*,
    944 F. Supp. 2d 71 (D.D.C. 2013)....................................................................29

*United States v. Davis*,
    596 F.3d 852 (D.C. Cir. 2010)..........................................................................38

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
    749 F.2d 788 (D.C. Cir. 1984)..........................................................................30

*\*Waterkeeper Alliance v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017)........................................................................6, 7

*Waukesha Cty. Envtl. Action League* v. *U.S. Dep't of Transp.*,
    No. 15-cv-801-PP, 2018 WL 5085519 (E.D. Wis. Oct. 18, 2018)..................24, 31

## Statutes and Regulations

5 U.S.C. § 706(2) ..............................................................................................40

20 U.S.C. § 1418 .........................................................................................3, 4, 9

34 C.F.R. § 300.646 ....................................................................................3, 9, 21

81 Fed. Reg. 92376 (Dec. 19, 2016) (codified at 34 C.F.R. §§ 300.646-647)
    ("2016 Regulations") ..............................................3, 4, 8, 10, 13, 22, 23

82 Fed. Reg. 28431 (June 22, 2017) ................................................................39

83 Fed. Reg. 8396 (Feb. 27, 2018) ......................................................31, 35, 37

83 Fed. Reg. 31306 (July 3, 2018) ("Delay Regulation") ...........................3, 5, 8, 12, 14, 15, 18,
    21, 23, 25, 26, 28, 29, 31, 32, 33, 34, 35, 36, 43, 44

**Other Authorities**

*Commissioner's Monday Message – on Tuesday, July 3, 2018 from Wayne D.
    Lewis, Jr., Interim Commissioner of Education*, Ky. Dep't of Educ.: Monday
    Superintendent Emails (July 3, 2018),
    https://education.ky.gov/CommOfEd/mon/Pages/July-2-2018.aspx ......................................43

Press Release, U.S. Dep't of Educ., FACT SHEET: Equity in IDEA (Dec. 12,
    2016), https://www.ed.gov/news/press-releases/fact-sheet-equity-idea ................................22

U.S. Dep't of Educ., *1820-0300 Annual State Application under Part B of the
    Individuals with Disabilities Act – Responses to Comments – November 8,
    2017* (Nov. 21, 2017),
    https://www.reginfo.gov/public/do/DownloadDocument?objectID=78801601 ....................36

## INTRODUCTION

This is a simple case about a complex issue – how the U.S. Department of Education (ED) should ensure compliance with the statutory requirement in the Individuals with Disabilities Education Act (IDEA) that states identify and respond to significant racial disproportionality.  In 2016, ED determined that many states had evaded the statutory requirement and that the status quo was unacceptable for children, particularly children of color. ED engaged in wide-ranging consultation and, after notice-and-comment, promulgated final regulations in 2016. Recognizing that states would need time to prepare to come into compliance with the regulations, ED set the compliance date for July 1, 2018.

After the transition to a new Administration, ED announced that it believed it could craft a better regulation to achieve the same statutory ends – but it did not know what that regulation might look like.  ED also did not know whether the 2016 Regulations would incentivize racial quotas – but it had a concern that they might (the same concern, in fact, that ED expressly grappled with in 2016).  Based solely on its concern about possibly incentivizing racial quotas, ED issued a regulation on July 3, 2018, to delay the compliance requirement for two years so that it could have a chance to rewrite the regulation in some not-yet-articulated way.

The Administrative Procedure Act (APA) requires more than such tentative concerns or imaginary future solutions before an agency may reverse course like this. The APA requires a good reason, such as new evidence.  But the only new evidence ED points to arose out of widespread violations of the IDEA in Texas, from which ED drew the conclusion that attaching consequences to a particular metric encourages people to take actions to meet that metric.  That should not have come as news to anyone, not even the federal government.

ED is proceeding as though it obtained evidence that showed that even a scintilla of inducement may cause government employees to engage in intentional race discrimination

1

against children – regardless of what precautions are taken.  It gave no consideration to the fact, for example, that such conduct is not only obviously unconstitutional (as well as immoral) but that it could also result in lawsuits leading to punitive and compensatory damages and social approbation. The Texas violations shed no light on the relevant question asked and answered in 2016:  How can a regulation improve identification of school districts with significant racial disproportionality while avoiding the repercussions of any incentives for racial discrimination?

In part because ED's identification of the problem is so tenuous, the flaws in the Delay Regulation's rationale are myriad.  ED failed to explain why delay is necessary to allow reconsideration; relied on internally inconsistent reasoning; failed to consider reasonable alternatives to delay; failed to account for the costs the delay has on students and their families; and reached a result preordained well before the NPRM was issued.

Plaintiff Council of Parent Attorneys and Advocates (COPAA) and its members are injured by ED's delay of the 2016 Regulations.  Consistent with ED's own estimates, COPAA has shown that the delay has resulted in fewer school districts being identified as significantly disproportionate compared to the 2016 Regulations.  This, in turn, denies COPAA and its members information to which they are entitled and which they would use.  It also denies parents in those additionally identified school districts, which could number in the hundreds annually, the statutory right to have an automatic state-provided review of their school district's polices, practices, and procedures and to have the school district make any necessary revisions to redress any violations found – including remedies that would flow to individual students.

Vacating the Delay Regulation will lead ineluctably to the restoration of those statutory rights.  The Delay Regulation needs to be vacated promptly, so that states will be required to follow the 2016 Regulations for the 2018-19 school year.

**ARGUMENT**

**I.      COPAA HAS ESTABLISHED ITS STANDING.**

      **A.      COPAA And Its Members Have Experienced Injury Due To The Delay Regulation.**

      The Delay Regulation, 83 Fed. Reg. 31306 (July 3, 2018), has denied COPAA and its members three types of information that, as members of the public, they would have received if the standard methodology of the 2016 Regulations, 81 Fed. Reg. 92376 (Dec. 19, 2016) (codified at 34 C.F.R. §§ 300.646-647), had not been delayed.  In addition, COPAA's members in school districts that would have been identified as significantly disproportionate have lost the opportunity to have an automatic state-provided review of their district's practices, policies, and procedures.

      *1.      The Delay Regulation reduces the amount of significant disproportionality information available to COPAA.*

      Pursuant to 20 U.S.C. § 1418(a)(3), ED requires each state education agency ("SEA" or "state") to report to ED the names of all local education agencies ("LEAs" or "school districts") that have been determined to be significantly disproportionate.  *See* 83 Fed. Reg. at  31313; Pl.'s Mem. of P. & A. Opp'n to Defs.' Mot. to Dismiss and Supp. Pl.'s Cross-Mot. for Summ. J., Dkt. 15, at 11 n.7 [hereinafter COPAA MSJ].  Any information reported to ED under section 1418(a) "shall be publicly reported by each State."  20 U.S.C. § 1418(b)(1).  In states that have previously identified no districts as significantly disproportionate, for example, the increase of identified districts caused by the 2016 Regulations will result in the creation and mandatory public release of new information.

      In addition, each school district that is identified as significantly disproportionate "[m]ust identify and address the factors contributing to the significant disproportionality."  34 C.F.R. § 300.646(d)(1)(ii).  And each such district is also subject to an automatic state-provided review

to identify practices, as well as policies and procedures, that violate the IDEA; any revisions resulting from that review must be reported to the public.  20 U.S.C. § 1418(d)(2)(C).

ED does not dispute that the loss of the information described above can constitute an Article III injury.[1]  Instead, it argues (Defs.' Reply Supp. Their Mot. to Dismiss, Dkt. 19, at 4-7 [hereinafter ED MTD Reply]) that COPAA has not shown that the number of school districts that would be identified as significantly disproportionate and revise their policies, practices, or procedures would increase in the absence of the Delay Regulation.  ED's argument is meritless.

First, ED's argument requires it to discount the very estimates on which ED itself relied in 2018 to assess the costs and benefits of the Delay Regulation.  Initially, in 2016, ED estimated that if the 2016 Regulations were to go into effect, 400 additional LEAs would be identified as significantly disproportionate and "half of [those 400 additional] LEAs . . . would need to revise their policies, practices, and procedures" and publicly report.  81 Fed. Reg. at 92461.  In 2018, ED reported that it "ha[d] received no information that would lead it to adjust the original estimated number of LEAs that would be identified in each year outside a revision of the number

---

[1] ED continues to argue (ED MTD Reply, Dkt. 19, at 14-15) that the loss of the root-cause analyses cannot create informational injury because no statute requires that information to be disclosed.  But it does not dispute that such a statute did not exist in either *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986), or *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087 (D.C. Cir. 2015) ("*PETA*"), both of which sustained plaintiffs' informational standing.  *See PETA*, 797 F.3d at 1104 (Millet, J., concurring dubitante) ("PETA points to nothing that requires the Department to generate the enforcement reports that it finds so helpful, let alone a legal basis for asserting an enforceable private right to such information.").  Subsequent D.C. Circuit decisions cannot add a new requirement that would overrule those cases.  And they do not.  The appellate cases ED cites – *ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13 (D.C. Cir. 2011), and *Friends of Animals v. Jewell*, 828 F.3d 989 (D.C. Cir. 2016) – simply say that a statutory-disclosure requirement is *sufficient* to establish standing.  They do not hold that it is *necessary*.  In any event, for the reasons discussed in the text, COPAA has standing due to the informational loss of the state's public identification of significantly disproportionate districts, and the district's public disclosure of any revisions they make after the state-provided review.

4

of States" that would use the standard methodology and thus estimated that the delay would result in only "150 additional LEAs . . . identified with significant disproportionality in Year 1 [school year 2018-19]" and "220 in Year 2." 83 Fed. Reg. at 31316. And ED decided not to modify its determination that half of LEAs would need to revise their policies, practices, and procedures and publicly report. *Id.*; *see also* AR 2317 (ED using multiplier of 50% (0.5) to estimate number of LEAs that would spend money on "Revision"). While ED now describes the estimates as "proffered without explanation or analytical support" (ED MTD Reply, Dkt. 19, at 1), ED previously responded to questions about the basis of its 2018 estimates by telling the public that "in developing any cost estimates for proposed regulations, the Department relies on the expertise of its staff members and relevant external sources." Adams Aff. II ¶ 37 (quoting email from ED's press secretary). It should not now be able to disclaim its own estimates when its staff's expertise is in tension with its litigation positions.

Second, ED staff's expert prediction in 2016 and 2018 about what effects the Delay Regulation would have is bolstered by the evidence regarding three states that took the delay afforded by the Delay Regulation. In response to COPAA's state public records requests, each state said that it would have (or would likely have) identified additional school districts as significantly disproportionate under the 2016 Regulations. COPAA MSJ, Dkt. 15, at 17. In total, those states identified 48 additional districts. *Id.* ED claims (ED MTD Reply, Dkt. 19, at 5-6) that those responses were not clear that the states had accounted for all the flexibilities of the 2016 Regulations, including the discretion to refrain from identifying a district with significant disproportionality until the district has exceeded a particular risk ratio threshold for up to three prior consecutive years, or where the district has demonstrated reasonable progress in lowering its risk ratio in each of the two prior years. COPAA went back to the three states and

confirmed with each that their statements about the increased number of school districts had

taken into account *all* the flexibilities permitted by the 2016 Regulations.  Adams Aff. II ¶¶ 2-15.

Further, ED's prediction about how many of the school districts identified as significantly

disproportionate would need to report on revisions to their policies, practices, and procedures is

consistent with the experiences of COPAA and its members.  COPAA explained that in its

experience it is a rare school district that does not engage in some practices that violate the IDEA

(Almazan Aff., Dkt. 15-4, ¶¶ 19-20), and its members averred that they have witnessed

violations of the IDEA in their districts, which would have been identified as significantly

disproportionate absent the Delay Regulation.  COPAA MSJ, Dkt. 15, at 9-10, 19-20.

ED also argues (ED MTD Reply, Dkt. 19, at 9-11) that the D.C. Circuit cases relied on by

COPAA that have sustained informational standing are distinguishable from this case because

they did not involve non-regulation of third parties not before the court.  That is not accurate.

*Waterkeeper Alliance v. EPA* held that the petitioners had informational standing despite the

involvement of *two sets* of third parties who were not before the court.  853 F.3d 527 (D.C. Cir.

2017).  In that case, a statute required certain private entities to notify state or local governments

if the entities released extremely hazardous substances into the environment; the state or local

government, in turn, was required to make available to the public the "followup emergency

notices" from the entity.  *Id.* at 534.

The D.C. Circuit held in *Waterkeeper* that the petitioners had standing to challenge the

federal agency's rule seeking to exempt certain entities from the reporting requirements because

the exemption "reduces the information that must be publicly disclosed."  *Id.* at 533.  The court

did not require the petitioners to establish how many emergency notices would be submitted by

exempted third parties to state and local governments, or how many state and local governments

would comply with the federal disclosure requirements.  It was "injury enough" that the unlawful

exemption "cut[] back" on the statutory "reporting and disclosure requirements" and thus

"deprive[d] Waterkeeper of information, the public disclosure of which would otherwise be

required." *Id*. at 533-34.  The same is true in this case.  The Delay Regulation has reduced the

information that states and local school districts must publicly disclosed.

      ED finally suggests (ED MTD Reply, Dkt. 19, at 15) that even if COPAA showed that, as

a result of the Delay Regulation, it was denied information to which it was entitled, it must also

show how the loss of that information inhibits its work.  But nothing of the sort was required in

*Waterkeeper* or other D.C. Circuit cases.  COPAA MSJ, Dkt. 15, at 11-13.[2]  In any event,

COPAA alleged and averred how these public disclosures would help it and its work (such as

education of its members and members of the public) and how the absence of this information

due to the Delay Regulation requires it to divert resources from other tasks.  COPAA MSJ, Dkt.

15, at 11, 14-15.  ED challenges only one of the diversion-of-resources claims, thus conceding

the others.  ED asserts (ED MTD Reply, Dkt. 19, at 11-14) that due to the multiple flexibilities in

the 2016 Regulations, the regulations will not generate "comparable information on racial

disproportionality" across states and school districts.  But, once again, its litigation position is

---

[2] As Judge Bates noted in *Campaign Legal Center v. FEC*, 245 F. Supp. 3d 119, 128 (D.D.C. 2017), the D.C. Circuit in *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040-41 (D.C. Cir. 2016), found informational standing without applying the organizational diversion-of-resources standing analysis of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); and the D.C. Circuit analyzed informational and organizational standing as alternative theories in *ASPCA v. Feld Entm't, Inc.,* 659 F.3d 13, 22, 24 (D.C. Cir. 2011).  *See also Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 381 (D.C. Cir. 2017) (Williams, J., concurring in part and concurring in judgment) ("Where an organization's only asserted injury is an informational one, we have not engaged in a separate analysis of informational and organizational injury."), *petition for cert. filed* (U.S. Aug. 30, 2018) (No. 18-267).

contrary to what it said in the Federal Register.  In promulgating the Delay Regulation, ED

acknowledged that "increased comparability of data across states" was a "benefit[]" of the 2016

Regulations that it "believe[s] could be reasonably argued to be delayed as a result of the" Delay

Regulation.  83 Fed. Reg. at 31316.[3]  Thus, ED itself understood that the delay would make it

harder for COPAA and others to engage in cross-state comparisons, just as COPAA alleged and

averred.

> 2.  *COPAA's members suffer the same informational injury as COPAA itself,
>      as well as an additional individual injury.*

Like COPAA, COPAA's parent members experience the same losses of information due

to the Delay Regulation, and that injury extends to COPAA through associational membership

standing.  ED asserts (ED MTD Reply, Dkt. 19, at 16), without support, that COPAA's members

must show more than that they would read the documents released by their school districts if

they were made publicly available.  But in *Havens Realty Corp. v. Coleman*, the Supreme Court

held that an individual who was denied statutorily-required truthful information about the

availability of housing experienced Article III injury even if he "may have approached the real

estate agent fully expecting that he would receive false information, and without any intention of

buying or renting a home."  455 U.S. 363, 374 (1982); *see also Am. Canoe Ass'n, Inc. v. City of*

---

[3] In promulgating the 2016 Regulations, ED said that, even with its flexibilities, the standard
methodology will "increase comparability of data across States" and "will accrue benefits to
stakeholders in reduced time and effort needed for data analysis and a greater capacity for
meaningful advocacy."  81 Fed. Reg. at 92457; *see also id*. at 92386 ("The purpose of these
regulations is to increase comparability and transparency in the examination of data and
identification of LEAs with significant disproportionality across States to ensure that States are
more uniform in implementing IDEA section 618(d)."); *id*. at 92407 ("[I]n the interest of
increasing both comparability and transparency across States, . . . we believe it is necessary to
require States to use a common analytical method for determining significant disproportionality
and to allow limited flexibilities within that methodology rather than allowing or requiring
additional methodologies.").

*Louisa Water & Sewer Comm'n*, 389 F.3d 536, 545 (6th Cir. 2004) (rejecting argument that "to establish standing, a plaintiff must adequately allege more than the withholding of the required information from the citizenry").  To the extent more is required, the fact that the members of COPAA are parents of children with disabilities enrolled in public schools provides the extra "plus" that distinguishes them from members of the general public.  *See* 389 F.3d at 546.

Additionally, COPAA's members are injured because their school districts are not identified as significantly disproportionate and therefore not subject to a state-provided automatic review of the district's policies, practices, and procedures to ensure compliance with the IDEA.  20 U.S.C. § 1418(d)(2)(A); 34 C.F.R. § 300.646(c).  ED argues (ED MTD Reply, Dkt. 19, at 16-17, 23) that this review will be of no direct benefit to COPAA's members because the review is not required to identify individual instances of student misidentification, misplacement, or improper discipline.

By their terms, the statute and regulation are not so limited.  They require review of "practices," not just "policies" and "procedures."  "Practices" cannot be reviewed without examining the actual application (or not) of policies and procedures to individual cases.  While the regulatory text may leave states discretion on how to provide the review (ED MTD Reply, Dkt. 19, at 21, 23), the regulatory preamble accompanying the 2016 Regulations confirms that the review is required to be comprehensive and individualized.  For example, ED explained that when a school district is found to "have significant disproportionality with respect to placement" of students with disabilities in different education settings, the district "must review its policies, practices, and procedures to ensure that the policies and procedures conform with IDEA requirements *and* that the practice of placement teams in implementing these policies and procedures is also consistent with IDEA – such as involving parents in placement decisions, and

9

ensuring placement decisions are made in conformity with least restrictive environment requirements." 81 Fed. Reg. at 92414 (emphasis added).  It is difficult to understand how the review could determine whether placement decisions are in conformity with the least restrictive environment requirement without looking at individual placement decisions.  ED did not require a mere desk audit of paper policies and procedures.  While ED now suggests that these reviews were never intended to be a significant endeavor, ED previously explained that such a review "would require [school districts] to examine data, identify areas of concern, visit schools, review IEPs and evaluations, and review any other relevant documents."  *Id*. at 92461.

In any event, regardless of the precise scope of the automatic review, the Delay Regulation denied parents identified in the affidavits the opportunity to have each of their school districts subject to a review, which is itself an injury sufficient for standing.  For example, if a state decided to select by lottery which school districts it was going to subject to review, but excluded a particular school district from the lottery, a parent in that excluded school district would have standing to challenge his or her district's exclusion from the lottery, even if there was no guarantee that his or her district would be selected in a properly run lottery.  COPAA MSJ, Dkt. 15, at 21.  It is not necessary, as ED asserts (ED MTD Reply, Dkt. 19, at 18 n.7), that the parent show that the Delay Regulation denied them the opportunity *to take some action* in order to show injury; they need only show that their child's school district lost the opportunity for review.  *See e.g., CC Distribs., Inc. v. United States*, 883 F.2d 146, 150 (D.C. Cir. 1989) (loss of opportunity to compete for contract sufficient injury).

## B. Vacating The Delay Regulation Will Redress COPAA's And Its Members' Injuries That Were Caused By The Delay Regulation.

ED's arguments challenging COPAA's informational standing on causation and redressability grounds are essentially the same as their challenges to COPAA's injury-in-fact.

ED argues (ED MTD Reply, Dkt. 19, at 19-23) that even if the Delay Regulation were vacated, there is no certainty that any additional school district will, after a review of its policies, practices, and procedures, have any revisions to publicly report.  This argument disregards the fact that under the IDEA, the state must publically release information pertaining to the identification of districts with significant disproportionality, regardless of the outcome of the review.  *See* page 3, *supra*.  It also disregards that a root-cause analysis will be generated for each such school district, which COPAA and its members could obtain.  COPAA MSJ, Dkt. 15, at 18 n.9.

Even focusing solely on the publicly reported revisions, ED disregards its own assessment of the increased number of such school districts if the Delay Regulation was not in force.  *See* pages 4-5, *supra*.  All COPAA need establish is that there is a substantial probability that at least one additional school district will publicly report on its revisions.  COPAA MSJ, Dkt. 15, at 17-18.  It has more than done so.

Contrary to ED's claim (ED MTD Reply, Dkt. 19, at 10-11), this is not a situation like *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), where the Court held that the defendant had "only speculative and indirect control" over the third parties.[4]  Here,

---

[4] None of the additional authorities on which ED relies compels a different conclusion.  In each, causation was found lacking because there were "multiple, tenuous links" connecting the challenged conduct and the asserted injury.  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1335 (D.C. Cir. 1986); *see, e.g., Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (seven "attenuated" links); *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 55 (D.C. Cir. 2015) (three "attenuated" and "speculative" links); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669-70 (D.C. Cir. 1996) (en banc) (three "protracted" links); *Abulhawa v. U.S. Dep't of Treasury*, 239 F. Supp. 3d 24, 34-35 (D.D.C. 2017) (Moss, J.) (four speculative links, any one of which a third-party could break), *aff'd*, No. 17-5158, 2018 WL 3446699 (D.C. Cir. June 19, 2018).

ED has direct control over the relevant third parties; if the Delay Regulation is vacated, ED's

2016 Regulations will require states and school districts to use the federal standard methodology.

## II.    ED'S EXCLUSIVE RELIANCE ON THE INAPT TEXAS EXAMPLE DEMONSTRATES THAT THE DELAY REGULATION IS ARBITRARY AND CAPRICIOUS.

There are some areas of shared agreement between COPAA and ED.  The parties both

agree that "from the beginning," *i.e.*, prior to the 2016 Regulations being adopted, "commenters

warned" ED that the standard methodology could incentivize "de facto racial or ethnic quotas."

Def.'s Mem. Supp. Their Mot. for Summ. J. & Opp'n Pl.'s Cross-Mot. for Summ. J., Dkt. 23, at

9 [hereinafter ED MSJ] (capitalization altered).  And the parties agree that ED acknowledged

and responded to those warnings, *id.* at 11 – even if ED now thinks those responses were

insufficient.  Save for a single footnote, ED's Motion for Summary Judgment makes clear that it

is relying only on "new evidence" related to its concerns that the standard methodologies could

incentivize such quotas to justify the delay.  *See, e.g.*, ED MSJ, Dkt. 23, at 16 ("Given This New

Evidence, ED's Final Rule Postponing the Compliance Dates of the 2016 Regulations Is Neither

Arbitrary Nor Capricious").[5]

The new evidence to which ED's brief refers is the Texas monitoring visit example.  This

example is inapt, provides no justification for the rule, and demonstrates that the Delay

---

[5] By failing to include them in its motion for summary judgment or to respond to COPAA's argument on them, ED has abandoned several other grounds that it floated in the Federal Register as bases for the delay.  *See Connecticut v. United States Dep't of the Interior*, No. CV 17-2564 (RC), 2018 WL 4681619, at *24 n.36 (D.D.C. Sept. 29, 2018) (Contreras, J.) (citing *McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986)).  For example, ED does not defend its assertion that the Delay Regulation was needed because "the causes of . . . significant disproportionality" have not "received sufficient study." 83 Fed. Reg. at 31306; *see also* COPAA MSJ, Dkt. 15, at Mot. 32-33 (responding to ED's assertion).  Nor does ED raise the argument that, regardless of their incentives, risk ratios are racial classifications subject to strict scrutiny.  83 Fed. Reg. at 31309-10; *see also* COPAA MSJ, Dkt. 15, at 33-34 (responding to ED's assertion).

Regulation is arbitrary and capricious.  The Texas example did not provide any new insights or evidence unknown to ED when it promulgated the 2016 Regulations, the Texas monitoring system did not involve a consideration of race, the Texas monitoring system did not include the panoply of safeguards that ED previously found sufficient to address the risk that school districts would avoid identifying children from particular racial or ethnic groups in order to avoid a finding of significant disproportionality, and the Texas school districts' manipulation of their identification rates (unlike manipulation of significant disproportionality rates) would not give rise to the risk of private civil rights litigation for compensatory and punitive damages.  For these reasons, ED's reliance on the Texas example provides no reasoned basis for delaying the 2016 Regulations and is not the kind of "predictive judgment" entitled to any special deference from this Court.

> **A.  The Texas Example Did Not Provide Any New Insights Or Evidence Unknown To ED In 2016 About The Risks Of The Standard Methodology.**

It should not come as a shock to anyone that "regulatory incentives can . . . motivate behavior."  ED MSJ, Dkt. 23, at 26.  As COPAA explained (COPAA MSJ, Dkt. 15, at 25-27), and ED agrees (ED MSJ, Dkt. 23, at 9-12), ED was already aware of and had considered concerns in the 2016 rulemaking that the standard methodology might "create an incentive [for LEAs] to not identify children for special education and related services in order to reduce [racial] disproportionality numbers" and thus result in de facto racial quotas.  81 Fed. Reg. at 92454; *see also id.* at 92385.  Nonetheless, ED determined in 2016 – in direct contrast to what ED has said both in the 2018 Delay Regulation and in this litigation – that the standard methodology embodied in the 2016 Regulations would not result in quotas or caps because of other systems and incentives *not* to discriminate on the basis of race.

13

Despite being referenced by only three commenters during the 2018 rulemaking (AR 1422, 1433, 1888),[6] and despite receiving only brief mention by ED in the Delay Regulation itself (83 Fed. Reg. at 31309), ED now defends the Delay Regulation entirely based on the results of its February 2017 monitoring visit to the Texas Education Agency (TEA) and twelve of its districts.  ED MSJ, Dkt. 23, at 12-14.  During that visit, ED learned that some school districts in Texas had "[taken] actions specifically designed to decrease the identification of children for special education and related services under the IDEA when [the TEA] indicated that the [school district's] rate exceeded 8.5 percent" because decreasing their identification rates to below 8.5 percent could reduce the amount of monitoring of their special education programs by the TEA.  *See* AR 1290-91.

ED concluded that the TEA had violated the IDEA by not sufficiently supervising the school districts.  For example, in one school district, the TEA itself had previously documented in its "TEA program monitoring report" that the school district "[was] taking action to . . . ultimately reduce the number of students who require special education services."  AR 1293.  TEA did nothing.  Many of the other districts documented their intentions to restrict access to IDEA services.  TEA did nothing.  The critical conclusion of the report – not cited or quoted in ED's otherwise lengthy summary – says ED "determined that TEA failed to ensure that its [school districts] properly implemented IDEA child find requirements, and consequently, failed to make FAPE available to all eligible children with disabilities residing in the State, as required by the IDEA."  AR 1302.  "*This failure*," ED said, "resulted in improper reductions, over a

---

[6] ED cites AR 1888 as supportive of its concerns about the standard methodology.  ED MSJ, Dkt. 23, at 12.  But the comment appearing at AR 1888 – from The Advocacy Institute – supported the 2016 Regulations and "extensive[ly] oppose[d] . . . the proposed delay."  AR 1891.  It viewed the problems identified in the Texas monitoring visit, discussed in the text, as the result of a failure to carry out monitoring and enforcement responsibilities.  AR 1888.

14

period of years, in the number of children identified as having disabilities and needing special education and related services under the IDEA." *Id.* (emphasis added).  Read plainly, ED did not conclude that the TEA's use of a numeric threshold caused the violation; it concluded that the violation was due to the TEA's reliance on numbers combined with the failure of the TEA to monitor and supervise the districts to ensure that incentives created by the 8.5 percentage rate did not result in improper reductions in identification.

ED now argues in defense of the Delay Regulation that its Texas monitoring visit "substantiated" or "corroborated" or "confirmed [the] risk" (ED MSJ, Dkt. 23, at 18, 20, 22) that a standard methodology for measuring significant disproportionality "may create an incentive for [school districts] to establish de facto quotas in identification, placement, and discipline – or otherwise create a chilling effect on such identification – to avoid being identified with significant disproportionality."  83 Fed. Reg. at 31308.  Notably, ED did not explain in the text of the Federal Register what *new* lessons it could draw from that single example that it did not already know in 2016, or why that example shed any light on the very different circumstances presented here.  That alone evinces unreasoned agency decisionmaking.

But even if ED had tried to so explain, the Texas monitoring visit provided no new insights into, or evidence of, such a risk.  While the conduct of those Texas districts is deplorable and, in fact, illegal in violation of the IDEA, their conduct provides no new evidence about the potential willingness of school administrators and teachers to intentionally gerrymander individual student's identification, placement, and discipline *because of their race* so as to avoid

a finding of significant disproportionality for their school district.[7]  That distinction is critical

because, as ED acknowledged in its 2016 Regulations (COPAA MSJ, Dkt. 15, at 26 (discussing

81 Fed.  Reg. at 92385)), the use of racial quotas to avoid a finding of significant

disproportionality "would almost certainly result in legal liability under . . . the Constitution," not

just the IDEA.  Moreover, unlike violations of the IDEA, the use of racial quotas by school

officials risks individual liability in private civil litigation for compensatory and punitive

damages and attorneys' fees, in addition to damages and attorneys' fees against the school

district itself.  COPAA MSJ, Dkt. 15, at 26.  These incentives not to discriminate on the basis of

race are but one subset of multiple safeguards that the 2016 Regulations expressly include, the

Texas example lacks, and therefore further make ED's reliance on the Texas example inapt.

> **B.    The Texas Example Did Not Provide Any New Insights Or Evidence
> Unknown To ED In 2016 About The Incentives *Not* To Engage In Racial
> Discrimination.**

In addition to expressly relying on the possibility of statutory civil rights and

constitutional liability for money damages, the 2016 Regulations identified additional safeguards

that would even further protect against LEAs employing racial quotas to avoid a significant

disproportionality finding.  The full list of safeguards has been enumerated repeatedly in the

complaint and several of the briefs that have already been filed by both parties.  *See, e.g.,*

COPAA MSJ, Dkt. 15, at 25-27.  From a broader, functional, perspective, the following comes

through from ED's discussion preceding the promulgation of the 2016 Regulations:

---

[7] None of the four program areas for which Texas measured a school district's performance
levels measured *racial* disparities in the identification, placement, or discipline of children with
disabilities.  The 2016 TEA Manual in the administrative record articulates performance
indicators for racial and ethnic disproportionality but expressly disclaims "that performance
levels for this indicator will be assigned solely based on disproportionality rates beginning with
the 2017" assessments.  AR 97-99.

16

- ED gave states latitude to set high risk-ratio thresholds so that even substantial racial differences would not be enough to trigger an identification of a school district as significantly disproportionate, which would attenuate incentives about small numbers of children; and gave states further latitude to look at multiple years of data, which would attenuate incentives in any given year.  And it subjected those state decisions to review for reasonableness by the ED, which had recognized that low risk-ratio thresholds were more likely to incentivize caps and quotas.

- For those who read the regulatory preamble –attorneys, special education administrators, people operating training programs, etc. – ED made absolutely clear that quotas were not allowed.

- For those who would not be expected to read the preamble, ED added a provision to the regulation that reiterated that one could not deny FAPE to a child in order to avoid a significant disproportionality determination.

- And for those who would not necessarily be expected to read either the preamble or the regulations – such as principals, teachers, and parents – ED issued guidance documents that reiterated those instructions about no quotas or caps in more accessible language.

ED determined that all these elements together (plus the existence of civil damages remedies) were enough to prevent any incentives of the standard methodology to use caps or quotas.  Recognizing that it did not have perfect information, ED also committed to evaluating whether this new system was resulting in caps or quotas on the ground.  Presumably, if the evaluation found such problems, ED would find ways to remedy them.

*None* of these safeguards is present in the Texas system that ED monitored in 2017. There is no civil damages action under the IDEA.  The only "safeguards" that Texas provided

were technical safeguards "conducted by the agency to ensure the integrity of the performance-based monitoring system" (since-disavowed)[8] relating to "leaver data, student assessment data, and discipline data."  AR 47.  Those "safeguards" did not incentivize identification of children as students with disabilities (and thus did not balance out the 8.5 percent measure) and have nothing whatsoever to do with whether children with disabilities are being identified, placed, or disciplined in a racially disproportionate manner.  In light of those significant distinctions, the Texas monitoring visit – passingly and, therefore, insufficiently considered in the 2018 rulemaking – does nothing to justify ED's about-face decision to delay the 2016 Regulations.

In promulgating the Delay Regulation in 2018, ED did not determine that the system of safeguards identified in 2016 would not overcome any incentives to impose caps and quotas.  To the contrary, ED does not contest the fact that it could point to no examples of any state or school district that has been incentivized by the IDEA to impose racial quotas in the past, even though states have been required to assess significant disproportionality for the past 14 years and some have done so under methodologies similar to the standard methodology, which ED has now delayed.  COPAA MSJ, Dkt. 15, at 29; *see* 83 Fed. Reg. at 31309.

ED did not even say in 2018 that it had determined that there was a significant risk that the system it envisioned in 2016 would not work in addressing race quotas.  It was agnostic about "whether" the regulations might incentivize intentional unconstitutional race quotas at all, 83 Fed. Reg. at 31308, much less "how much" it might incentivize such quotas.  It was thus equally agnostic about what safeguards might suffice to balance against those possible

---

[8] Texas no longer uses "a performance indicator based on the number or percentage of children who receive special education services." After ED's monitoring visit, Texas enacted a law prohibiting it.  AR 1302.

incentives.  Instead, ED simply stated that the standard methodology *might* incentivize caps and

quotas.  ED MSJ, Dkt. 23, at 29 (agreeing with COPAA on this point).  But that was not a new

insight.[9]  It was, as noted above, one of the basic premises of the 2016 Regulations.

> **C.    In The Absence Of New Evidence, ED Had No Grounds To Delay The Regulation.**

ED seems to contend that even in the absence of new evidence, its "predictive judgment"

as to "how school districts were likely to respond" to the 2016 Regulations would merit

deference.  ED MSJ, Dkt. 23, at 22 n.5.  There are several fatal problems with this argument.

First, ED did not make such a predictive judgment in 2018.  To the contrary, as ED

admits (ED MSJ, Dkt. 23, at 29), it did not find that the 2016 regulations would result in racial

quotas or even that they would incentivize racial quotas.  ED merely had "concerns" that they

"might."  ED MSJ, Dkt. 23, at 20.

Second, ED had already made a predictive judgment in 2016 that it was *not* likely that

school districts would respond to the 2016 Regulations by instituting racial quotas.  ED offers no

reason why, in the absence of new evidence, it was or should be entitled to reach a different

predictive judgment.  To that end, ED's argument that its "predictive judgment" about how

school districts would likely respond to the 2016 Regulations is entitled to special "deference"

and would be so entitled "even in the absence of evidence" is meritless.  ED MSJ, Dkt. 23, at 20,

22 n.5.  Reasonable evidence supporting any agency judgment – however labeled by the agency

in litigation – is always required.  *See, e.g.*, *Nat'l Lifeline Ass'n v. FCC*, No. 18-1026, 2018 WL

4154794, at *1 (D.C. Cir. Aug. 10, 2018) (per curiam) (citing *Sorenson Commc'ns, Inc. v. FCC*,

755 F.3d 702 (D.C. Cir. 2014) for the proposition that "agency action based on speculation rather

---

[9] Indeed, the primary case ED relies on for that point is 20 years old.  *See Lutheran Church – Missouri Synod v. FCC*, 141 F.3d 344 (D.C. Cir. 1998).

than evidence is arbitrary and capricious"); *Sorenson Commc'ns, Inc.*, 755 F.3d at 708 ("Though an agency's predictive judgments about the likely economic effects of a rule are entitled to deference, deference to such . . . judgments must be based on some logic and evidence, not sheer speculation.") (citation omitted); *BellSouth Telecommc'ns, Inc. v. FCC*, 469 F.3d 1052, 1060 (D.C. Cir. 2006) (rejecting FCC's insistence for special deference where FCC "cast its analysis as a prediction of future trends" but there was an "absence of record evidence" supporting its analysis); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843–44 (D.C. Cir. 2006) ("Professing that a [rule] ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking."); *Desoto Gen. Hosp. v. Heckler*, 766 F.2d 182, 185–86 (5th Cir. 1985) (finding the rule arbitrary and capricious because agency relied on study that did not support agency's conclusions).  Because the only asserted evidence (the Texas monitoring visit) on which ED can now rely to attempt to defend its decision to delay the 2016 Regulations is inapt, it does not salvage the Delay Regulation from this Court's vacatur.

## III.   BEYOND ED'S FAILURE TO JUSTIFY ITS DELAY REGULATION WITH ANY NEW EVIDENCE, THE DELAY IS ARBITRARY AND CAPRICIOUS ON SEVERAL INDEPENDENT GROUNDS.

Apart from its exclusive reliance on the inapposite Texas example, ED failed to justify delaying the regulation in light of the safeguards in the 2016 Regulations and relied on internally inconsistent reasoning to justify the rule.  Moreover, even if there were a justifiable concern about the effects of the 2016 Regulations, that would not justify ED responding by delaying the regulations.  To the contrary, there were reasonable alternatives to delay that ED refused to give real consideration to; and there were significant costs to delay that ED refused to acknowledge.

20

### A.     ED Failed To Explain Why Delay Was Necessary Despite The Safeguards Described In The 2016 Regulations.

COPAA demonstrated that ED failed to account for the multiple safeguards in the 2016 regulations and thus failed to show why delay was necessary. COPAA MSJ, Dkt. 15, at 24-29. ED's response does nothing to undermine that conclusion.

ED lumps together the first four safeguards – the preamble's statement that the regulations do not authorize use of quotas, the amendment to the regulation reiterating the prohibition on denying FAPE to avoid a significant disproportionality finding, the warnings that quotas would violate the IDEA, and the recognition of legal liability under civil rights laws and the Constitution – and contends that it found them insufficient because "'regardless of [its] disclaimer' of any intent to incentivize quotas, in operation, the regulations could, 'in fact, incentivize quotas' all the same." ED MSJ, Dkt. 23, at 25 (quoting 83 Fed. Reg. at 31308). The portion of the Delay Regulation on which ED relies, however, addresses only "[t]he discussion in the 2016 significant disproportionality regulation *disclaiming an intent to establish quotas*." 83 Fed. Reg. at 31308 (emphasis added). It does not explain why the further warning that quotas would violate the IDEA or the amendment to the regulation itself are insufficient to dissuade officials from acting illegally.[10] And it certainly does not address the threat of civil liability for such actions. ED is wrong to characterize such potential legal liability as a mere "disclaimer."

---

[10] ED claims (ED MSJ, Dkt. 23, at 11) that this the regulatory amendment provision "was not specifically added in response to concerns about racial or ethnic quotas," but ED said otherwise in the Federal Register in 2016. The discussion of this addition took place in a section of the 2016 Regulations about a set of comments grouped together under the title "Proposed Regulations Would Create Racial Quotas." 81 Fed. Reg. at 92385. After describing many comments that stated that the proposed regulations "would put into place racial quotas," and saying in the "Discussion" section that "implement[ation] of racial quotas in an attempt to avoid findings of significant disproportionality by States" would be "contrary to IDEA," ED identified the "Changes" in response to include adding 34 C.F.R. § 300.646(f) "to make clear that these regulations do not authorize . . . actions that violate any IDEA requirements." *Id.*

Next ED asserts that incentives to avoid exceeding numerical thresholds can arise even where the thresholds are "State-established."  ED MSJ, Dkt. 23, at 26.  Whether true or not, the portion of the Delay Regulation it cites in no way addresses the relevant safeguard in the 2016 Regulations that allowed states flexibility in setting thresholds only subject to reasonableness review by ED.  81 Fed. Reg. at 92419.  The cited language merely mentions "State-established risk ratio thresholds."  ED does not purport to show that states would set thresholds so low that school districts would readily evade them.  Nor does it address this safeguard's added protection of subjecting the thresholds to ED's review for reasonableness.  *Id*.  Finally, here again ED turns to the Texas example (ED MSJ, Dkt. 23, at 26), but COPAA has shown why this example does not support ED's position.  *See* pages 13-16, *supra*.

With respect to the guidance envisioned in the 2016 Regulations, ED concedes that it failed to consider this safeguard.  ED MSJ, Dkt. 23, at 27.  Instead, ED claims that its expressed intention in the 2016 Regulations to publish guidance was not a way to mitigate the risk of incentivizing racial or ethnic quotas.  *Id.*  But, at the time, ED said that the guidance would "help schools to prevent racial discrimination . . . , including over-identification, under-identification, and delayed identification of disabilities by race," 81 Fed. Reg. at 92397, and the guidance was released simultaneously with the 2016 Regulations.  Press Release, U.S. Dep't of Educ., FACT SHEET: Equity in IDEA (Dec. 12, 2016), https://www.ed.gov/news/press-releases/fact-sheet-equity-idea.  Under-identification and delayed identification on the basis of race are the very means ED now fears school districts would be incentivized to use.  83 Fed. Reg. at 31308 (concern about "artificially reduc[ing] the number of children identified").  The guidance squarely addresses that concern.

ED also contends (ED MSJ, Dkt. 23, at 27) that it explained why the safeguard of evaluating the implementation of the 2016 Regulations would be "undesirable." But it cites only its own conclusion that the regulations may create an incentive for quotas. *Id.* This is again purely circular reasoning: The evaluation would not safeguard against incentives for quotas because the regulations *may* nonetheless create incentives for quotas. In any event, although ED stated generally in the Delay Regulation that it wanted to conduct further evaluation before requiring compliance with the 2016 Regulations, it did not provide this explanation as a reason for rejecting the 2016 evaluation safeguard. ED's argument also mischaracterizes the 2016 Regulations, which did not specify that the evaluation would be entirely "after-the-fact." *See* 81 Fed. Reg. at 92385 (discussing the evaluation in present tense); *cf.* ED MSJ, Dkt. 23, at 27. ED's contention thus treats the evaluation as a purely academic exercise as opposed to a way to identify and remedy any problems.

Finally, ED concedes (ED MSJ, Dkt. 23, at 27-28 n.7) that it failed to consider whether these multiple complementary layers of warnings, express prohibitions, threats of enforcement and civil liability, flexibility in setting thresholds, provision of guidance, and evaluation of implementation provide insufficient disincentives to ward off the risks of racial quotas it asserts might exist.[11]

---

[11] ED's contention (ED MSJ 27, n.7) that it was not required to consider whether the multiple safeguards combined addressed the risk of quotas is wrong for several reasons. First, ED's assertion that the 2016 Regulations did not reach any conclusion about the combined effect of the multiple safeguards blinks reality. The 2016 Regulations recognized the risk of quotas and adopted multiple safeguards to address that risk. ED promulgated the 2016 Regulations and all of its safeguards together; ED did not promulgate an a la carte order form allowing states to pick and choose certain safeguards but not others. Second, commenters including COPAA urged ED not to delay implementation of that full package of regulations and safeguards. AR 1925-40. Third, ED's reliance on *Waukesha County Environmental Action League v. U.S. Department of*

**B.      ED Cannot Delay Because It Thought It Might Want To Change Its Mind.**

ED did nothing more than restate the problem it confronted in 2016 and say it needed

more time to decide *if* its earlier judgment was correct.  ED gave no reason to call its 2016

judgment into question.  But if that were enough to delay or suspend a regulation, the APA's

requirement of reasoned decisionmaking would be a farce.  *Air Alliance Houston v. EPA*, 906

F.3d 1049 (D.C. Cir. 2018), is controlling on this point and, on its own, mandates that the Court

find that ED's Delay Regulation is arbitrary and capricious.  Even so, ED attempts to hide the

ball by cursorily calling it distinguishable in a footnote without confronting what the case holds.

ED argues (ED MSJ, Dkt. 23, at 22 n.4) that because its reason to reconsider the rule was

the "risk" of a "specific, undesirable outcome," *Air Alliance* does not apply because the EPA's

explanation for delay "rested on 'the mere fact of reconsideration alone.'"  *Id.* (quoting *Air All.*

*Hous.*, 906 F.3d at 1067).  But that pat response misunderstands the case.  First, it is factually

incorrect.  The court of appeals explained that EPA referred "to alleged 'security risks' . . . raised

by industry" as a ground for delay, even as the agency acknowledged that it "ha[d] not concluded

[the rule it sought to delay] would increase such risks."  *Air All. Hous.*, 906 F.3d at 1065 (second

phrase quoting the EPA's Delay Rule).  That tracks very closely what ED said in its Delay

Regulation.

But more broadly, the EPA explicitly stated that its delay would allow it "time for a

*comprehensive review of objections* to the rule without imposing the rule's substantive

---

*Transportation* in this connection is seriously misplaced.  *Waukesha County* addressed whether
an agency must consider the combined effect of multiple alternatives to its rule when the agency
had determined that each alternative would have *no effect whatsoever* on its own.  No. 15-cv-
801, 2018 WL 5085519, at *10 (E.D. Wis. Oct. 18, 2018); *see also* pages 31-32*, infra*.  Here, ED
departed from its own prior conclusion that its package of safeguards would address the risk of
quotas, and ED in 2018 did not conclude that each safeguard would have zero effect
individually.  Indeed, ED did not address several of the safeguards at all.

compliance." *Air All. Hous.*, 906 F.3d at 1068 (quoting the EPA's Delay Rule). This is identical to ED's claim here. ED did not delay the 2016 Regulations because it purported to know that they would result in (or even likely result in) racial quotas. *See* ED MSJ, Dkt. 23, at 28 (acknowledging that ED did not find that the 2016 Regulations would incentivize quotas). ED delayed the 2016 Regulations because it wanted to conduct a comprehensive review of the objections that raised the specter of such quotas. 83 Fed. Reg. at 31308. The D.C. Circuit plainly held that that precise reason for delay is arbitrary and capricious. *Air All. Hous.*, 906 F.3d at 1068.

EPA, like ED, wanted to issue a new, likely more permissive regulation and did not want the prior rule to take effect in the interim. EPA, like ED, nowhere explained how the prior rule's compliance date "would prevent [it] from undertaking notice and comment or other tasks for reconsideration," "why a delay is necessary to [the agency's] process," or how the rule "becoming effective on schedule would otherwise impede [the agency's] ability to reconsider" it. *Air All. Hous.*, 906 F.3d 1068. And EPA, like ED, justified the delay solely on the basis that it would reconsider the prior regulation. Thus, ED's delay, like EPA's arbitrary and capricious one, was in fact based solely on its desire to reconsider the findings and conclusions of the 2016 Regulations. In *Air Alliance*, the D.C. Circuit held that such a desire, based merely on "concerns," was not a valid reason to delay a regulation. ED utterly failed to confront this point in its response to COPAA's motion.

ED changed the status quo by adopting the Delay Regulation 18 months after the 2016 Regulations were effective and days after compliance was required, and it was not allowed to do so based on inchoate doubts about the effects of its past decisions.

C.      ED's Reasoning Was Internally Inconsistent.

Contrary to ED's assertion, its reasoning for imposing the delay is internally inconsistent, a flaw that on its own renders the Delay Regulation arbitrary and capricious and requires vacatur. On one hand, ED asserts that it has such great concerns that the 2016 Regulation's standard methodology *may* provide an incentive for districts to resort to racial quotas, that it has decided that it must delay implementation of the 2016 Regulations.  On the other, it expressly allows states to use that very methodology during the delay period and does so without implementing key safeguards that ED purposefully and carefully put into place in 2016.  Indeed, ED *relies* on the states' ability to implement the standard methodology to minimize the projected costs of the delay.  83 Fed. Reg. at 31316.  Nowhere does ED claim that the potential incentives may occur when they are mandated by the federal government but will not occur when merely mandated by the state government.

Strikingly, in purporting to wash its hands of any responsibility for the state's choice of methodology during the delay, ED ignores that for 18 months it had required states to prepare to comply with the 2016 Regulations.  Then, after the states have invested time and resources in preparing, ED suddenly told them within days of the deadline that they get to choose whether to continue on the path or not.  In that circumstance, where ED imposed costs that are wasted unless the states use the standard methodology, it is untoward for ED to contend that it has no responsibility for what states decide to do.

ED attempts to justify its inconsistent reasoning by emphasizing that it never found that racial quotas would occur or that the 2016 regulations would even incentivize racial quotas.  ED MSJ, Dkt. 23, at 28.  But that justification merely lays bare the arbitrary and capricious nature of the Delay Regulation.  Without such findings, there is no justification for delay.  All ED has is

26

pure speculation, which, as explained above is entitled to no deference or weight.  *See* pages 19-20, *supra*.  Delaying a fully fleshed out regulation because of a concern that something "'potentially' could" happen is arbitrary and capricious.  ED MSJ, Dkt. 23, at 28.  ED's very argument in its memorandum on this point proves the flaws COPAA has identified:  There is no reason for the delay; and ED could study whether its concerns are valid while the 2016 regulations are in effect.  It defies logic that an agency genuinely concerned about unconstitutional racial quotas being incentivized by a regulation, even with a panoply of safeguards, would be laissez-faire about states implementing that precise regulation without key safeguards.

### D. ED Failed To Consider Reasonable Alternatives To Delay.

In addition to not regulating at all or requiring compliance with the 2016 Regulations while conducting a new substantive rulemaking, COPAA offered three alternatives to delay: (1) "ED could provide more technical assistance and guidance to ensure that States and districts avoid the outcomes about which ED has concerns;" (2) "ED could accelerate the evaluation, to which it committed in the 2016 final regulation preamble, of the extent to which school and district personnel incorrectly interpret the risk ratio thresholds and implement racial quotas to avoid findings of significant disproportionality, looking at States that already use risk ratios;" and (3) "ED could initiate and publicize compliance reviews under Title VI of the Civil Rights Act to ensure that States and districts do not adopt 'numerical quotas' based on race."  AR 1938.

ED gave these alternatives the back of the hand, simply saying it was not sure if they would be effective to prevent caps and quotas and that it would review whether they could be effective "during the delay."  83 Fed. Reg. at 31315.  (ED's claimed uncertainty about a compliance review's efficacy is ironic in light of its heavy reliance on a compliance review of

Texas that identified and ameliorated significant violations.)  But ED was required to consider these as alternatives *to delay*, not as alternatives to the 2016 Regulations themselves.  ED's purported reason for the delay is its mere *concern* that the 2016 Regulations would incentivize racial quotas.  It needed to thus seriously consider whether COPAA's proposed alternatives further reduced the possible incentive for quotas such that no delay was needed.  Each alternative clearly does.  The more assistance, guidance, evaluation, and monitoring ED provides to states and districts, the less likely they are to accede to any possible incentives to implement illegal racial quotas.  Instead of confronting these alternatives, ED sidestepped them.

For the most important alternative – monitoring – ED completely failed to consider whether it is a viable alternative *to delay*.  Instead, ED rejected monitoring because it is "not certain that compliance-driven monitoring will, by itself, effectively address the factors *contributing to significant disproportionality*."  83 Fed. Reg. at 31309 (emphasis added).  But the question is not whether monitoring would address factors of significant disproportionality, the question is whether it would address or counteract any incentive of districts to implement racial quotas.  ED tries to explain away this failure by claiming (ED MSJ, Dkt. 23, at 37-38) that COPAA misunderstood which comments ED was referring to when it referred to "compliance-driven monitoring."  That is difficult to square with the discussion in the Federal Register itself.  In a section entitled "**Quotas**," ED said that some commenters "elaborated that the Department and States could mitigate the risks of quotas through close monitoring of States for compliance with IDEA."  83 Fed. Reg. at 31307.  In the responsive discussion, there is a paragraph in which ED said that it was responding to comments that "close monitoring of States for compliance with

IDEA" was an alternative to delay.  *Id*. at 31309.  In that same paragraph, it recited the language quoted above, which was clearly non-responsive to the suggestion.[12]

In addition, ED utterly failed to consider the proposed alternatives and the safeguards from the 2016 Regulations in combination with each other.  ED claims that it was not required to consider the combined effect because COPAA did not raise this point in its comments.  ED MSJ, Dkt. 23, at 27 n.7, 39 n.15.  But ED misreads the single authority it cites.  All the judicially created exhaustion doctrine requires, in the context of a notice and comment rulemaking, is that an argument was fairly brought before the agency.  *See Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 79-80 (D.D.C. 2013)  (Walton, J.) (plaintiffs did not exhaust an argument that "at no point did they raise").  In *Styrene*, the plaintiff had only challenged the manner in which the agency was applying the criteria and not – as they were arguing before the district court – the validity of the criteria themselves.  *Id.* at 80.  Indeed, the court found that the plaintiff had expressed "approval" of the criteria before the agency and the court.  *Id.*

The exhaustion claim advanced by ED would have required COPAA to say that the agency should consider safeguard A with safeguard B; safeguard A with safeguard C; safeguard B with safeguard C; safeguards A, B, and C together; and each separately before ED would (or should) consider any safeguards in combination.  It stretches credulity that the agency was not on notice that a list of safeguards could be used in combination with each other, especially because

---

[12] ED contends (ED MSJ, Dkt. 23, at 27 n.13) that it addressed COPAA's monitoring proposal "in a different part" of the Delay Regulation.  It points to a page of the Federal Register that reproduced the Regulatory Impact Analysis (RIA), where ED simply lumped together COPAA's multiple proposed alternatives and dismissed them with a cursory statement that it would evaluate them *during* the delay because "[k]nowing if these measures would be effective requires careful review," 83 Fed. Reg. at 31315, a rationale that is inconsistent with considering the proposals as alternatives *to delay*.

the 2016 Regulations themselves included seven safeguards in combination.  The law does not require such onerous specificity from public commenters.

The APA requires that the agency consider all reasonably obvious alternatives, *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983), and ED acknowledges that it was required to consider "significant and viable" and "obvious" alternatives to the Delay Regulation.  ED MSJ, Dkt. 23, at 25 (quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013)); *see Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 818 (D.C. Cir. 1983) (agency "required to address common and known or otherwise reasonable options").  It failed to do so.  ED blames COPAA for giving only a "cursory proposal of these alternatives."  ED MSJ, Dkt. 23, at 36.  COPAA disagrees with ED's characterization, but ED's failure to give these alternatives any consideration violates its duty in any event.  *Cf. Ill. Commerce Comm'n v. ICC*, 776 F.2d 355, 363 (D.C. Cir. 1985) ("We agree that the particular alternative urged on appeal as the remedy for petitioners' objection need not have been presented to the agency – at least where, as here, that alternative is an obvious one.").  And because it failed to give them meaningful consideration, it failed to give "reasons for rejecting [the] alternatives" in "sufficient detail to permit judicial review."  *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984).[13]  The only alternatives it in fact

---

[13] In particular, two of COPAA's alternatives called for enhancements to the safeguards ED itself proposed in the 2016 Regulations.  *See* AR 1938 ("more technical assistance and guidance to ensure that States and districts avoid the outcomes about which ED has concerns" and "accelerat[ing] the evaluation" provided for in the 2016 Regulations).  ED fails to explain why it required further elaboration beyond the suggestions to enhance and accelerate options it had itself adopted.  Similarly, while ED faults COPAA for not establishing that these alternatives were "viable," it does not contend that they are in fact not viable, nor could it, given that it already found them viable in 2016.

considered were different lengths of delay.[14]  *See* 83 Fed. Reg. 8396, 8396 (Feb. 27, 2018)

(NPRM proposing as options only a 1 year delay, a 2 year delay, or a 3 year delay); *id.* at 31315

(final regulation stating that it was unsure of the efficacy of the safeguards and other proposed

safeguards and further explaining its only detailed analysis – choosing between lengths of delay).

ED's refusal to conduct more than a cursory rejection of the reasonable alternatives proposed

makes the delay arbitrary and capricious.

ED separately contends, in a throwaway citation at the end of a footnote, that if it finds

that each alternative is ineffective on its own, that is enough to satisfy an argument that it should

consider them in combination.  *See* ED MSJ, Dkt. 23, at 27-28 n.7 (citing *Waukesha Cty. Envtl.

Action League v. U.S. Dep't of Transp.*, No. 15-cv-801-PP, 2018 WL 5085519, at *10 (E.D. Wis.

Oct. 18, 2018)).  But ED admittedly did not find any of the alternatives ineffective; it merely said

that it did not know if they would be.  That key difference completely undermines ED's analogy

to *Waukesha County*.  There, the court logically held that if an agency reasonably found that

individual alternatives were entirely ineffective, it did not then have to also say they would be

ineffective in combination.  *Id.*  The court contrasted that situation with one in which the

alternatives are "potentially effective" in solving the problem.  *Id.* (discussing *Davis v. Mineta*,

302 F.3d 1104 (10th Cir. 2002), and *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d

1152 (10th Cir. 2002)).  In such a case, "failing to further study such promising alternatives

alone or in combination render[s] the [decisionmaking process] inadequate."  *Id.*  ED did not

dispute that each of the additional safeguards proposed by COPAA would be "potentially

---

[14] ED's attempt to will this fact not to be true fails before it gets off the ground.  Its insistence
that it "clearly considered" not postponing the regulations' compliance dates speaks past
COPAA's argument.  What ED failed to consider was the efficacy of not postponing the
compliance date *with additional safeguards related to its concern of incentivizing racial quotas.*

effective" in reducing the risk that districts will impose racial quotas; it merely stated that it was not sure.  Under the very case and standard that ED proposes that this Court apply, its failure to consider these "potentially effective" alternatives in combination was arbitrary and capricious.

### E.   By Failing To Account For Key Costs, ED Ignored Significant Aspects Of The Problem.

ED first argues (ED MSJ, Dkt. 23, at 29-31) that because it was not required by statute to engage in a cost-benefit analysis, but did so only pursuant to Executive Orders, judicial review of its analysis is precluded.  The D.C. Circuit has already rejected that argument.  *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039–40 (D.C. Cir. 2012) ("[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable" even when the agency "does not have a statutory duty to demonstrate that the benefits of the amended rule outweigh its costs.").  ED relied on its cost-benefit analysis in adopting the Delay Regulation.  83 Fed. Reg. at 31314 (cross-referencing cost-benefit analysis).[15]

Moreover, ED does not dispute that an agency must consider all relevant factors to justify a regulation, or that costs are important aspects of a regulation.  *See* ED MSJ, Dkt. 23, at 32; *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015); *State Farm*, 463 U.S. at 43.  COPAA asserts that ED failed to properly consider two relevant factors pertaining to costs: (1) loss of the benefits to children, parents, and society, including greater transparency, increased role for the State Advisory Panels, reduction in inappropriate policies and practices, increased comparability of data across states, and expansion of activities allowable under comprehensive CEIS, *see* 83 Fed. Reg. at 31315, and (2) costs incurred by states in reliance on the 2016 Regulations, *see*

---

[15]  Indeed, ED itself relies on the RIA in defending the rule before this Court.  *See* ED MSJ, Dkt. 23, at 38 n.13; page 29 n.12, *supra*.

COPAA MSJ, Dkt. 15, at 34-39.  To be clear, COPAA is not asking the Court to "re-weigh those costs," as ED insists.  ED MSJ, Dkt. 23, at 32.  Instead, COPAA argues that ED failed to account for the costs of delay to children, parents, and society and refused to consider the associated reliance costs.  The Court does not need to re-weigh the factors because ED failed to consider these important costs altogether.

Regarding costs to children, parents, and society, ED failed to account for any cost associated with two of the identified benefits: transparency and increased stakeholder participation.  *See* COPAA MSJ, Dkt. 15, at 35-36.  Indeed, ED does not engage with COPAA's point that the Delay Regulation negated the transparency benefit because its purpose was "'to foster greater transparency in how States identify significant disproportionality'" by adopting "'simply and easily interpreted analyses.'"  COPAA MSJ, Dkt. 15, at 36 (quoting 81 Fed. Reg. at 92404).  Instead, ED contends that the transparency and stakeholder involvement benefits have already accrued.  ED MSJ, Dkt. 23, at 32-33 (citing 83 Fed. Reg. at 31315).  ED's argument, however, does not show that it considered the costs to expanded transparency and stakeholder involvement due to the Delay Regulation.  That is because ED did not consider or explain how any transparency or stakeholder involvement gains would continue with the Delay Regulation in place.

As for the remaining benefits – comparability of inter-state data, reduction in inappropriate policies and practices, and expanded funds for comprehensive CEIS – ED concedes that it only found these costs to be mitigated "in part."  ED MSJ, Dkt. 23, at 33.  ED does not dispute that it failed to consider all the relevant factors pertaining to these benefits.  *See id.*  Instead, ED frames COPAA's argument as a disagreement with how ED weighed those costs.  *Id.*  To the extent COPAA disagrees with ED's weighing of the costs, it is because ED

failed to consider certain costs all together.  COPAA MSJ, Dkt. 15, at 36-38.  In particular, ED failed to acknowledge that certain LEAs that will not receive the benefit of a state-provided review of policies, practices, and procedures or an evaluation of the root-cause of the disproportionality, and that more students will continue to be inappropriately identified, placed, and/or disciplined.  ED makes no mention of these students, and yet, they suffer the biggest cost of all.  Indeed, the students are the focus of the congressional policy aimed at monitoring and studying the problem of significant disproportionality.

ED did not take reliance costs seriously either.  ED's attempts to argue that it earnestly considered such reliance costs fall short.  ED MSJ, Dkt. 23, at 33-34.  The three sentences it on which it relies overtly dismiss reliance costs as inconsequential.  ED characterized these costs as "sunk investments," and concluded that it "would not be appropriate to assign their value as either a cost or benefit."  83 Fed. Reg. at 31316.  This does not explain why the agency refused to consider these costs as either a cost or benefit, and simply saying that it "would not be appropriate" to do so is not an explanation for why ED disregarded them.  Dismissively ignoring reliance costs is reason enough to find the Delay Regulation arbitrary and capricious.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126-27 (2018) (invalidating regulation for not considering reliance costs).

Moreover, there is no dispute that such reliance costs exist.  Indeed, the Delay Regulation acknowledges that "expenditures [were] already incurred" and "States would be unable to recover those expenses."  83 Fed. Reg. at 31316.  ED attempts to downplay the reliance costs by arguing that the "false choice" raised by COPAA is untrue because states have a choice to implement either the standard methodology or an existing methodology.  ED MSJ, Dkt. 23, at 34.  But it is ED's claim that states "would not 'be required to recreate the work already

34

completed' in two years' time," (*id.* (quoting 83 Fed. Reg. at 31316)), which is a false promise.  States that choose to abandon the standard methodology in favor of a pre-existing methodology must take a loss in wasted resources.  ED endeavors to justify these wasted resources by pointing to generalized benefits that "*could* offset such reliance costs."  *Id.* (emphasis added) (citing 83 Fed. Reg. at 31315-16).  This does not change the fact that states expended resources in reliance on the 2016 Regulations and that it was all for naught.  Despite ED's efforts to reduce the significance of reliance costs, the agency's failure to consider these costs is reason enough to invalidate the regulation.

    **F.**    **ED Provided No Meaningful Opportunity To Comment On The Delay Regulation.**

        The notice-and-comment process was a mere charade, in violation of the APA.  ED's actions prior to the NPRM showed that it had already decided that it was going to delay the 2016 Regulations.  That closed-mindedness was confirmed by the initial instruction of the NPRM itself:  "We will consider comments on proposed delayed compliance dates only and will not consider comments on the text or substance of the final regulations."  83 Fed. Reg. at 8396.  The events that followed, including the cursory treatment of comments on the costs of delay and reasonable alternatives, discussed above on pages 27-35, *supra*, underscore ED's lack of open-mindedness.  And the contents of the Administrative Record ED submitted in November 2018 confirm ED's predetermination.

        In determining whether an agency was sufficiently open-minded to comply with the APA, the D.C. Circuit's decision in *Rural Cellular Association v. FCC*, 588 F.3d 1095 (2009), provides the governing standard.  The cases on which ED relies (ED MSJ, Dkt. 23, at 39-40), by contrast, apply the constitutional due process standard articulated in *Association of National Advertisers v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979), for determining when officials must recuse

themselves.  The standards are distinct, and the APA standard is less forgiving.  *See California v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1071 n.6 (N.D. Cal. 2018) (holding that APA standard is distinct from constitutional recusal standard).  In *Rural Cellular*, the D.C. Circuit held that the APA requires the agency to offer a "meaningful opportunity" to participate in rulemaking, which includes the obligation that the agency "must remain sufficiently open-minded."  588 F.3d at 1101.  ED's actions here cannot pass that test.

First, ED's spokesperson said in December 2017 that "the Department is looking closely at this rule and has determined that while this review takes place, it is prudent to delay implementation for two years."  83 Fed. Reg. at 31311.  ED argues (ED MSJ, Dkt. 23, at 40) that this statement is not remarkable, emphasizing the word "prudent" in the statement.  But ED ignores (and in fact does not even repeat) the spokesperson's use of the phrase "has determined."  Months before the NPRM was issued, ED had already made a determination of its course of action: delay.  ED did not equivocate or suggest that this was a mere proposal subject to the APA-mandated processes.

Second, ED's formal decision not to collect certain significant disproportionality data from states, made a month prior to the spokesperson's statement and several months prior to the NPRM, likewise shows ED's mind was already made up.  As ED acknowledges (MSJ, Dkt. 23, at 40), ED proposed in July 2017 (six months into this Administration) to collect this data from states for the 2018-19 school year.  Despite the fact that it received only comments supporting the collection of this data,[16] ED reversed course in November 2017.  COPAA MSJ, Dkt. 15, at 6. ED argues that because the timing of the collection of the data was discretionary and not a

---

[16] U.S. Dep't of Educ., *1820-0300 Annual State Application under Part B of the Individuals with Disabilities Act – Responses to Comments – November 8, 2017* (Nov. 21, 2017), https://www.reginfo.gov/public/do/DownloadDocument?objectID=78801601.

condition precedent to compliance with the 2016 Regulations, its decision not to collect the data

is no evidence it had reached a decision about the Delay Regulation.  But ED identifies no *other*

reason for not deciding not to get authorization to collect the data.  The only fair inference is that

ED did not want to collect the data because it had already decided to delay the 2016 Regulations

– well before the NPRM was issued.  If ED was merely concerned about uncertainty of the 2016

Regulations' status, it could have sought permission to collect the data, and then declined to do

so if, after notice-and-comment, the 2016 Regulations were delayed.

Third, ED limited the comments it would consider, warning potential commenters that it

would "not consider comments on the text or substance of the final regulations."  83 Fed. Reg. at

8396.  As COPAA showed (COPAA MSJ, Dkt. 15, at 44), multiple courts have held such

comment "content restrictions" violate the APA when the text and substance are relevant to the

grounds for delay.  *See also N.C. Growers' Ass'n, Inc. v. United Farm Workers,* 702 F.3d 755,

770 (4th Cir. 2012) ("[T]he content restriction was so severe in scope, by preventing any

discussion of the 'substance or merits' of either set of regulations, that the opportunity for

comment cannot be said to have been 'a meaningful opportunity.'").

ED addresses none of these cases.  Instead, it elects to argue only (ED MSJ, Dkt. 23, at

41-43) that it met a separate APA requirement that the agency's proposed change be clear to

readers.  To be sure, the 2018 NPRM was clear that the agency wanted to delay the 2016

Regulations.  But ED's instructions regarding what comments were permissible discouraged

comments on the grounds ultimately relied on by the agency, *i.e.*, concerns about the substance

of the 2016 Regulations.  As Judge Wilkinson explained in a similar situation:

> The confusion was further compounded when the [NPRM regarding delay] invited
> comments on whether the Department should suspend the [existing] regulations, but then
> stated that comments concerning the "substance or merits" of those very same regulations
> "will not be considered."  How in the world was a prospective commenter to know what

37

could and could not be commented on, or what the agency would or would not deem worthy of its attention?

*N.C. Growers' Ass'n,* 702 F.3d at 772 (Wilkinson, J., concurring) (citation omitted).

ED suggests (ED MSJ, Dkt. 23, at 42-43) that the comprehensive comment COPAA submitted undermines this argument. Near the beginning of its comment, COPAA flagged this instruction and asked ED that a further opportunity for comment be provided after the instructions were clarified, but also elected to raise its substance-related concerns "contrary to the NPRM's instructions" out of an abundance of caution. AR 1926; *see also* AR 2185 n.8 (similar comment by Consortium for Citizens with Disabilities). Other individual commenters were more conservative and expressly stated that they were confused by those instructions, *see, e.g.*, AR 1669, or had truncated their comments in response to those instructions*, see, e.g.,* AR 1589, 1590, 1594, 1602, 1604, 1608, 1613, 1617, 1624. There is no way to know how many commenters did not participate in the process at all because of ED's instructions, or what they might have said. "The court cannot brush aside this procedural violation of the Act and determine that it was harmless error, because there is no way for the court to determine that Plaintiffs experienced no harm" from the violation. *Level the Playing Field v. FEC*, 232 F. Supp. 3d 130, 143 (D.D.C. 2017) (Chutkan, J.).[17]

---

[17] ED has not argued, and has therefore forfeited, any argument that these errors, separately or together, were harmless. *See United States v. Davis*, 596 F.3d 852, 861 (D.C. Cir. 2010) (court need not address harmless error when government fails to raise it); *cf. Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 851 n.16 (D.C. Cir. 1970) ("The doctrine must be used gingerly, if at all, when basic procedural rights are at stake."). In any event, "a showing of actual prejudice is not required;" it is enough that commenters could make "a colorable claim that [they] would have more thoroughly presented [their] arguments had [they] known that the [agency] was contemplating" the substance of the 2016 Regulations. *Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003); *see also Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991) (per curiam) (holding that agency must offer "persuasive evidence that possible objections to its final rules have been given sufficient consideration").

Finally, ED's compilation of the Administrative Record for this action further shows that the delay of the 2016 Regulations was foreordained.  ED "bear[s] the burden of compiling the materials and documents it considered, either directly or indirectly."  *Beyond Nuclear v. U.S. Dep't of Energy*, 233 F. Supp. 3d 40, 48 (D.D.C. 2017) (Chutkan, J.).  In this instance, ED included in the Administrative Record just seven comments received in response to its pre-NPRM request "seeking input on regulations that may be appropriate for repeal, replacement, or modification."  82 Fed. Reg. 28431, 28431 (June 22, 2017); *see* AR 1306-49 (seven comments).  But ED did not include in the Administrative Record any of the comments received in response that urged that the 2016 Regulations *not* be amended or delayed.  This is so even though COPAA called ED's attention to several such comments in its response to the Delay Regulation NPRM.  *See* AR 1927 & nn.9, 10, 11.  ED's Administrative Record thus, by definition, shows that it did not consider *any* of the comments that opposed initiating proceedings to delay the 2016 Regulations.[18]

In a last-ditch effort to defend the process, ED is forced to fall back on the presumption of regularity.  ED MSJ, Dkt. 23, at 39-41.  But it has been long established that even when an agency action is "entitled to a presumption of regularity, . . . that presumption is not to shield [an] action from a thorough, probing, in-depth review."  *Lefrancois v. Mabus*, 910 F. Supp. 2d 12, 18 (D.D.C. 2012) (Collyer, J.) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).  This is particularly so when the relevant question relates to a court

---

[18] COPAA could not raise this specific argument about the Administrative Record earlier because ED filed the Administrative Record with the court belatedly, and only after COPAA had filed its motion for summary judgment.  In its comments in response to the NPRM, COPAA anticipated this argument by raising the issue "why the [seven] comments [ED] described [in the NPRM] warranted credence, but the many comments filed that urged ED to retain the 2016 final regulations – submitted by members of Congress, organizations, educators, and parents – were completely disregarded."  AR 1927; *see also* Compl., Dkt. 1, at ¶ 92.

"[r]eviewing the procedures through which agencies develop legislative rules," which "falls within the court's 'special areas of competence.'" *Chamber of Commerce v. SEC*, 443 F.3d 890, 899-900 (D.C. Cir. 2006) (alterations omitted).

Viewed as a whole, the course of these proceedings "giv[e] the impression that the agency had already made up its mind and that the comment period was, at best, for show and provided only in an effort to do the minimum necessary to squeak by judicial review." *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring). This Court should not let the delay of an important regulation squeak by.

## IV.    THE APPROPRIATE REMEDY IS VACATUR.

ED suggests (ED MSJ, Dkt. 23, at 43) that the usual remedy for an APA violation is merely remand without vacatur. This is incorrect: "vacatur is the normal remedy." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014). The APA "itself contemplates vacatur as the usual remedy when an agency fails to provide a reasoned explanation for its regulations." *AARP v. EEOC*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017) (Bates, J.). The APA provides that courts shall "hold unlawful *and set aside*" an agency action found to be arbitrary and capricious or without observance of procedure required by law. 5 U.S.C. § 706(2) (emphasis added). "The Supreme Court and the D.C. Circuit Court have held that remand, *along with vacatur*, is the presumptively appropriate remedy for a violation of the APA." *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010) (Lamberth, J.) (emphasis added).

Courts routinely vacate agency action where an agency – like ED here – has failed to provide a reasoned explanation for its determination, failed to consider reasonable alternatives, or failed to provide for meaningful participation. *See, e.g.*, *Allina Health Servs.*, 746 F.3d at 1110-11 (vacating for failure to provide sufficient notice); *Comcast Corp. v. FCC*, 579 F.3d 1, 8

(D.C. Cir. 2009) ("In the past we have not hesitated to vacate a rule when the agency has not

responded to empirical data or to an argument inconsistent with its conclusion."); *Ill. Pub.

Telecommc'ns Ass'n v. FCC*, 123 F.3d 693, 694 (D.C. Cir. 1997) ("[W]e have vacated FCC rules

even when we have not foreclose[d] the possibility that the Commission may develop a

convincing rationale for re-adopting the same rule on remand."); *NAACP v. Trump*, 298 F. Supp.

3d 209, 244-45 (D.D.C.) ("[U]nsupported agency action normally warrants vacatur."), *adhered

to on a denial of reconsideration*, 315 F. Supp. 3d 457 (D.D.C. 2018) (Bates, J.), *appeal

docketed*, No. 18-5245 (D.C. Cir. Aug. 13, 2018).  Indeed, in *Air Alliance*, the D.C. Circuit

recently vacated a delay rule that was arbitrary and capricious for the same fundamental error –

failure to provide a reasoned basis for delay – that ED has committed here.  *Air All. Hous.*, 906

F.3d at 1069.[19]

Remand without vacatur is only appropriate in circumstances where the agency can show

that the disruptive consequences of vacating the regulation outweigh the deficiencies in the

agency's action.  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51

---

[19] ED mischaracterizes *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985), to support
its assertion that, "where the record before an agency does not support the agency action . . .
except in rare circumstances," courts merely remand as opposed to vacate and remand.  ED MSJ,
Dkt. 23, at 43.  That case did not address whether the court should vacate an agency rule that
violates the APA or instead merely remand for further explanation.  Instead, it held that, except
in rare circumstances, a court is not "empowered to conduct a de novo inquiry into the matter
being reviewed and to reach its own conclusions" when "the record before the agency does not
support the agency action."  *Fla. Power & Light Co.*, 470 U.S. at 744.  ED's reliance on
*Northern Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012), is likewise
misplaced.  *Northern Air Cargo* did not involve an agency rulemaking but rather a challenge to a
decision by the Postal Service, an agency "exempt from review under the Administrative
Procedure Act," whose "actions are reviewable to determine whether it has acted in excess of its
statutory authority."  *Id.*  And the language quoted by ED, like the language of *Florida Power*,
was distinguishing between the court deciding for itself and remanding to the agency, not
between vacating and remanding or merely remanding.

(D.C. Cir. 1993).  ED would have to demonstrate that disruptive consequences would be rather dire because, as shown above, the deficiencies in ED's rulemaking are numerous and significant. *See, e.g.*, *Am. Great Lakes Ports Ass'n v. Zukunft*, 301 F. Supp. 3d 99, 105 (D.D.C. 2018) (Contreras, J.) (finding that deficiencies including failure to consider significant aspects of the problem are significant and weigh in favor of vacatur), *appeal docketed*, No. 18-5167 (D.C. Cir. May 31, 2018).  ED suggests (ED MSJ, Dkt. 23, at 44) that it might be able to provide "a more fulsome explanation" of the Texas example, but ED has failed to provide such explanation in its NPRM, the final rule, or its opposition to summary judgment and offers no reason why this Court should believe it might be able to do so on remand.  More fundamental, ED does not and cannot show that the Texas example involves comparable circumstances to the 2016 Regulations when it did not address race and contained none of the 2016 Regulations' safeguards to address the risk of quotas.  *See* pages 13-19, *supra.*

On the other side of the balance, ED contends (ED MSJ, Dkt. 23, at 44-45) that vacatur "could be" disruptive because some states may be unprepared to comply with the 2016 Regulations.  But states were supposed to be prepared, after an 18-month compliance window, to comply as of July 1, 2018.  The Delay Regulation allowed states to temporarily halt steps they had already taken to comply with these regulations.  There is no evidence that any state was not ready or able to comply at the time ED delayed the regulation on July 3, 2018.  To the contrary, "many States" told ED that they intended to "implement the standard methodology . . . even if the Department delays these regulations."  83 Fed. Reg. at 31309, 31312-13.

ED relies on Kentucky as its only example of a state that said it needed additional time. ED MSJ, Dkt. 23, at 44-45.  This example is without force, however, because Kentucky decided to "move forward with implementing the regulations around significant disproportionality as

42

described in the December 2016, release" despite the Delay Regulation. *Commissioner's Monday Message – on Tuesday, July 3, 2018 from Wayne D. Lewis, Jr., Interim Commissioner of Education*, Ky. Dep't of Educ.: Monday Superintendent Emails (July 3, 2018), https://education.ky.gov/CommOfEd/mon/Pages/July-2-2018.aspx.  The same is true of Alabama, which advocated in support of the Delay Regulation so that it could continue to prepare technical assistance for its school districts, but then decided to use the standard methodology this school year.  AR 2225; André Aff., Dkt. 20-1, at 9.

ED further alleges that vacatur "could require States . . . to switch to using the standard methodology in the midst of a school year," which "could be extremely disruptive, especially where districts have already set their budgets."  ED MSJ, Dkt. 23, at 44.  It offers no support for that assertion.  By contrast, COPAA has been in contact with a number of states that have elected to take advantage of the Delay Regulation and have not yet made their significant disproportionality determinations for this school year.  *See* Adams Aff. II ¶¶ 16-35.  Vacatur is not disruptive where "the timing of the vacatur is scheduled in a manner to avoid any disruptive consequences."  *Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) (Howell, J.).

Vacating a delay order, as opposed to a new regulation, is also not disruptive because "vacating the Delay Rule would simply allow the [original] [r]ule to take effect, as the agency originally intended."  *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 21 (D.D.C. 2017) (Boasberg, J.); *cf. Air All. Hous.*, 906 F.3d at 1068 (discussion of status quo).[20]  Indeed, vacatur

---

[20] Further, to the extent that there may be some disruption because the middle of the school year approaches, ED does not have clean hands.  It is primarily responsible for the timing.  ED did not issue the Delay Regulation until just after the last possible moment – the delay of the July 1, 2018 compliance date was not published in the Federal Register until July 3 – and COPAA filed suit nine days later.  COPAA has repeatedly sought ED's agreement to expedited briefing in

is particularly warranted where the arbitrary and capricious action at issue centers on imposing a delay in implementing the lawfully promulgated regulation.  Remand without vacatur would enable the agency to achieve the very delay it has failed to justify in its rulemaking.  *See NRDC v. EPA*, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."); *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 21 (vacating delay rule and declining to stay vacatur because "[t]o so order would simply remedy the agency's delay with more delay"); *cf. Bauer v. DeVos*, No. 17-cv-1330, 2018 WL 4483783, at \*3 (D.D.C. Sept. 17, 2018) (Moss, J.) ("Because this case is about the consequences of delay, however, the Court is mindful that, in crafting the appropriate remedy, time is of the essence. The further delay that would result from remanding the Section 705 Stay to the Department for further explanation without vacatur risks depriving Plaintiffs of meaningful relief."); *NAACP*, 298 F. Supp. 3d at 245 (noting that "the Court is also mindful that, as several judges of the D.C. Circuit have noted, remand without vacatur 'sometimes invites agency indifference'" and explaining that "[t]his concern is particularly acute here, where each day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action.").

---

order to ensure that it could obtain full relief if it prevailed, and ED has repeatedly refused.  André Aff., Dkt. 20-1, at 1-2.  COPAA raised this very concern about remedies in its comments to ED, stating that "the timing of the NPRM's publication, in context, raises concerns that ED is at least recklessly – if not intentionally – planning to issue the final delay regulation so late in the process that aggrieved individuals and organization will not have time to seek and obtain judicial review prior to the final delay rule's effective date," and predicting that ED would argue in any lawsuit that "it is too late to undo what the final delay regulation would do." AR 1939-40.  ED responded at the time that "[n]othing the Department has done prevents an aggrieved party from seeking judicial review after this document is published." 83 Fed. Reg. at 31312.  ED should not be allowed, now, to argue that it is too late to obtain meaningful relief.

In addition, vacatur is warranted because, as COPAA has demonstrated, allowing the delay to continue imposes serious harm on families, students, and society at large.  COPAA MSJ, Dkt. 15, at 3-5, 9-10.  "[V]acatur is appropriate in order to prevent significant harm resulting from keeping the agency's decision in place."  *Sierra Club*, 719 F. Supp. 2d at 80.  For all these reasons, this Court should order the "normal" remedy and vacate ED's Delay Regulation and remand it to ED for further proceedings.

## CONCLUSION

For the foregoing reasons, the Court should deny ED's motion for summary judgment, grant COPAA's cross-motion for summary judgment, and vacate the Delay Regulation.

## REQUEST FOR A HEARING

Pursuant to Local Rule 7(f), COPAA requests an oral hearing on this matter.  Further, because ED has suggested that the appropriate remedy may depend on the timing of the Court's decision (ED MSJ, Dkt. 23, at 44-45), and because this case concerns delay and the harms that continued delay causes, oral argument is requested as soon as practicable for the Court.

Dated: November 30, 2018

Respectfully Submitted,

/s/ Jennifer J. Clark

Michael Harris (*admitted pro hac vice*)
NATIONAL CENTER FOR YOUTH LAW
405 14th St., 15th Floor
Oakland, CA 94612
Telephone: (510) 835-8098
Facsimile: (410) 835-8099
mharris@youthlaw.org

Jennifer J. Clark (Bar No. 1003483)
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
jennifer.clark@sidley.com

Jean-Claude André (*admitted pro hac vice*)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 400
Los Angeles, CA 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
JCAndre@sidley.com
*Counsel for Plaintiff*